

40 North Central Avenue
Phoenix, Arizona 85004-4429

Susan M. Freeman, Arizona .State Bar No. 004199
Direct Tel. (602) 262-5756
Direct Fax (602) 734-3834
Email: SFreeman@LRLaw.com

Rob Charles, Arizona State Bar No. 7359
Direct Tel. (520) 329-4427
Direct Fax (520) 879-4705
Email: RCharles@LRLaw.com

Marvin C. Ruth - Arizona State Bar No. 024220
Direct Tel. (602) 262-5770
Direct Fax (602) 734-3909
Email: MRuth@LRLaw.com

Proposed Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>MONDRIAN TTL, L.L.C., a Delaware limited liability company,<br><br>                    Debtor.<br><br>EID # 20-1473299<br><br>GRIGIO TTL, L.L.C., an Arizona limited liability company,<br><br>                    Debtor.<br><br>EID #20-5787568 | Case No. 2:10-bk-14140-RJH<br><br>Case No. 2:10-bk-14141-JMM<br><br>Chapter: 11<br><br>Jointly Administered Under<br>Case No. 2:10-bk-14140-RJH<br><br>**Emergency Motion For Interim Order To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; Compelling Release of Estate Funds From Debtor's Pre-Petition Deposit Accounts**<br><br>Hearing Date: TBA<br>Hearing Time: TBA |

      Mondrian TTL L.L.C., a Delaware limited liability company ("Mondrian" or "Debtor") moves, on an emergency basis, pursuant to Sections 105(a) and 363 of the United States Bankruptcy Code (the "Bankruptcy Code") for an Interim Order (the "Interim Order"): (a) authorizing Debtor to use certain cash and cash equivalents (the "Cash") in which various creditors may claim an interest ("Interested Parties") to pay necessary and essential postpetition operating expenses and for certain emergency

2188690.3



expenses whenever incurred, as reflected in Debtor's Cash Flow Budget (the "Budget")[1] attached hereto as Exhibit "A", (b) deeming prepetition secured parties adequately protected pursuant to § 363, and (c) compelling KeyBank and TPG (Grigio) Note Acquisition, LLC ("Picerne") to release estate funds from Debtor's prepetition deposit accounts for deposit into Debtor's insured debtor in possession account as required by the United States Trustee guidelines, including the segregated tenant security deposit funds.

> This Motion does not seek the kind of relief identified in Local Bankruptcy Rule 4001-4(b).

This Motion is supported by the Omnibus Declaration of Brian Kearney in Support of Chapter 11 Case (the "Kearney Declaration") [Docket # _]. In support of this Motion, Debtor represents as follows:

## PROCEDURAL BACKGROUND

1. On May 10, 2010 (the "Petition Date"), Mondrian filed a voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

2. Mondrian's petition was filed in conjunction with the petition filed by Grigio TTL L.L.C., an Arizona limited liability company. The debtors have sought joint administration of their estates.

3. Mondrian continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

---

[1] The Budget provides a cash flow projection for Debtor covering the remainder of 2010 that has been prepared by management.

2188690.3



1  5. The predicates for the relief requested are 11 U.S.C. §§ 105(a) and 363 and
2  Bankruptcy Rule 4001.

**BACKGROUND**

**Debtors' Business and Assets**

6. Mondrian is the owner of the leasehold interest in an apartment complex known as Grigio Tempe Town Lakes, in Tempe, Arizona (the "Apartment Building"); and is affiliated with multiple entities owned by Bruce Gray or entities he controls ("Gray Companies").

7. The Gray Companies buy land, obtain entitlements and zoning for construction of apartment buildings, arrange for the design and construction of the apartment buildings, lease the apartments to tenants, then sell the buildings as leased. The Gray Companies have built 28 such apartment communities in Arizona and other states and sold 17 of them. The business was profitable and successful until the recent economic downturn impaired the ability of potential purchasers of the buildings to obtain financing for such acquisitions, and made it impossible for Gray to find permanent financing to repay the current construction note owed by Mondrian.

8. The Apartment Building project commenced in 2005 and was completed in 2008. The Apartment Building is approximately 90 percent leased. Tenant leases are signed by individual tenants on a form listing the name of the Apartment Building owned by Mondrian.

9. The Apartment Building and other apartment buildings owned by Gray Companies are managed by Gray Residential, L.L.C. ("Gray Residential") pursuant to management agreements. Another Gray Company, GDG Partners, L.L.C. ("GDG Partners"), employs all persons who work at the Apartment Building and other Gray Companies apartments. This arrangement allows properties affiliated with Gray Companies to obtain employee services at a lower cost than would be available without

2188690.3



consolidated purchasing power. Gray Residential acquires and maintains property and liability insurance covering the Apartment Building and other Gray Companies apartments, with premiums paid by GDG Partners. This insurance program allows properties affiliated with Gray Companies to obtain necessary insurance coverage at a price and on terms more favorable to the properties than would be available without a consolidated program. Mondrian's allocated share of insurance premiums, employee wages and benefits, and other cost advances are charged to Mondrian on a regular basis by GDG Partners. Mondrian's last such payment for payroll of Apartment Building staff was made on May 7, 2010.

10. Mondrian directly contracts with vendors for operation and maintenance needs other than employees and insurance.

11. The Apartment Building and related improvements and the land on which the Apartment Building is located were conveyed to the City of Tempe and leased back to Mondrian pursuant to a Land and Improvements Lease (C2004-130C) dated as of November 30, 2009, pursuant to a Development Agreement dated as of June 23, 2004 (C2004-130). Under that agreement and the lease, the City granted to Mondrian statutorily-authorized Government Property Lease Excise Tax ("GPLET") status for a 35-year period. During the first eight years of the lease beginning in December 2009, Mondrian's rent in-lieu of property taxes will be $0 during the eight-year abatement period. Mondrian pays nominal rent to the City, may lien its leasehold interest (and has done so to first and second lienholders, as noted below), and is entitled to transfer its leasehold interest freely.

**The Secured Creditors**

A. **KeyBank - Now TPG (Grigio) Note Acquisition LLC**

2188690.3



12. Mondrian's principal secured debt is in the amount of $62,675,000 ("Senior Note"), collateralized by a first priority security interest in the Apartment Building. The original lender was KeyBank.

13. The Senior Note matured in March 2009. KeyBank did not issue a default notice. Mondrian and KeyBank entered into a forbearance agreement that expired in March 2010, although payments continue to be made as provided by the forbearance agreement. Mondrian has tried to refinance the Senior Note, but in light of the constraints of the current capital markets, has not succeeded in that effort.

14. Bruce Gray, GDG Enterprises, L.L.C. and Gray Meyer Fannin, L.L.C. guaranteed the Senior Note. The guaranty amount is currently 50% of the amount of the debt.

15. Interest on the Senior Note is payable at the prime rate (currently 3.25%) on $62 million (the initial construction loan) and at 15% on $675,000 (an advance made when the parties entered into the 2009 forbearance agreement). Default rate interest has not been charged on the Senior Note.

16. Under the forbearance agreement with KeyBank, as later amended, tenant rent payments have been made directly to a controlled account at KeyBank, and related income and tenant payments by manual checks were deposited into the same account. By the 15th of each month, Mondrian submitted a list of its proposed expenditures with supporting documents to KeyBank. The rental and related income was used to pay, in the following order: (1) monthly reserves for estimated tax/CFD, GPLET and insurance payments, (2) operation and maintenance expenses, (3) reimbursement to KeyBank for any costs and expenses incurred in connection with the forbearance agreement, (4) interest on the $675,000 KeyBank advance and the $62 million construction loan, and (5) the balance directed to an escrow account at KeyBank for City of Tempe deferred water and

2188690.3



sewer assessments estimated at $1.9 million. Any excess would be used to pay the principal amount of the Senior Note.

17. Monthly income generated by tenants has been sufficient to pay the waterfall obligations, including interest on the Senior Note, but not full payment of the water and sewer escrow and thus not principal on the Senior Note. Approximately $250,000 to $350,000 has been deposited and spent each month under this arrangement since December 2009.

18. On May 5, 2010, Mondrian was advised that KeyBank had sold the Senior Note to TPG (Grigio) Note Acquisition LLC, which Mondrian understands is an entity formed and owned by The Picerne Group, Inc. ("Picerne") at an unknown discounted amount.

B. **City of Tempe**

19. The City of Tempe holds a second priority security interest in the Apartment Building in the principal amount of $10 million, with accrued and deferred interest at 5%. The City indebtedness is owed by GDG Partners, and Mondrian in turn owes GDG Partners under a $10 million note secured by a deed of trust. The debt is derived from a settlement of various claims by Gray Companies against the City entered into on June 15, 2006. Under the settlement agreement, the City advanced $10 million to GDG Partners which GDG Partners used for the Mondrian Apartment Building. GDG Partners undertook other obligations in the settlement agreement, including paying for the replacement of the rubber dams that form Tempe Town Lake. GDG Partners assigned to the City its beneficial interest in the Mondrian second priority deed of trust to secure that obligation.

20. Pursuant to a Subordination and Intercreditor Agreement dated as of November 21, 2006, as amended, the City of Tempe agreed that it would receive no

2188690.3



payment on its junior secured indebtedness until the Senior Note is paid in full with all interest and other payments due under the Senior Note loan documents.

C. **Babson Mezzanine**

21. Mondrian is indebted to Cornerstone Real Estate Advisers, LLC (f/k/a Babson Mezzanine Realty Advisors LP ("Babson"). The principal amount of the Babson debt is $8,600,000, and it accrues interest at 15% per annum, or, in the event of a default, at 17% per annum, pursuant to a Loan Agreement entered into by Mondrian and Babson on November 21, 2006 (the "Babson Note"). The Babson Note is secured by Grigio's 100 percent membership interest in Mondrian pursuant to a Membership Pledge and Security Agreement entered into by Grigio and Babson on November 21, 2006 (the "Pledge Agreement"). Pursuant to the Babson Note, an event of default exists if Mondrian is in default under the loan agreement with KeyBank. Consequently, the Babson Note is now in default. Mondrian and Grigio have been unsuccessful in their efforts to negotiate arrangements to satisfy the Babson debt.

22. Pursuant to an Intercreditor Agreement dated as of November 21, 2006, as amended, Babson agreed that it would receive no payment on the Babson Note until the Senior Note is paid in full with all interest and other payments due under the Senior Note loan documents.

23. Under the Babson Note and the Pledge Agreement, Babson has the right to enforce its security interest in Grigio's membership interest in Mondrian and thereby take control of Mondrian. Debtors have been advised that Picerne may be acquiring the Babson Note and plan to take such action, prompting these bankruptcy filings.

**Adequate Protection of Secured Creditors**

24. Mondrian needs to use tenant income held at KeyBank in controlled accounts assigned to Picerne, and to continue using post-petition tenant income to pay operating and maintenance expenses and required escrows. Mondrian must have access to

2188690.3



cash collateral to operate the Apartment Building and provide necessary services to the tenants. As the cash flow from the Apartment Building exceeds the operating expenses, accruing tax obligations, and is sufficient to pay interest on the Senior Note, using tenant income for this purpose in and of itself provides a significant form of adequate protection to secured creditors, by supporting and enabling an ongoing flow of tenant income.

25. The Budget was prepared by management as a budget of operating income and expense for the Apartment Building for 2010, broken down by month. Actual income and expenses for the first quarter of 2010 have been less than the budgeted amounts, fluctuating within a range of approximately 10%. Mondrian proposes to pay the actual expenses needed to properly manage and maintain the value of the Apartment Building, which are expected to be consistent with but somewhat less than the amounts reflected in the Budget.

26. Mondrian is willing to continue paying interest at the non-default rate, as it has for some time, to Picerne as the successor to KeyBank. Mondrian is also willing to grant a replacement lien to Picerne in the same assets, to the same extent and in the same priority as the lender had before the bankruptcy filing.

27. Mondrian proposes to continue its prepetition treatment of the City of Tempe's secured claim as well, with a second priority replacement lien in the same assets, to the same extent and in the same priority as the City had before the bankruptcy filing. While the cash flow has not been sufficient to pay interest on the City's claim, use of tenant income to operate and maintain the property provides adequate protection to the City until a transaction under a plan can be effected to pay the City along with other Mondrian creditors.

**Viability of the Debtor and Reorganization Plan**

28. Debtor expects to file a plan of reorganization in the first 60 to 90 days of this case, and Debtor expects that its plan of reorganization will provide for prompt

8

2188690.3



1 payment of allowed claims.  Debtor expects that the senior secured loan will be paid in full
2 from the proceeds of a sale or refinancing of the Apartment Building.

3     29.    In the meantime, Debtor will continue to provide its tenants with the highest
4 quality service that they have come to expect.  All tenant leases will be assumed.  Use of
5 Debtor's Cash during the interim will insure that Mondrian is current on its post-petition
6 obligations to the tenants.

**RELIEF REQUESTED**

8     30.    The Cash sought to be used by Debtor is or may be claimed as cash
9 collateral security by the Debtor's secured creditors listed above, particularly Picerne and
10 the City of Tempe.

11     31.    By this Motion, Debtor requests entry of an Interim Order authorizing the
12 use of Cash Collateral and as adequate protection to the Interested Parties of their interests
13 in the cash, replacement liens and security interests (the "Replacement Liens") on all
14 existing and hereafter acquired property and assets of Debtor, to the extent (if any) and of
15 the same type and character held by the creditor as of the Petition Date.  Debtor is also
16 willing and able to continue providing the first priority secured lender with monthly
17 payments of interest on the Senior Note at the non-default rate.  Since the City as second
18 priority lender agreed in its Subordination and Intercreditor Agreement that it would not
19 be paid until the senior lender was paid in full, no interest payment is offered as adequate
20 protection to the City.  Under the circumstances, the Replacement Liens and senior lender
21 interest adequately protect the interests claimed by the Interested Parties in the Cash.
22 Debtor should accordingly be granted authority to use the Cash.

23     32.    Debtor does not have sufficient available sources of working capital to
24 operate its business without the use of the Cash.  The ability of Debtor to meet its
25 obligations to tenants, pay employees, maintain business relationships with utilities,
26 vendors and suppliers, and otherwise finance its operations is essential to Debtor's

2188690.3



continued viability. In order to protect and preserve assets of the estate as described above, Debtor must be authorized to pay the essential postpetition operating expenses as described in the Budget. Absent payment of these essential operating expenses, Debtor's ability to protect and preserve estate assets will be severely limited, resulting in irreparable harm to Debtor and the estate.

33. All Cash is in the possession or control of the senior lender in controlled accounts at KeyBank. Debtor must be able to access the Cash to pay its administrative expense obligations, including access to tenant security deposit accounts when needed to provide refunds to tenants. The Cash needs to be moved to DIP accounts meeting U.S. Trustee Guidelines.

34. In order to continue its business, Debtor requests that the Court hold an emergency hearing to consider entry of the proposed Interim Order (attached to this Motion as Exhibit "B") authorizing Debtor to use the Cash, and directing the funds be moved to appropriate DIP accounts. Entry of the Interim Order will enable Debtor to continue to operate its business in a manner that will allow Debtor to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to the estate and all parties in interest, pending the final hearing on this Motion.

**LEGAL ARGUMENT**

35. Debtor seeks interim authorization from the Court to use the Cash to pay essential postpetition operating expenses as described in the Budget. The Interested Parties may claim a security interest in the Cash. Debtor is not aware of any other estate creditor that claims or may claim a lien or security interest in Cash, Cash equivalents, or accounts of Debtor.

**A.   The Interested Parties are Adequately Protected.**

36. Pursuant to 11 U.S.C. § 363(c) and (e), a debtor-in-possession may use funds claimed as cash collateral so long as any other person having or claiming an interest in the

2188690.3



cash collateral is "adequately protected." In this case, the Interested Parties are the only creditors which claim a lien (or may claim a lien) or security interest in the Cash.

37. Under Section 552(a) of the Bankruptcy Code, except as provided in § 552(b), particularly as to rents, and absent a Court order, prepetition security interests do not attach to property acquired by the estate or by the debtor postpetition. Notwithstanding § 552, as adequate protection, Debtor will agree to grant the Interested Parties replacement liens and security interests (the "Replacement Liens") on all existing and hereafter acquired property and assets of Debtor, to the extent (if any) and of the same type and character held by the creditor as of the Petition Date.

38. The Interested Parties' interests in the case are further preserved and protected by allowing Debtor to continue to operate the Apartment Building and to protect and preserve the value of its assets, including assets in which the Interested Parties claim an interest. Courts have repeatedly found that a debtor's use of cash collateral to maintain properties from which rents are being generated is a sufficient form of adequate protection.[2]

39. Therefore, to the extent that Debtor's Cash constitutes cash collateral security of the Interested Parties, their interests will be adequately protected.

40. Debtor reserves the right to seek restrictions on the Interested Parties' post-petition liens based on the equities of the case under § 552(b)(2) and to seek a surcharge under 11 U.S.C. § 506(c) and other applicable law.

---

[2] *See Federal Nat'l Mortg. Ass'n. v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 214 (N.D. Ill. 1993) ("[T]he required adequate protection of rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased."); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of cash collateral to maintain property); *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.)*, 88 B.R. 261, 167 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion).

2188690.3



## B. The Use Of The Cash To Pay Essential Postpetition Operating Expenses Is Essential To The Preservation Of Estate Assets.

41. As discussed above, Debtor must be permitted to use Cash to pay essential postpetition operating expenses as described in the Budget. Absent authority to pay these essential postpetition operating expenses, Debtor will be unable to maintain essential services necessary to continue operating postpetition. If Debtor is forced to completely cease its operations, valuable estate assets will be placed at substantial risk and the estate will suffer irreparable harm. The collateral securing the Interested Parties will significantly decline in value. Moreover, Debtor will lose the opportunity to successfully reorganize and to maintain its going concern value.

## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court enter an Interim Order:

A. Granting this Emergency Motion on an interim basis;

B. Authorizing Debtor to use the Cash in accordance with the Budget;

C. Transferring all funds from bank accounts at KeyBank now in the control of Picerne into new DIP accounts (with the tenant security deposit account at KeyBank transferred into a new tenant security deposit DIP account);

D. Setting a final hearing on the Motion as soon as possible 14 days after the date of the filing of the Motion; and

E. Granting such other and further relief as this Court may deem just and proper.

DATED May 9, 2010.

**LEWIS AND ROCA LLP**

By   /s/ Susan M. Freeman (#004199)
    Susan M. Freeman
    Rob Charles
    Marvin C. Ruth
Proposed Attorneys for Debtors

2188690.3

2188690.3