

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

40 North Central Avenue
19th Floor
Phoenix, Arizona 85004-4429

Susan M. Freeman Arizona State Bar No. 004199
E-mail: SFreeman@LRLaw.com
Telephone: (602) 262-5756
Facsimile: (602) 734-3824

Rob Charles, State Bar No. 007359
Direct Dial: (520) 629-4427
Direct Fax: (520) 879-4705
EMail: RCharles@LRLaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>MONDRIAN TTL, L.L.C., a Delaware limited liability company,<br><br>Debtor.<br><br>EID # 20-1473299 | Case No. 2:10-bk-14140-RJH<br><br>Chapter: 11<br>Jointly Administered<br><br><br>Case No. 2:10-bk-14141-RJH |
| In re:<br><br>GRIGIO TTL, L.L.C., an Arizona limited liability company,<br><br>Debtor.<br><br>EID #20-5787568 | **Disclosure Statement For Debtors' Joint Plan Of Reorganization Dated July 23, 2010, as Amended September 1, 2010** |

## DISCLAIMER

[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.][1]

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS-IN-POSSESSION, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

---

[1] Bracketed language will be deleted from the approved Disclosure Statement.

270126.14



ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF MONDRIAN TTL, L.L.C., GRIGIO TTL, L.L.C. OR ANY OF THEIR AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, MONDRIAN TTL, L.L.C., GRIGIO TTL, L.L.C. OR ANY OF THEIR AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

270126.14



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

Table of Contents

Article I. Introduction ..................................................................................................1

Article II. Disclaimers and Nature of Information Contained in Disclosure
    Statement ..............................................................................................................1

Article III. Answers to Commonly Asked Questions ................................................2

    A.    Who are the Debtors? ...............................................................................2

    B.    How long have Debtors been in Chapter 11? ......................................2

    C.    What is Chapter 11? ..................................................................................2

    D.    What are Debtors attempting to do through the Plan? ....................2

    E.    If The Plan Of Reorganization Governs How My Claim Is Treated,
        Why Am I Receiving This Disclosure Statement? ...............................3

    F.    Has this Disclosure Statement been approved by the Court? ..........3

    G.    Who provided the information in this Disclosure Statement? ..........3

    H.    How will the Plan of Reorganization treat my claim? ......................4

    I.    Why is confirmation of the Plan of Reorganization important? .....6

    J.    What is necessary to confirm the Plan of Reorganization? .............6

    K.    Are creditors entitled to vote on the Plan of Reorganization? .......7

    L.    When is the deadline for returning my ballot? .................................8

Article IV. Background and History of Debtors ........................................................8

    A.    Structure and Ownership of the Debtors .............................................8

    B.    Overview of the Debtors and Project .....................................................9

    C.    Project Construction Indebtedness .........................................................9

    D.    City of Tempe Government Property Lease Excise Tax Abatement ..........10

    E.    Debtors' Need For Restructuring ..........................................................11

    F.    Debtors' Management Through Affiliates ...........................................12

Article V. Summary of Debtors' Assets ....................................................................12

    A.    Mondrian Project .....................................................................................12

    B.    Grigio Property ........................................................................................15

    C.    Potential Avoidance Actions ..................................................................15

Article VI. Overview of Debtors' Debt and Claims ................................................16

    A.    Mondrian's Secured Creditors ...............................................................16

    B.    Mondrian's Unsecured Creditors ..........................................................17

    C.    Grigio Claims ............................................................................................18

Article VII. Actions And Proceedings During The Chapter 11 Case ....................19

    A.    Professionals Retained .............................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

270126.14


LEWIS
AND
ROCA
LLP
L A W Y E R S

| | | | |
|---|---|---|---|
| | B. | Request to Pay Prepetition Claims | 19 |
| | C. | Request to Use Cash Collateral | 19 |
| | D. | Bankruptcy Proceedings | 19 |
| | E. | Automatic Stay | 19 |
| | F. | Leases and Contracts | 20 |

Article VIII. Debtors' Business Operations After Filing The Chapter 11 Case ............ 20

Article IX. Summary of the Plan ............ 21

| | | | |
|---|---|---|---|
| | A. | Overview | 21 |
| | B. | Unclassified Claims | 21 |
| | C. | The Classes Of Claims Designated Under This Plan And Treatment Of Such Claims Are As Follows: | 23 |
| | D. | Treatment Of Executory Contracts And Unexpired Leases | 27 |

Article X. Means of Execution and Implementation of the Plan ............ 31

| | | | |
|---|---|---|---|
| | A. | Sale of Project | 31 |
| | B. | Cancellation of Existing Securities and Agreement. | 35 |
| | C. | Objections to Claims and Interests/Actions to Subordinate. | 38 |
| | D. | Compliance with Tax Requirements. | 38 |
| | E. | Conditions to Effectiveness of the Plan. | 39 |
| | F. | Corporate Action | 40 |
| | G. | Effectuating Documents; Further Transactions. | 40 |
| | H. | Discharged Claims and Terminated Interests. | 41 |
| | I. | Compromises And Settlements. | 42 |
| | J. | Setoffs. | 42 |
| | K. | Releases by Debtors | 42 |
| | L. | Exculpation and Limitation of Liability | 42 |

Article XI. General Considerations and Risk Factors To Be Considered ............ 43

| | | | |
|---|---|---|---|
| | A. | General Considerations | 43 |
| | B. | Certain Bankruptcy Considerations | 43 |
| | C. | Future Payments | 43 |

Article XII. Feasibility Of The Plan And The Best Interest Test ............ 44

| | | | |
|---|---|---|---|
| | A. | Feasibility Of The Plan | 44 |
| | B. | Acceptance of the Plan | 45 |
| | C. | Best Interests Test | 46 |
| | D. | Estimated Valuation Of The Reorganized Debtors | 47 |
| | E. | Application Of The Best Interests Test To The Liquidation Analysis And The Valuation Of The Reorganized Debtors | 47 |

Article XIII. Alternatives To Confirmation And Consummation Of The Plan ............ 48

270126.14



A.    Continuation Of The Bankruptcy Case .................................................. 48

B.    Alternative Plans Of Reorganization .................................................. 48

C.    Liquidation Analysis ........................................................................ 48

Article XIV. Tax Consequences Of The Plan ............................................. 49

A.    Debtors' Tax Consequences ............................................................ 51

B.    United States Federal Income Tax Consequences to Holders of Claims Against and Interests in Debtors ......................................... 51

C.    Information Reporting and Backup Withholding ............................ 55

D.    Importance of Obtaining Professional Tax Assistance ................. 55

Article XV. Definitions ................................................................................ 56

Article XVI. Conclusion/Recommendation ................................................. 56

270126.14



1                                              **Article I.**

2                                            **Introduction**

3       Mondrian TTL, L.L.C. and Grigio TTL, L.L.C., debtors and debtors in possession,

4 (collectively "Debtors") submit this Disclosure Statement in connection with their "Joint

5 Plan of Reorganization dated July 23, 2010, as Amended September 1, 2010" ("Plan"). A

6 copy of the Plan is attached to this Disclosure Statement as Exhibit "1." This Disclosure

7 Statement is intended to provide Creditors and interested parties with sufficient

8 information from which to make an informed decision when voting to accept or reject the

9 Plan. Debtors have submitted this Disclosure Statement for approval by the Bankruptcy

10 Court pursuant to Bankruptcy Code ("Code") § 1125. Code § 1125(b) prohibits

11 solicitation of an acceptance or rejection of a plan unless a copy of the plan or summary of

12 the plan is accompanied by a disclosure statement approved by the Bankruptcy Court.

13       All words or phrases used in this Disclosure Statement shall have their usual and

14 customary meanings. Capitalized words or phrases have the definitions set forth in the last

15 Article of the Plan.

16                                            **Article II.**

17    **Disclaimers and Nature of Information Contained in Disclosure Statement**

18       Debtors neither warrant nor represent that there are no inaccuracies in this

19 Disclosure Statement, although the information provided is accurate to the best of

20 Debtors' knowledge, information and belief. Creditors and interested parties should be

21 aware that Debtors' books and records, from which the information contained herein is

22 derived, have not been audited, and therefore could contain inaccurate information.

23 Debtors have taken reasonable steps to ensure that the information provided is materially

24 accurate to the best of their knowledge and belief.

25       MOREOVER, THE COURT HAS NOT VERIFIED THE ACCURACY OF THE

26 INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE

27 COURT'S APPROVAL HEREOF ONLY SIGNIFIES THAT IF THE INFORMATION

28 CONTAINED HEREIN IS ACCURATE, IT IS SUFFICIENT TO PROVIDE


1  CREDITORS AND INTERESTED PARTIES AN ADEQUATE BASIS TO DECIDE

2  WHETHER TO ACCEPT OR REJECT THE PLAN. COURT APPROVAL IS NOT A

3  JUDICIAL ENDORSEMENT OF THE PLAN.

4  ### Article III.

5  ### Answers to Commonly Asked Questions

6  As part of Debtors' effort to inform Creditors regarding the Plan and the plan

7  confirmation process, the following summary provides answers to various questions,

8  which are often asked by a party receiving a disclosure statement.

9  THE FOLLOWING SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY

10  THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.

11  **A.  Who are the Debtors?**

12  Mondrian TTL, L.L.C., a Delaware limited liability company, and Grigio TTL,

13  L.L.C., an Arizona limited liability company. Mondrian owns the Grigio Apartments at

14  Tempe Town Lake, 1001 E. Playa Del Norte, Tempe, AZ 85281. Grigio owns Mondrian.

15  **B.  How long have Debtors been in Chapter 11?**

16  Since May 9, 2010.

17  **C.  What is Chapter 11?**

18  Chapter 11 is the business reorganization section of the Bankruptcy Code. As

19  applicable here, it allows a debtor or creditor to submit a plan providing new terms for the

20  payment of one or more debtor's debts.

21  **D.  What are Debtors attempting to do through the Plan?**

22  The principal objective of a Chapter 11 case is confirmation of a plan of

23  reorganization that provides for payment of creditors in a fair way. A plan of

24  reorganization sets forth the means for treating impaired and unimpaired Claims against a

25  debtor. A Claim is impaired under a Plan of Reorganization if the plan provides that such

26  Claim will not be repaid in full or that the legal, equitable, or contractual rights of the

27  holder of such Claim will be altered. A Claim is unimpaired if it will be paid in full or the

28  legal, equitable or contractual rights of the holder of such Claim are not altered by the plan



of reorganization. A holder of an impaired Claim generally is entitled to vote on a plan of reorganization if such Claim has been allowed under Bankruptcy Code § 502.

**E.    If The Plan Of Reorganization Governs How My Claim Is Treated, Why Am I Receiving This Disclosure Statement?**

The Bankruptcy Code requires that the proponent of a plan solicit acceptances and rejections of a proposed plan before a plan may be confirmed by the Bankruptcy Court. Before Debtors can solicit acceptances of their Plan, the Bankruptcy Court had to approve the Disclosure Statement and determine that the Disclosure Statement contains information adequate to allow Creditors to make informed judgments about the Plan. After Bankruptcy Court approval of the Disclosure Statement, the Disclosure Statement, proposed Plan and a ballot are sent to the holders of Claims. The Creditors then have the opportunity to vote on the Plan and should consider this Disclosure Statement when voting.

**F.    Has this Disclosure Statement been approved by the Court?**

Yes. The Bankruptcy Court approved this Disclosure Statement as containing information of a kind, and in sufficient detail, as is reasonably practicable in light of the nature and history of Debtors and the condition of Debtors' books and records, to enable a hypothetical, reasonable investor typical of holders of Claims of the relevant Classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of any of the information contained in either the Disclosure Statement or the Plan.

**G.    Who provided the information in this Disclosure Statement?**

The information in this Disclosure Statement, including projections and financial information, has been provided by Debtors, their counsel and advisers, who have utilized information believed to be accurate in preparing this Disclosure Statement. However, neither Debtors nor their counsel warrant the accuracy of the information contained in or relied upon in preparing this Disclosure Statement, nor should this Disclosure Statement be construed to be any representation or warranty whatsoever express, implied or



1  otherwise, that the Plan of Reorganization is free from risk, that acceptance or

2  confirmation of the Plan will result in a risk-free or assured restructuring of the debts of

3  the Debtor, or that the projections or plans for payment will be achieved.

### H.     How will the Plan of Reorganization treat my claim?

5       People who are owed money by the Debtor hold what is known as a "Claim". The

6  Plan organizes Claims into Classes based upon when the Claim arose, the nature of the

7  Claim, and the treatment that the Claim will receive under the Plan. In order to determine

8  how the Plan treats your Claim, you must first determine which Class covers your Claim.

9       The table below summarizes the treatment of certain administrative and priority

10 claims and sets forth Debtors' estimates of the amount of Claims that will ultimately be

11 Allowed in each category, as well as the treatment of Interests (owners of Debtors) and the

12 source of Plan funding. The amounts of claims set forth therein are estimates and not

13 admissions by Debtors.

| Class | Description | Estimated Amount of Claim | Proposed Treatment | Estimate of Treatment Cost |
|---|---|---|---|---|
| | | *Unclassified* | | |
| | Administrative E.g., Lewis and Roca LLP | $350,000 | Payment in full, in cash, on Mondrian Distribution Date | $350,000 |
| | Priority Taxes | $245,340 | Payment in full, in cash, on Mondrian Effective Date | $245,340 |
| | | *Priority Claims* | | |
| 1 | Employees and providers of employee benefits for employees at the Project | | Cash on the Distribution Date | De minimis |
| | | *Secured Claims (Mondrian)* | | |
| 2 | Picerne/Key | $62,675,000 | Unimpaired (paid in full) on Mondrian Effective Date | $62,675,000 + reasonable attorneys' fees |
| 3 | Tempe | $9,786,681 plus postpetition interest and attorneys' fees | Paid $9,786,681 plus reasonable attorneys' fees up to $50,000 on Mondrian Effective Date | $9,836,681 |
| | | *Secured Claims (Grigio)* | | |



| Class | Description | Estimated Amount of Claim | Proposed Treatment | Estimate of Treatment Cost |
|---|---|---|---|---|
| 8 | Picerne/Babson | | Unimpaired | |
| **Unsecured Claims (Mondrian)** | | | | |
| 4 | Mondrian Vendor Claims | Approximately $165,200 | Paid in full on Distribution Date in exchange for trade credit | $165,200 |
| 5 | Other Mondrian Unsecured | None identified, except vendors declining to extend trade credit | Pro rata share with Picerne/Babson of $150,000 on Distribution Date | $0 |
| 6 | Picerne/Babson (secured by Grigio's interest in Mondrian) | $10,061,379.00 | Pro rata share with Other Mondrian Unsecureds of $150,000 on Distribution Date | $150,000 |
| 7 | Tempe | $1,656,948 plus postpetition interest | Paid in full on Mondrian Effective Date | $1,656,948 + postpetition interest |
| **Unsecured Claims (Grigio)** | | | | |
| 9 | Grigio Unsecured | | Distributions to Debtor-affiliates waived | $0 |
| **Equity Interests** | | | | |
| 10 | Mondrian Ownership | | Unimpaired | $0 |
| 11 | Grigio Ownership | | Unimpaired | $0 |
| | | **Total** | | $75,029,169 + Picerne/Key postpetition interest + reasonable attorneys' fees |

| **Means of Payment** | | |
|---|---|---|
| Source | Description | Amount |
| Mondrian | Accumulated cash | undetermined as of Mondrian Effective Date |
| Purchaser | APA purchase price less closing costs, fees, etc. | Est. $75,340,000 |

270126.14



1    **I.    Why is confirmation of the Plan of Reorganization important?**

2        Confirmation of the Plan by the Bankruptcy Court is necessary for Debtors to

3    provide the proposed treatment to Creditors under the Plan.  Unless the Plan is confirmed,

4    Debtors are legally prohibited from providing creditors what has been proposed in the Plan

5    and Debtors may well be liquidated.

6    **J.    What is necessary to confirm the Plan of Reorganization?**

7        At a hearing scheduled by the Bankruptcy Court, the Court will consider whether

8    the Plan should be confirmed.  Code § 1129 contains the requirements for confirmation of

9    a Plan of Reorganization.  YOUR VOTE IS IMPORTANT.  A form of ballot will

10   accompany this Disclosure Statement.  In order for the Plan to be accepted, at least 2/3 in

11   amount ($) and more than ½ in number (#) of the voting Creditors in each Class must

12   affirmatively vote for the Plan.  The Court must find that the Plan complies with the

13   applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also

14   complied with the Bankruptcy Code.  The Court must also find that the Plan has been

15   proposed in good faith and not by any means forbidden by law.  The Court must find that

16   the proponents of the Plan, that is Debtors, have disclosed the identity and affiliation of the

17   persons who will manage Debtors after confirmation, that the appointment of such persons

18   is consistent with the interest of Creditors and holders of Equity Interests and with public

19   policy, and that the identity and compensation of any Insiders that will be employed or

20   retained by Debtors has been disclosed.  The Court must additionally find that each Class

21   of Claims has either accepted the Plan or will receive at least as much as it would under a

22   Chapter 7 liquidation.  The Bankruptcy Code also provides for the treatment of certain

23   priority Claims.  If any Classes of Claims are impaired under the Plan, the Court must find

24   that at least one Class of Claims that is impaired has accepted the Plan without counting

25   any votes by Insiders.  The Court must also find that confirmation of the Plan of

26   Reorganization is not likely to be followed by the liquidation or the need for further

27   reorganization of the successor to the Debtor.  Additionally, the Plan of Reorganization

28   must provide for payment of fees to the United States Trustee.

270126.14



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1    In the event the Plan is not accepted by all the voting Classes of Claims or Interests,

2    Debtors may attempt to obtain confirmation under what is known as "cram-down." To

3    obtain confirmation by cram-down, the Court must find that the Plan of Reorganization

4    does not discriminate unfairly and is fair and equitable with respect to each Class of

5    Claims or Interests that is impaired by the Plan and has not accepted the Plan. The

6    Bankruptcy Code provides several options for a Plan of Reorganization to be "fair and

7    equitable" to a secured Creditor. Included among these options are that a secured Creditor

8    retains its lien and receives deferred cash payments at a market interest rate totaling either

9    the value of the property securing the Claim or the amount of the Allowed Claim as found

10   by the Court, whichever is less. With respect to a Class of unsecured Claims, the

11   requirement that a Plan of Reorganization be "fair and equitable" requires that the holder

12   of an unsecured Claim be paid the allowed amount of its Claim or that no junior interest

13   receive or retain any property on account of its prior Claim. With respect to an Interest (or

14   equity owner), the requirement that a Plan of Reorganization be "fair and equitable"

15   requires that the holder of an Interest receive or retain property under the Plan of

16   Reorganization having a value equal to the value of the holder's Interest or that the holder

17   of any Interest that is junior not receive or retain property under the Plan of

18   Reorganization on account of such junior interest.

19       **K.      Are creditors entitled to vote on the Plan of Reorganization?**

20       Each Creditor holding an Allowed Claim in an impaired Class of Claims is entitled

21   to vote on the Plan. If you hold a Claim in an impaired Class under the Plan, a ballot to be

22   used for voting on the Plan has been distributed to you with this Disclosure Statement. If

23   you lose your ballot, you may request another one from Debtors' counsel. Instructions for

24   completing and returning the ballot are set forth on the ballot and should be reviewed

25   carefully.

26

27

28

270126.14



**L.** **When is the deadline for returning my ballot?**

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots must be received by Debtors no later than 5:00 p.m. Arizona time, on September __, 2010, at the following address:

Marilyn Schoenike<br>
<strong>Lewis and Roca LLP</strong><br>
40 North Central Avenue<br>
Phoenix, Arizona 85013<br>
Email: MSchoeni@LRLaw.com

You may vote by telecopier by sending your ballot to Lewis and Roca LLP, Attn. Marilyn Schoenike at (602) 734-3847 by the same deadline.

**Article IV.**

**Background and History of Debtors**

**A.** **Structure and Ownership of the Debtors**

 **1.** **Mondrian TTL, L.L.C.**

Mondrian was formed on August 4, 2004, as a Delaware limited liability company. Gray Meyer Fannin L.L.C. and BlackRock Mondrian LLC ("BlackRock") were the members of Mondrian under a Second Amended and Restated Operating Agreement dated as of February 11, 2005. In 2006, BlackRock agreed to sell its membership interest in Mondrian to Grigio TTL, L.L.C., an entity formed by the various persons and entities listed on its Schedule of Equity Security Holders [DE 29] for $27,250,000.

Mondrian is managed by Mondrian Manager L.L.C., an Arizona limited liability company, managed by its sole member, GDG Enterprises L.L.C., which is the assignee of Gray Meyer Fannin, L.L.C.

 **2.** **Grigio TTL, L.L.C.**

Grigio was formed by the filing with the Arizona Corporation Commission of its Articles of Organization on October 27, 2006. Grigio is managed by GDG Enterprises L.L.C., an Arizona limited liability company.

270126.14



1       According to its Operating Agreement, Grigio was initially capitalized by investors

2 contributing a total of $8,300,799 in 1031 exchanges and $17,199,201 in additional non-

3 1031 cash exchanges and contributions.

4       **B.**     **Overview of the Debtors and Project**

5       Founded in 1992 by Bruce Gray, Gray Development Group is a fully-integrated

6 real estate development company, including architecture, construction and property

7 management. From inception, Bruce Gray's vision centered on building ultra high-end

8 apartment communities, with flair, style, and spirit all working synergistically together.

9 Gray Development Group is an acknowledged pioneer and industry leader in apartment

10 living, appealing to those who desire an urban and modern living experience. Gray

11 Development Group has developed more than 7,700 apartments, and currently manages

12 nearly 3,700 units, and has more than 4,500 units either under construction or in the

13 pipeline. Gray Development principals are principals of Mondrian and Grigio.

14       Gray Development Group was responsible for building the 523-unit Mondrian

15 Tempe Town Lake project (the "Project"), now known as Grigio, as part of a new vision

16 for development in Tempe. It was one of the first residential buildings adjacent to newly-

17 created Tempe Town Lake. The Project was constructed under a contract between

18 Mondrian and Gray Palmer Construction L.L.C. The Project was developed by Gray

19 Meyer Fannin L.L.C. under a Development Agreement dated February 11, 2005.

20       **C.**     **Project Construction Indebtedness**

21       Construction of the Project was financed in substantial part through a KeyBank

22 construction loan in the original principal amount of $53,050,000, later increased in

23 November 2006 to $62,000,000, secured by a first priority deed of trust on the Project.

24       A dispute arose in connection with the Project construction, leading to a lawsuit by

25 GDG Partners, L.L.C. against the City of Tempe. Pursuant to a Settlement Agreement and

26 Release entered into as of June 15, 2006, the parties settled their disputes. Under the

27 settlement, the City acquired a park from GDG Partners; certain permit and processing

28 fees paid from 2004 to date were rebated or waived, as well as certain residential



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   development fees; the Development Agreement for the Mondrian Development was

2   amended; the parties agreed to enter into a mutually acceptable Development and

3   Disposition Agreement, also referred to as the Transit Project; GDG Partners was

4   authorized to construct a floating dock on the Town Lake adjacent to the Project; the

5   parties agreed to joint marketing efforts for two years; and the City advanced $10 million

6   to GDG Partners, repayment of which was described in the Settlement Agreement, and

7   secured by a second priority lien on the Project in favor of GDG Partners and assigned to

8   Tempe. GDG Partners became obligated to make additional payments known as the Town

9   Lake Payments and agreed to restrictions upon development, if the development was of a

10  certain size and within a certain radius from a freeway or light rail transit line with certain

11  zoning.

12        In November 2006, BlackRock sold its interests; the KeyBank loan was increased;

13  a number of investors provided tax deferred exchange financing and cash for the Project

14  through equity investments in Grigio; and Babson Mezzanine Realty Investors LP, now

15  known as Cornerstone Real Estate Advisers LLC ("Babson") loaned $8,100,000

16  (increased within a year to $8.6 million). The total development cost for the Project was

17  estimated at $87,550,000.

18        **D.     City of Tempe Government Property Lease Excise Tax Abatement**

19        In a June 23, 2004 subordinate development parcel agreement, the GPLET structure

20  described below was authorized. Pursuant to a Modification Agreement (amending

21  C2006-310) entered into as of September 18, 2008, between Tempe and two Gray entities,

22  Tempe Transit, L.L.C. and GDG Partners, L.L.C., the City acknowledged that if the

23  parties reached agreement on a mutually satisfactory resolution of certain issues, and if the

24  Gray entities satisfied the statutory conditions, then they would continue to be entitled to

25  all statutorily-authorized property tax abatements, including, without limitation, the

26  abatements currently available through the provisions of A.R.S. §§ 42-6201 to 6209,

27  inclusive. The modification clarified the terms under which Tempe's junior lien on the

28  Project could be transferred to alternative collateral. That agreement also provided that the

270126.14



1    Gray entities agreed to make an annual in-lieu payment to the City in an amount equal to

2    the GPLET rate otherwise applicable pursuant to A.R.S. § 42-6201. The GPLET payment

3    during the first 8 years would be abated and instead, an in-lieu payment would be due.

4    The parties agreed that the amount of the in-lieu payment would be $50,000 less the total

5    property taxes paid by other property owners in the Playa del Norte community. The total

6    taxes paid have exceeded $50,000 annually, and thus the in-lieu payment has been zero.

7        In order to accomplish this transaction, the Mondrian Project was conveyed to

8    Tempe, and then leased back to Mondrian through an Improvements Lease. The

9    conditions were satisfied and accordingly, and as a result of a transaction closed on

10    December 4, 2009, the fee title for the Mondrian Project is in the City of Tempe and

11    Mondrian leases the Project from Tempe pursuant to the Land and Improvements Lease

12    ("GPLET Lease").

13      **E.**      **Debtors' Need For Restructuring**

14        These Reorganization Cases were filed by Mondrian and Grigio after KeyBank sold

15    its debt to a competitor of Gray Development, The Picerne Group ("Picerne"), and the

16    terms of forbearance agreements with KeyBank and Babson (discussed below) expired.

17    Like other commercial developers, Mondrian had experienced difficulty in refinancing its

18    KeyBank construction loan with the freezing of capital markets beginning in 2008.

19        At KeyBank's insistence, Gray engaged KeyBank's KeyCorp Real Estate Capital

20    Markets group to obtain a HUD loan to replace the construction loan. After spending

21    months working with this group on such financing, in late 2009 they were surprised to

22    learn that the requested loan size did not fit within HUD guidelines, leaving Gray to

23    scramble to find other financing options. Gray then, working with Canyon-Johnson Urban

24    Fund III L.P., negotiated with KeyBank to acquire the construction loan at a discount,

25    matching the highest bid obtained by KeyBank in the open market. KeyBank refused to

26    sell to Gray/Canyon-Johnson at such price, indicating that they would have to pay par to

27    acquire the loan. Instead, KeyBank sold the loan to a Picerne entity.

28

         270126.14



1    Picerne is an acquirer of distressed debt that has already acquired one Phoenix area

2  apartment complex, and appears to be related to a multi-family project developer that

3  owns and manages 11 apartment projects in the Phoenix metropolitan area (in addition to a

4  project in Tucson and several others in Nevada), according to its website.  See

5  www.picernegroup.com and www.picerneaptsaz.com.  Picerne acquired the senior secured

6  debt of KeyBank, apparently at or near par.  Picerne's intention to thereby acquire the

7  Project is shown by its motion for stay relief to foreclose its security interest and thus

8  foreclose out the junior creditors and acquire the Project.  After the filing of these Chapter

9  11 cases, Picerne also acquired the Babson note secured by Grigio's ownership of

10  Mondrian, and filed for stay relief to foreclose that security interest and acquire the Project

11  through taking control of Mondrian.

12    **F.    Debtors' Management Through Affiliates**

13    Gray Development Group affiliates provide Mondrian with property management

14  services and employees just as other Gray Development affiliates initially provided

15  architecture, construction and other development services for the Project.  Gray

16  Residential provides property management services and will do so by agreement with the

17  CJUF III Grigio Tempe Town Lake LLC, a Delaware limited liability company

18  ("Purchaser") after the Effective Date.  Gray Services LLC is the employer of all of the

19  on-site employees working at the Project, as well as the employer of people working at

20  other Gray Development apartment communities.  Salaries and benefits are allocated

21  monthly among the various properties.

22                    **Article V.**

23              **Summary of Debtors' Assets**

24    **A.    Mondrian Project**

25    The Project is a 523-unit luxury apartment community known as Grigio at Tempe

26  Town Lake at the southeast quadrant of Scottsdale Road and the Red Mountain Freeway

27  (Loop 202) or 1001 East Playa del Norte Drive, Tempe, Arizona 85281. Mondrian places

28  tenant deposits into a segregated account, which is not reflected as an asset in this

270126.14


1   discussion.The Project is composed of 437,006 rentable square feet with a cluster of

2   studios, one, two, three and four bedroom units among 48 floor plans within six

3   connecting buildings that range in height from four to six stories. The buildings surround

4   a six-story parking structure and offer an average unit size of 836 rentable square feet.

5   The project was completed during 2008.

6           The Project has frontage along the Tempe Town Lake, a "man-made" lake that

7   extends approximately two miles in length within the Salt River Basin.

8           The Project also offers 7,600 square feet of lakefront restaurant and market/café

9   space that holds the potential for conversion to six additional units. The exterior design of

10  the project is "sophisticated urban contemporary", with a mixture of brick, steel, synthetic

11  stucco and built-up roof systems that are intended to create an atmosphere of elegance,

12  urban refinement and sophistication. There are broad ranges of sizes and floor plans to

13  meet various tenant needs, as well as variations with lofts, quarter bathrooms and

14  townhouse orientations. About 10% of the units are two-story lofts or townhouses with

15  the balance noted as single-level flats. About 3/4 of the units have private patios or

16  balconies and about 29% have private storage areas. Tenants park within the adjoining

17  parking structure.

18          The Project site has a "park-like" environment. Access to all of the non-carriage

19  units is from fully finished, air-conditioned, double-loaded interior corridors that are

20  carpeted to create the feel of a luxury hotel. The majority of the units look outward with a

21  high percentage benefitting from direct or partial lake views. The remaining units face

22  inward to one of the Project's three enclosed courtyards, each with a pool and related

23  amenities. Although all units are offered as rentals, the design of the Project will allow the

24  eventual segregation of the 523 units between rentals and "for-sale" dwelling units. Other

25  Project amenities include security gating, elevators, a four-level clubhouse area with

26  leasing/management offices, fitness and business facilities. The units are provided with

27  major-brand name appliances. Other features include raised nine foot or vaulted ceilings,

28  ceiling fans, some walk-in closets, mirrored closet doors and patio doors to private patio



1 balconies (where applicable). Entries are tile or laminated hardwood floors or ceramic tile

2 with upgradeable carpet in the living areas with vinyl (or better) floor coverings in the

3 kitchen and bathrooms. All units also include vertical and/or mini-blinds, and wiring for

4 state-of-the-art telephone, video and high-speed data transfer.

5       The design and appeal of the Project is competitive with other recent vintage

6 apartment complexes in the immediate area as well as more "upscale" projects in

7 Scottsdale, Paradise Valley and in certain redevelopment districts in central Phoenix. Its

8 unique "lake" amenity is enabling it to compete with resort and golf-course oriented

9 apartment projects.

10       Mondrian valued the Project at between $70 and $78 million in its Schedules.

11 Picerne has filed an appraisal prepared for KeyBank suggesting the "as is" value as of

12 March 4, 2010 was $59,595,000. Based upon Gray's unsuccessful negotiations with

13 KeyBank, Mondrian believes Picerne paid KeyBank near par for the Picerne/Key loan,

14 which with other actions taken by Picerne and the price being paid by the Purchaser

15 suggests the value of the Project is well in excess of the appraised value. Mondrian did

16 not market the Project for sale prepetition, but did seek to refinance the Project

17 indebtedness.

18       KeyCorp Real Estate Capital Markets (a KeyBank affiliate) had been engaged by

19 Gray to procure Agency (HUD) take-out financing for the KeyBank debt in mid-2009.

20 While the Project met the financial qualifications to secure such financing, in late 2009

21 KeyCorp discovered that HUD was not interested in providing financing of this

22 magnitude. As a result Gray engaged CB Richard Ellis (CBRE) in early 2010 to find new

23 debt and/or equity participants that would be interested in a recapitalization of Mondrian.

24 CBRE prepared marketing materials related to Mondrian and solicited over 100 potentially

25 interested debt and/or equity sources including insurance companies, private equity and

26 hedge funds. After receiving preliminary offers from several interested parties, Gray

27 began serious discussions in March 2010 with representatives of Canyon Johnson Urban

28 Fund III.

        270126.14



As part of the recapitalization efforts, CJUF attempted to acquire the KeyBank debt on terms that would match other offers received, including the bid by Picerne/Key, which was at a discount from the face value of the note. KeyBank declined to sell the note to CJUF at any discount from face value because of its association with Gray. After the KeyBank debt was acquired by Picerne, CJUF made an offer to Babson for $2,600,000 to satisfy that debt in full, in a contemporaneous closing that would pay the Picerne/Key debt in full and that provided $4,800,000 to the City of Tempe to satisfy the payment obligations under the City of Tempe's recently approved Resolution.

**B. Grigio Property**

Grigio's principal asset is its ownership of Mondrian. It also owns less than $25,000 in intercompany receivables from Gray entities, one of which is Mondrian.

**C. Potential Avoidance Actions**

Each Debtor's Estate is granted certain avoidance powers under Bankruptcy Code §§ 544 *et. seq.* In particular, payments to creditors made within 90 days of the bankruptcy filing out of a debtor's property on account of a claim may be avoided as a preference under Bankruptcy Code § 547. Each Debtor identified payments within 90 days of the bankruptcy filing aggregating less than $5,500.00, and payments made to insiders within one year in the answer to question 3 in its Statement of Financial Affairs. In addition, each Debtor identified other transfers in answer to question 10 and that there were no withdrawals from the LLC in the answer to question 23. These schedules of transfers are on file with the Court or available upon request.

Sections 544 and following of the Bankruptcy Code, particularly Code § 548, allow the avoidance of other transfers, including particularly fraudulent transfers.

If a trustee were to analyze each of these transfers for potential avoidance under the Bankruptcy Code, Debtors believe the trustee would conclude that avoidance is not possible, primarily because the payments were made in the ordinary course of business.

270126.14



1    As to transfers to insiders, Mondrian's Statement of Financial Affairs, question

2  3(b), identified the transfers within a year of bankruptcy, which are probably not

3  avoidable, or are unlikely to be collected.

4    Grigio had no relevant transfers in its answers to the Statement of Financial Affairs.

5  ### Article VI.

6  ### Overview of Debtors' Debt and Claims

7  **A.    Mondrian's Secured Creditors**

8    **1.    KeyBank Loan (Purchased By Picerne)**

9    Mondrian is indebted to KeyBank or its successor upon the Second Amended and

10  Restated Promissory Note made by Mondrian TTL L.L.C. to the order of KeyBank

11  National Association dated as of December 3, 2009, in the amount of $62,675,000. The

12  loan was evidenced and secured by the Picerne/Key Loan Documents. The KeyBank lien

13  is the senior lien on the Project. Gray Meyer Fannin, L.L.C., GDG Enterprises and Bruce

14  Gray guaranteed the Picerne/Key indebtedness.

15    Mondrian and KeyBank had worked out periods of forbearance against KeyBank

16  enforcing its rights on the loan, which had matured in March 2009. The last forbearance

17  period under a Forbearance Agreement dated November 4, 2009 (as amended) expired on

18  March 1, 2010. Working with Canyon-Johnson Urban Fund III L.P., Mondrian's affiliate

19  sought to buy the KeyBank loan at or close to par. On May 5, 2010, KeyBank advised

20  that it had sold the debt to Picerne, which formed a new entity to hold the debt, called

21  Picerne/Key in this Disclosure.

22    **2.    City of Tempe**

23    The City of Tempe has been an active partner with Gray in developing property in

24  the City for a number of years. A number of the developments relate to each other, and

25  the overall relationship allows the City to expect commitments from Gray that are beyond

26  those of the ordinary developer.

27    Tempe and GDG Partners L.L.C. are the parties to the Payment Agreement (c2006-

28  301) dated as of November 21, 2006, under which the City's Secured Claim arose. The



LEWIS
AND
ROCA
—LLP—
LAWYERS

Original Agreement was previously modified by the Modification Agreement dated as of September 18, 2008, and by the Second Modification dated as of July 2, 2009 (as amended, the "Tempe Agreement"). Repayment of the obligation is evidenced and secured by the Tempe Loan Documents.

The Tempe Agreement provided for the City to advance $10,000,000 to GDG Partners, which in turn GDG Partners advanced to Mondrian to construct certain improvements described in the Tempe Agreement as the Mondrian Project, in exchange for a $10,000,000 debt due to the City. The debt is evidenced by a November 21, 2006 note, payable in monthly installments for 179 months with a balance (balloon payment) due in month 180, on November 1, 2024. The obligation to make payments on the $10 million obligation under the Tempe Agreement is secured by a second priority deed of trust on the Project. Certain payments due under the Tempe Agreement are deferred until the earlier of a HUD Loan or other refinancing transaction closing or April 30, 2013 pursuant to the Second Modification Agreement. Monthly payments of $65,995.57 resume on May 1, 2013. In the interim, all Excess Cash (defined in the Second Modification Agreement) from the Project is payable 50-50 to Tempe and Babson. The amount due as of the filing date was $9,786,681.

Although the secured indebtedness to Tempe is payable over an extended period of time, Mondrian has provided for early and full cash payment under the Plan (except for a relatively small amount for postpetition interest), a considerable benefit to the citizens of Tempe.

### B. Mondrian's Unsecured Creditors

#### 1. Babson Loan (Purchased by Picerne)

Mondrian was indebted to Babson upon a Promissory Note dated November 21, 2006, payable to the order of Babson by Mondrian up to $8,600,000. The loan is evidenced, secured and guaranteed pursuant to the Picerne/Babson Loan Documents. The Babson indebtedness is owed by Mondrian, but is an unsecured claim in the Mondrian

270126.14



1   bankruptcy case. Gray Meyer Fannin, L.L.C. guaranteed the Picerne/Babson

2   indebtedness.

3       Before the bankruptcy petitions were filed, Mondrian and Babson had worked out

4   periods of forbearance against Babson enforcing its rights on the loan, which was in

5   default. The last forbearance period expired on March 1, 2010. Working with Canyon

6   Johnson Urban Fund III L.P., a Mondrian affiliate sought to satisfy the Babson loan at a

7   discount. Babson sent Mondrian notice of default on May 7, 2010. Mondrian continued

8   to seek to settle payment of the Babson claim on terms acceptable to Babson. On June 10,

9   2010, after the bankruptcy filings, Babson advised that it had sold the debt to Picerne,

10  which formed a new entity to hold the debt, called Picerne/Babson in this Disclosure.

11      Mondrian estimates the Babson claim is $10,061,379.

### 2.      City of Tempe

13      Tempe is owed $1,656,948 in payment of deferred water and sanitary sewer

14  development or impact fees that are described in Section 7.7 of the Playa del Norte

15  Subordinate Development Parcel Agreement that was recorded on July 2, 2004, as Doc.

16  No. 2004-0764286 ("Deferred Fees"). This is an unsecured claim. Tempe also holds a

17  priority tax claim in the amount of $245,340.

### 3.      Mondrian Unsecured Claims

19      Mondrian owes other unsecured claims. Based on the schedules, and excluding

20  insider claims and claims paid with Court permission, the aggregate amount is $235,785,

21  all of which is owed to vendors doing business with Mondrian. In the past, these vendors

22  have provided Mondrian with trade credit in the ordinary course, which is the basis for

23  their unsecured claims.

### C.      Grigio Claims

### 1.      Picerne/Babson

26      Picerne/Babson bought the Babson loan. It is secured by Grigio's equity interest in

27  Mondrian. Grigio does not believe there are any monetary obligations owed to

28  Picerne/Babson by Grigio.


1    **2.    Grigio Unsecured Claims**

2    There are two claims scheduled against Grigio owed to Gray related entities.

3    **Article VII.**

4    **Actions And Proceedings During The Chapter 11 Case**

5    **A.    Professionals Retained**

6    After the bankruptcy filings, Debtors sought authority to employ Lewis and Roca

7    LLP as their general bankruptcy counsel.  The motion was granted.

8    Debtors sought authority to retain special counsel for landlord tenant issues, which

9    was approved by the Court without objection.

10    **B.    Request to Pay Prepetition Claims**

11    In connection with their bankruptcy filing, Debtors sought emergency authority to

12    pay certain pre-petition claims of utilities and employees, and those motions were granted

13    by the Court in specific orders.

14    **C.    Request to Use Cash Collateral**

15    Debtors sought and obtained interim authority to use rents and other income of the

16    Project, which is Picerne/Key's cash collateral.  That authority was granted with the

17    secured creditor's consent and now extends through approval of the August 2010 Budget.

18    **D.    Bankruptcy Proceedings**

19    Pursuant to an order of the Court, these bankruptcy cases are jointly administered

20    under one caption.  The cases are not substantively consolidated.

21    Each Debtor filed schedules of assets and liabilities, a statement of financial affairs,

22    and other schedules required by the Bankruptcy Code and Rules.  Copies of those filings

23    are available from the Clerk of the Court or from Debtors' bankruptcy counsel.

24    **E.    Automatic Stay**

25    One of the fundamental protections in bankruptcy is the automatic stay, Code

26    § 362(a).  The automatic stay prevents creditors from taking actions to collect debts or take

27    debtor property while the debtor seeks to reorganize.

28



1    Picerne/Babson sought relief from the stay to foreclose its lien on Grigio's

2    ownership of Mondrian. Within a week, Picerne/Key also filed a motion for relief from

3    stay, seeking to foreclose its lien on the Mondrian Project. Debtors have opposed both

4    motions and offer the Plan in order to fully pay the Picerne/Key claims and meet cram-

5    down requirements for Picerne/Babson while also paying all other non-insider claims as

6    allowed by the Bankruptcy Code.

7    On August 26, 2010, the Bankruptcy Court ruled that Picerne/Babson is unimpaired

8    under the Plan, and that there is a reasonable likelihood that the Plan with respect to Grigio

9    can be confirmed. The Court held that Picerne/Babson is not entitled to stay relief, but at

10   the request of Picerne/Babson, set a continued preliminary hearing in the lift stay

11   proceeding.

12       **F.     Leases and Contracts**

13   Debtors have the opportunity to elect under Bankruptcy Code § 365(a) whether to

14   assume or reject their unexpired Leases and real estate contracts.   Tenant leases have

15   already been assumed, and will be assigned to the Purchaser. As explained in more detail

16   below, Debtors will assume and assign the GPLET lease with Tempe to the Purchaser. All

17   other contracts or agreements useful in connection with the Mondrian Project will be

18   assumed and assigned to the Purchaser under the Plan.

19   The Bankruptcy Code allows a debtor 120 days after the filing date to assume or

20   reject unexpired leases on non-residential real property where the debtor is the lessee or

21   tenant. The Court granted Debtors' motion to extend that deadline an additional 90 days

22   in order to make the election and in particular assume the City of Tempe lease in

23   connection with their Plan of Reorganization.

24                       **Article VIII.**

25   **Debtors' Business Operations After Filing The Chapter 11 Case**

26   The United States Trustee's office requires that debtors file a monthly operating

27   report with the Court. Each Debtor is current in filing its operating reports, and a copy is

28   available upon request or from the Clerk of the Court. The Mondrian Project is operating


LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   profitably and the tenants are receiving the high level of service they expect from this

2   Project. Debtors are current on their post-petition reporting and tax obligations. Debtors

3   are making monthly payments to Picerne/Key under the Court's order authorizing use of

4   cash collateral.

## Article IX.
### Summary of the Plan

### A.   Overview

8       In the Plan, Debtors propose to sell the Mondrian Project and distribute the

9   proceeds, resulting in full payment of Picerne/Key and full payment of the prepetition

10  claim amount plus reasonable attorneys' fees of the City of Tempe, full payment of trade

11  creditors extending new trade credit, and a distribution to Picerne/Babson and other

12  unsecured creditors, all in accordance with the priorities set forth in the Bankruptcy Code

13  and as set forth in the Plan. GDG Enterprises, LLC is also extending to Picerne/Babson

14  and any Class 5 creditors an Investment Opportunity, whereby they can invest in the

15  Project as non-managing members of a Delaware Investors LLC non-managing member of

16  GDG Grigio Tempe Town Lake LLC, as described in Section X.B. below.

17      There are two Debtors. The Plan separately classifies and treats the Claims and

18  Interests in Mondrian and Grigio.

### B.   Unclassified Claims

#### 1.   Administrative Expenses

21      Administrative Expenses are not classified under this Plan. Administrative

22  Expenses are Claims against any Debtor for any costs or expenses of the Reorganization

23  Case allowed under Code §§ 503(b) and 507(a)(1), including all actual and necessary

24  expenses of preservation of the Estate, Court fees and Professional Fees for Professionals

25  retained by a Debtor.

26      All requests for payment of Administrative Expenses that accrued during the

27  Administrative Period, including Professional Fees, shall be filed and served on the

28  Debtors by the Administrative Expenses Bar Date. Debtors may settle an Administrative

270126.14


1    Expense other than a Professional Fee claim without further Bankruptcy Court approval.

2    Unless Debtors object to an Administrative Expense other than a Professional Fee claim

3    within 60 days after the Administrative Expenses Bar Date (unless such objection period is

4    extended by the Bankruptcy Court), such Administrative Expense shall be deemed

5    Allowed in the amount requested.  If Debtors object to such an Administrative Expense,

6    the Bankruptcy Court shall determine the Allowed amount of such Administrative

7    Expense.  Notwithstanding the foregoing, no request for payment of an Administrative

8    Expense need be filed with respect to an Administrative Expense which is paid or payable

9    in the ordinary course of business.  Professionals retained pursuant to an order of the

10   Bankruptcy Court must file applications for Bankruptcy Court approval of their

11   Professional Fee claims instead of proofs of claim.  Their Administrative Expenses are

12   subject to Court approval after notice and hearing upon applications filed within the

13   Administrative Expenses Bar Date, and shall be paid by Debtors as ordered by the Court.

14          Except as specified above, all Allowed Administrative Expenses shall receive cash

15   from Reorganized Mondrian in the amount of such Administrative Expenses on the later

16   of (i) the Distribution Date; or (ii) the date such Administrative Expense becomes an

17   Allowed Administrative Expense, or at such other date and upon such other terms as may

18   be agreed upon by the holder of the Allowed Administrative Expense and Debtor or

19   ordered by the Court, and at such times as are mutually agreeable to the respective parties.

20          Notwithstanding the foregoing, (a) any Allowed Administrative Expense based on a

21   liability incurred by a Debtor in the ordinary course of business during the Reorganization

22   Cases may be paid in the ordinary course of business in accordance with the terms and

23   conditions of any agreement relating thereto and (b) any Allowed Administrative Expense

24   may be paid on such other terms as may be agreed on between the holder of such Claim

25   and Debtor.

26

27

28

270126.14



**2.    Priority Tax Claims.**

To the extent that Allowed Priority Tax Claims exist in both the Mondrian and Grigio estates, they shall be subclassified between the Debtors. Tempe has filed a $245,340 proof of claim in the Mondrian case for a residential development tax.

**Treatment.** Such Allowed Claims shall be paid in full, in cash, on the Distribution Date, except that the Tempe tax claim will be paid on the Mondrian Effective Date as part of the cure of the GPLET Lease being assumed and assigned to the Purchaser.

**C.    The Classes Of Claims Designated Under This Plan And Treatment Of Such Claims Are As Follows:**

**1.    Class 1. – Priority Claims.**

This Class shall consist of Allowed Claims entitled to Priority under Code § 507(a), other than Priority Tax Claims. This Class includes the Claims of employees and providers of employee benefits for employees at the Project entitled to priority under Code § 507(a)(8), to the extent not previously paid pursuant to Court orders.

**Treatment**: To the extent not previously paid under the Court's orders or pursuant to applicable law, all holders of Allowed Class 1 Claims shall be paid in full (without post-petition interest), in cash plus interest at the statutory rate, on the Distribution Date, and receive employee benefits as and when due, and are impaired.

**2.    Class 2. – Picerne/Key Secured Claims.**

This Class shall consist of the Allowed Secured Claims against Mondrian held by Picerne/Key.

**Treatment**: The Picerne/Key Secured Claim shall be reinstated and paid in full with interest at the non-default rate and any reasonable attorneys' fees on the Mondrian Effective Date, whereupon its security interests shall be released. Because this treatment results in Picerne/Key being unimpaired under the Bankruptcy Code, it is conclusively deemed to have accepted the Plan and is not entitled to vote on it.

270126.14



1    **3.    Class 3. – Tempe Secured Claims.**

2    This Class consists of the Allowed Secured Claims held by City of Tempe against

3    Mondrian. GDG Partners is the counter-party to the Tempe Agreement under which this

4    Claim arose.

5    **Treatment**:

6    a.    **Mondrian Payment.** Tempe shall be paid $9,786,681 cash plus reasonable

7    attorneys' fees and costs up to $50,000 on the Mondrian Effective Date.

8    b.    **Documentation and Release of Security Interest.** Before the Mondrian

9    Effective Date, Tempe will tender to an agreed Escrow Agent the documents needed to

10   release and reconvey its security interest in the Project, including the Tempe Deed of

11   Trust. On the Effective Date of the Mondrian Plan, Mondrian will tender to an Escrow

12   Agent the Mondrian Payment. On the Mondrian Effective Date, the Escrow Agent shall

13   record the release and reconveyance of the Tempe Deed of Trust and file and record any

14   other documentation necessary to release Tempe's security interest in the Project, and

15   shall wire transfer the Mondrian Payment to Tempe.

16   Tempe will not receive its postpetition interest, and accordingly the Tempe Claim is

17   impaired. Tempe is, however, receiving far more than the present value of its secured

18   claim, which is not due and payable in full for another 14 years.

19   **4.    Class 4. – Mondrian Vendor Unsecured Claims.**

20   This Class shall consist of the Allowed Unsecured Claims against Mondrian of

21   trade vendors.

22   **Treatment**: The Mondrian Vendor Unsecured Claims shall be paid in full without

23   interest on the Distribution Date with funds received by Mondrian from the Purchaser, on

24   the condition that each such Class member agrees by checking a box on its ballot or

25   otherwise confirming in writing to provide continuing goods and services to the Purchaser

26   on ordinary course trade credit terms of at least 30 days from the date of the invoice,

27   provided Purchaser timely pays such invoice within such time period, for at least 18

28   months. Any Class 4 member that does not check such a box on its ballot or declines to

270126.14


LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   enter into such a written agreement will become a member of Class 5. The Mondrian

2   Vendor Unsecured Claims are impaired. No distribution shall be made on account of

3   vendor Claims held by affiliates of Debtors.

**5.      Class 5. – Other Mondrian Unsecured Claims.**

5   This Class shall consist of the Allowed Unsecured Claims against Mondrian not

6   included in the Vendor Class other than the Allowed Unsecured Claims of TPG (Grigio)

7   Mezzanine, LLC (hereafter "Picerne/Babson"). Claims held by tenants under apartment

8   leases for security deposit are not included in Class 5, since the security deposits are

9   separately reserved, effectively in trust for the tenants, and all of their leases have been

10  assumed. The tenants no longer hold unsecured claims, but rather administrative expense

11  claims that are met in the ordinary course from their security deposits.

12  **Treatment**: The Other Mondrian Unsecured Claims shall share pro rata with

13  Picerne/Babson on the Distribution Date via a distribution of $150,000 received by

14  Mondrian from the Purchaser.

15  The Other Mondrian Unsecured Claims are impaired.

**6.      Class 6 - Picerne/Babson Claims.**

17  This Class shall consist of the Allowed Claims against Mondrian owned or acquired

18  by Picerne/Babson, including without limitation the claim acquired from Babson

19  Mezzanine Realty Investors, LP, with an approximate petition date balance of $8,600,000

20  principal and $1,461,379 interest. Given Picerne/Babson's security interest in Grigio's

21  ownership of Mondrian, Picerne/Babson has different rights than other Mondrian

22  unsecured creditors and is classified separately.

23  **Treatment**: Picerne/Babson shall share pro rata with the Other Mondrian

24  Unsecured Claims on the Distribution Date via a distribution of $150,000 received by

25  Mondrian from the Purchaser.

26  If the holder of the Picerne/Babson Class 6 Claims does not accept the Plan, it shall

27  elect (in its sole discretion) with its ballot either (i) to allow the Equity Interests in

28  Mondrian to be treated as set forth in Class 10 below, or (ii) that the Mondrian Equity

270126.14



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1     Interests shall be treated in accordance with Code § 1129(b)(2)(B)(ii) (cancelled). If it

2     does not accept the Plan and refuses to make the election described in this paragraph, it

3     shall be deemed to have elected option (ii).

4     The Picerne/Babson Unsecured Claims are impaired.

5     **7.    Class 7. – Tempe Unsecured Claims.**

6     This Class consists of the Allowed Unsecured Claim against Mondrian held by

7     Tempe of $1,656,948 (plus postpetition interest at the rate provided under applicable non-

8     bankruptcy law through the payment date) for deferred water and sanitary sewer

9     development or impact fees. These fees are comparable to taxes or utilities, entitled to

10     unique treatment under the Bankruptcy Code, and full payment is demanded by Tempe as

11     part of the cure of the GPLET Lease being assigned to the Purchaser.

12     **Treatment**: Mondrian will use money from the Purchaser to pay Tempe the

13     Deferred Fees on the Mondrian Effective Date. The Claim is unimpaired.

14     **8.    Class 8. – Picerne/Babson Secured Claim Against Grigio.**

15     This Class consists of the Allowed Secured Claim against Grigio acquired by

16     Picerne/Babson. The claim is secured by a Membership Pledge and Security Agreement

17     dated November 21, 2006 on Grigio's equity ownership Interest in Mondrian.

18     **Treatment**: Picerne/Babson retains its security interest in Grigio's equity

19     ownership of Mondrian. Picerne/Babson retains all of its rights against Grigio, is

20     unimpaired, and is not entitled to vote on the Plan.

21     **9.    Class 9. – Unsecured Grigio Claims.**

22     This Class shall consist of the Allowed Unsecured Claims against Grigio.

23     **Treatment**: The Allowed Unsecured Grigio Claims consist of Claims held by

24     Debtor-affiliates, and are waived.

25     **10.    Class 10. – Mondrian Equity Interests.**

26     This Class shall consist of the Equity Interest of Grigio in Mondrian.

27     **Treatment**: Equity Interests in Mondrian are deemed allowed on the Mondrian

28     Effective Date. No distributions shall be made to the holders of Equity Interests, but the

270126.14


LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   Equity Interests remain intact and collateralize the Picerne/Babson Claim until Plan

2   distributions are completed.  The Mondrian Equity Interests are treated in accordance with

3   Code § 1124(2)(E) and are unimpaired.

4       However, the foregoing is subject to and controlled by the election provided to the

5   holder of the Class 6 Picerne/Babson Claims.

6       **11.    Class 11. – Grigio Equity Interests.**

7       This Class shall consist of the Equity Interest of Grigio's owners.

8       **Treatment**:  Equity Interests in Grigio shall be deemed allowed on the Grigio

9   Effective Date.  The Grigio Equity Interests are treated in accordance with Code §

10  1124(2)(E) and are unimpaired.

11      **D.    Treatment Of Executory Contracts And Unexpired Leases**

12      **1.    Assumption of Contracts and Leases.**

13      **a.    City of Tempe GPLET Lease**

14      Mondrian assumes and assigns to Purchaser as of the Mondrian Effective Date all

15  of its rights and obligations under a title transfer and long term leaseback agreement with

16  Tempe as permitted by Arizona Revised Statutes § 42-6201, whereby in lieu of real estate

17  taxes, the lessee of the Project is obligated to pay a governmental property lease excise tax

18  (GPLET) during the term of the lease.  The GPLET Lease creates a significant savings to

19  the developer over the alternative of a real property tax assessment.  The bundle of rights

20  associated with the Project's long-term ground lease agreement is that of a leasehold

21  interest although it functions as a fee simple interest for valuation purposes.  Tempe's

22  priority tax claim and Deferred Fees claim will be paid as a cure of the GPLET Lease on

23  the Mondrian Effective Date when the GPLET Lease is assumed and assigned to the

24  Purchaser.  Mondrian believes it is not in default under the GPLET in any other respect.

25      **b.    Assumed Agreements**

26      All tenant leases for the Project have already been assumed pursuant to Court order,

27  and will be assigned to the Purchaser.  All executory contracts and unexpired leases as to

28

270126.14



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   which Mondrian is a party, listed on the Schedule of Assumed Agreements to a Plan and

2   Disclosure Statement Supplement to be filed at least 10 days before the deadline for voting

3   on the Plan (including the generic listing of all tenant leases), shall be deemed

4   automatically assumed and assigned to Purchaser in accordance with the provisions and

5   requirements of Code §§ 365 and 1123 as of the Mondrian Effective Date, unless prior to

6   the Mondrian Effective Date such executory contracts or unexpired leases (i) shall have

7   been previously rejected by Final Order of the Bankruptcy Court, (ii) shall be the subject

8   of a motion to reject pending on or before the Mondrian Effective Date, (iii) shall have

9   expired or terminated on or prior to the Mondrian Effective Date (and not otherwise been

10  extended) pursuant to their own terms, (iv) are listed on the Schedule of Rejected

11  Contracts, or (v) are otherwise rejected pursuant to the terms of this Plan.  Entry of the

12  Confirmation Order shall constitute approval of the rejections and assumptions

13  contemplated hereby pursuant to Code §§ 365 and 1123 as of the Mondrian Effective

14  Date, without prejudice to Mondrian's right to modify this portion of the Plan by

15  amending the Schedule of Assumed Contracts and Schedule of Rejected Contracts and

16  leases prior to the Mondrian Effective Date in accordance with Code § 1127(b).

17          Each executory contract or unexpired lease that is to be assumed and relates to the

18  use, ability to acquire or occupancy of real property shall include (a) all modifications,

19  amendments, supplements, restatements, or other agreements made directly or indirectly

20  by any agreement, instrument, or other document that in any manner affect such executory

21  contract or unexpired lease and (b) all executory contracts and unexpired leases

22  appurtenant to the premises, including all easements, licenses, permits, rights, privileges,

23  immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements,

24  vaults, tunnel or bridge agreements or franchises, and any other interest in real estate or

25  rights in rem related to such premises, unless any of the foregoing agreements has been

26  rejected pursuant to any order of the Court that may be entered prior to the Mondrian

27  Effective Date, including the Confirmation Order.

28

270126.14



c.    **Cure Payments.**

Mondrian believes that, except with respect to Tempe as set forth above, its obligations to lessors and other executory contract counterparties are current, except for a single month's payment that may have been outstanding on the Petition Date, and that Code §§ 365(b)(1)(A) or (B) accordingly require payment of only those minimal sums to such parties in order to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan ("Cure Payments"). If any non-Debtor party to an executory contract or lease contends that defaults exist and must be cured under such party's executory contract or lease, that party must comply with Section II.A.2.b of the Plan. As required by Code § 365(b)(1), any and all monetary defaults under each executory contract and unexpired lease to be assumed under this Plan will be satisfied on the Mondrian Effective Date, unless subject to a pending dispute on that date.

If a dispute arises regarding: (a) the amount of any proposed Cure Payments; (b) whether Mondrian or Purchaser provided adequate assurance of future performance under an executory contract or unexpired lease to be assumed, to the extent required under the Bankruptcy Code; or (c) any other matter pertaining to a proposed assumption, then any required Cure Payments will be made by the later of the Mondrian Effective Date or 14 days after entry of a Final Order resolving the dispute and approving the assumption. If there is either a dispute as to the Cure Amount, or the non-Debtor party otherwise objects to assumption, then Mondrian or Purchaser, as applicable, shall have the right to abandon the assumption of such contract or agreement listed on the Schedule of Assumed Agreements, and to treat such contract or agreement as rejected under the Plan at any time during the pendency of such dispute or upon resolution of such dispute.

d.    **Objections to Assumption or Proposed Cure Payments.**

Any entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan and either contends that the proposed Cure Payment described in the Schedule of Assumed Agreements is incorrect or otherwise objects to the contemplated

270126.14



assumption must file with the Court and serve upon Mondrian a written statement and supporting declaration of facts stating the basis for its objection. This statement and declaration must be filed and served by the later of: (a) 10 days before the Confirmation Hearing; or (b) 5 Business Days after Debtors file and serve any Plan modification with respect to an executory contract or unexpired lease to be assumed. Any entity that fails to timely file and serve such a statement and declaration will be deemed to waive and release any and all objections to the proposed assumption and the proposed Cure Payments.

### e. Resolution of Claims Relating to Assumed Agreements.

Payment of any Cure Payments required by Court Order with respect to executory contracts or unexpired leases that are assumed under the Plan shall be deemed to satisfy, in full, any prepetition arrearage or other damage claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the Schedules. Upon the tendering of the Cure Payment, such Claim shall be Disallowed, without further order of the Court or action by any party.

### 2. Rejection of Contracts and Leases.

### a. Identification of Rejected Agreements.

As of the relevant Effective Date, Debtors will reject any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and any not identified on the Schedule of Assumed Agreements, to the extent that these agreements constitute executory contracts or unexpired leases under Code § 365, as well as any contracts or leases previously rejected pursuant to Court orders. See attached Exhibit 2.

Debtors reserve the right to amend the Plan at any time before the relevant Effective Date to: (a) provide for assumption and assignment of any executory contract or unexpired lease under the Plan, or (b) delete any executory contract or unexpired lease from the Schedule of Assumed Agreements and thus provide for its rejection under the Plan, pursuant to Code § 1127(b). Debtors will provide notice of any modification to the

270126.14



1  Plan to the party or parties to the executory contracts or unexpired leases affected by the

2  amendment.

3  　　The Confirmation Order will constitute a Court order approving the rejection, as of

4  the relevant Effective Date, of any and all executory contracts and unexpired leases not

5  assumed under the Plan.

6  　　　　　　**b.　　Rejection Damages**

7  　　**Bar Date for Rejection Damage Claims.**　Any Claim for damages arising from the

8  rejection under the Plan of an executory contract or unexpired lease must be filed and

9  served upon Debtors by the Rejection Claims Bar Date.　Any such Claims that are not

10  timely filed and served will be forever barred and unenforceable against Debtors, the

11  Estates, the Reorganized Debtors and their respective property, and entities holding these

12  Claims will be barred from receiving any distributions under the Plan on account of such

13  untimely Claims.

14  　　All timely filed Claims for rejection damages shall be classified as unsecured

15  claims and treated in accordance with the Plan.

16  　　　　　　**3.　　Postpetition Contracts and Leases.**

17  　　Any contracts, leases, and other agreements that Debtors entered into after the

18  Petition Date, whether within or outside the ordinary course of business, other than

19  contracts with Insiders (unless approved by Court Order), shall be assumed and assigned

20  to Purchaser as of the Mondrian Effective Date.

21  　　　　　　　　**Article X.**

22  　　　**Means of Execution and Implementation of the Plan**

23  　　**A.　　Sale of Project**

24  　　On the Mondrian Effective Date, Mondrian shall transfer the Purchased Assets to

25  Purchaser on the terms set forth herein.

26  　　　　　　**1.　　Procedures**

27  　　In conjunction with the hearing on the Disclosure Statement, the Court shall be

28  asked to approve the following procedures for the sale of the Purchased Assets.

270126.14



### a. APA

Mondrian and Purchaser have entered into and filed at DE 159 a definitive asset purchase agreement, which has been amended (as amended, the "APA") which is incorporated by reference into the Plan, and attached thereto as Exhibit A.

### b. Good Faith Deposit

Not less than 14 days after the entry of the Court's order approving the Disclosure Statement, Purchaser shall deposit $1,000,000 into escrow as the revocable good faith deposit under the APA (the "Deposit").

### c. Irrevocable Offer

Entry of a Final Order approving the Disclosure Statement and Sale Procedures shall constitute satisfaction of all conditions of Purchaser to close the purchase of the Purchased Assets other than the conditions to the Mondrian Effective Date as set forth herein and the conditions set forth in the APA.

### 2. Purchased Assets

### a. Assets and Contracts.

On the Mondrian Effective Date, Mondrian shall sell and transfer the Project and the property rights associated therewith, including assignment of the Assumed Agreements, but excluding the Excluded Assets, to Purchaser. Purchaser will acquire and novate to the Assumed Agreements, which are substantially all of the contracts related to the Project, other than the Rejected Contracts. The assets being purchased and assigned include all Causes of Action, except for those expressly listed on the Excluded Assets list, as noted below. Thus, the Purchaser will be able to pursue contract rights under vendor agreements and tenant leases, for example. The rights associated with the Project acquired by and assigned to the Purchaser shall include the right to represent the interests of the Mondrian and Grigio Estates, as the real party in interest and Estate Representative, in defending any appeal of the Confirmation Order.

270126.14


1

**b.    Excluded Assets**

2    Notwithstanding the generality of the foregoing, certain assets are not a part of the

3    sale and purchase contemplated by the Plan and are excluded from the Purchased Assets in

4    the APA.  Any Excluded Assets will be administered by Reorganized Mondrian pursuant

5    to the Plan.

6

**c.    Causes of Action.**

7    The APA shall provide for the Purchaser to become the Mondrian Estate

8    representative with respect to all Causes of Action, including any potential Avoidance

9    Causes of Action relating to or in connection with any payments by or to, or other

10    transfers or assignments by or to Mondrian, provided that Purchaser shall allow

11    Reorganized Mondrian at its request to pursue an Avoidance Action as an offset against a

12    Claim under Code § 502(d) or otherwise.  Such Causes of Action include any causes of

13    action against The Picerne Group, Picerne/Key and Picerne/Babson with respect to

14    acquisition of Claims and solicitation actions in violation of 11 U.S.C. § 1125(b),

15    interference with contractual relationships and lender liability.  The Purchaser shall receive

16    the benefit of any recoveries, except to the extent of such offset.

17    There are no Causes of Action transferred or retained in the Grigio estate.

18

**d.    Records.**

19    Pursuant to the APA, all books, records, documents and other materials used or

20    held for use in connection with the ownership or operation of the Project, except for those

21    relating exclusively to the Excluded Assets, shall be delivered to Purchaser at or prior to

22    the Mondrian Effective Date, with reasonable access to Mondrian provided upon request.

23

**3.    Purchase Price**

24    On the Mondrian Effective Date, Purchaser shall tender into escrow approximately

25    $74,342,540 via wire transfer, consisting of the remaining portion of the APA

26    consideration paid to Mondrian (together with the Deposit, the "Purchase Price").  The

27    Purchase Price shall be finally determined at the closing under the APA.  The Purchase

28


1    Price shall be used to satisfy the obligations of Mondrian due under the Plan on or before

2    the Distribution Date.

3        Any remaining funds shall be used for post-Mondrian Effective Date

4    implementation of creditor distributions on the Distribution Date. Reorganized Mondrian

5    will serve as the Disbursing Agent implementing the Plan by making creditor

6    distributions.

7        **4.     Free and Clear**

8        The Plan shall be deemed to constitute a motion to sell the Purchased Assets free

9    and clear to the Purchaser. The Confirmation Order shall include certain findings by the

10    Court pursuant to Code § 363(m) with respect to successor liability of the Purchaser, in

11    particular the transfer of the Purchased Assets is free and clear of all liens, claims,

12    encumbrances, and interests, except with respect to Assumed and Assigned Leases and

13    Contracts.

14        **5.     Additional Terms**

15        Except as provided in the APA, the Sale under the APA shall be as is, where is,

16    with all faults. No representations or warranties of Mondrian shall survive the Mondrian

17    Effective Date.

18        Effective as of the Effective Date, Purchaser will enter into agreements with Gray

19    affiliates with respect to employment, leasing, shared services and other matters

20    concerning operation of the Project consistent with pre-petition agreements between

21    Mondrian and Gray affiliates.

22        **6.     Purchaser's Ownership**

23        The Purchaser is CJUF III Grigio Tempe Town Lake, LLC. The preferred member

24    of the Purchaser is CJUF III Grigio Tempe Town Lake Member LLC ("Preferred

25    Member"), which in turn is owned by Canyon-Johnson Urban Fund III, L.P. ("CJUF III")

26    CJUF III is a real estate private equity fund with $1 billion in equity commitments.

27    Additional information about CJUF, including its investment history and financial

28    capabilities, may be found at http://www.cjuf.com. The general partner of CJUF III has

270126.14



1    full discretion on all fund investments. Gray Development has teamed with CJUF III once

2    before. That Canyon Johnson entity formed CJUF III Grigio Metro Member, LLC and

3    invested $18 million with a Gray entity, GDG Grigio Metro LLC, to refinance an

4    apartment project in Tempe known as Grigio Metro. CJUF III complied with all of its

5    obligations in connection with that transaction, in full, on time, and in good faith.

6         The other member of the Purchaser is GDG Grigio Tempe Town Lake LLC ("GDG

7    Member"), an Arizona LLC which is owned by GDG Enterprises L.L.C. ("GDGE") as

8    managing member. GDG Member will provide approximately 10% of the funds required

9    by the Purchaser. Current investors in Grigio and holders of Class 5 and Class 6 Allowed

10   Claims may also participate in GDG Member indirectly as members of a separate

11   Delaware LLC non-managing member of GDG Member to the extent they participate in

12   the Investment Opportunity described at Section X.B.

13              **7.    Purchaser's Management**

14        The managing member of the Purchaser is GDG Member. It will implement its

15   management of the Project for the Purchaser through Gray affiliates in the same way that

16   Mondrian has been managed throughout the Bankruptcy Cases, and that Grigio Metro and

17   multiple other Gray-affiliated apartment projects are managed (see Section IV.F. above).

18   The identity and compensation of the individuals involved in the Purchaser's management

19   need not be disclosed since they will not be operating the Reorganized Debtors, which will

20   cease operations after the asset sale to the Purchaser closes.

21        **B.    Investment Opportunity**

22        Subject to (1) the terms herein, (2) Plan Confirmation and effectiveness, and (3) the

23   execution of transactional documents, GDGE is offering current Equity Interest holders in

24   Grigio and holders of Class 5 and Class 6 Allowed Claims the opportunity to invest in the

25   Project, sharing in the approximate $8 million capitalization of GDG Member by GDGE,

26   if they choose to invest funds in a separate Delaware LLC ("Investor LLC") as a non-

27   managing member of GDG Member granting releases ("Investment Opportunity"). The

28   Grigio Equity Interest holders and Babson contributed to the Project prepetition through



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1  loans to Mondrian or investments in Grigio aggregating approximately $40 million, of

2  which approximately $30 million was contributed by Grigio Equity Interest holders and

3  approximately $10 million was advanced by Babson. GDGE will allow Picerne/Babson to

4  invest up to 25% (approximately $2 million) of the approximate $8 million required to be

5  invested in GDG Member, and will allow the current Equity Interest holders in Grigio to

6  invest up to 75% of that amount (approximately $6 million) on a comparable pro rata basis

7  to their initial investments, in consideration of their investment of new funds and not on

8  account of existing investments and/or claims.

9       If Picerne/Babson and any Grigio Equity Interest holder chooses to take advantage

10  of the Investment Opportunity, all such holders will be treated equally with the same rights

11  to economic benefits and subject to the same restrictions and limitations as other non-

12  managing members in Investor LLC on account of their respective ratable investments.

13  GDGE will serve as the managing member of Investor LLC, contributing capital of $10.

14  The Operating Agreement for Investor LLC will provide, to the maximum extent

15  permitted by Delaware law, that GDGE owes no fiduciary or other duties as managing

16  member to the non-managing members of Investor LLC, including Picerne/Babson and

17  Grigio Equity Interest holders choosing to participate, and shall provide that the non-

18  managing members have no voting or other rights to participate in decision-making or to

19  replace GDGE as managing member or manager. A copy of the Investor LLC Operating

20  Agreement shall be filed with a Plan and Disclosure Statement Supplement no later than

21  10 days before the deadline for voting on the Plan.

22       Further, on or prior to the Mondrian Effective Date, GDG Member will be

23  converted from an Arizona limited liability company into a Delaware limited liability

24  company. The Operating Agreement of GDG Member shall provide, to the maximum

25  extent possible under Delaware law, that GDGE owes no fiduciary or other duties as

26  managing member to the non-managing member Investor LLC and its members, and shall

27  provide that the non-managing members have no voting or other rights to participate in

28  decision-making or to replace GDGE as managing member or manager. A copy of the

270126.14



1  GDG Member Operating Agreement shall be filed with a Plan and Disclosure Statement

2  Supplement no later than 10 days before the deadline for voting on the Plan.

3      GDGE is willing to include an Investor LLC as a member of GDG Member only if

4  the members of the Investor LLC refrain from litigation and the assertion of claims as set

5  forth herein.  A condition of the Investment Opportunity is accordingly that, effective on

6  the Confirmation and the Mondrian Effective Date, each holder of a Class 5 or Class 6

7  Allowed Claim and each current Grigio Equity Interest holder electing to participate in the

8  Investment Opportunity shall execute a covenant not to sue and shall grant a full, general

9  and unconditional release and waiver of any claims or Causes of Action of any kind or

10  nature arising on or before the Mondrian Effective Date against the Debtors, GDGE, GDG

11  Member, any of their affiliates including Bruce Gray and Gray Meyer Fannin L.L.C.,

12  Canyon-Johnson Realty Advisors III, LLC, CJUF III, Preferred Member, or Purchaser, or

13  with respect to each of the foregoing Persons, each of their respective existing and former

14  directors, officers, employees, agents, representatives, shareholders, partners, constituent

15  partners, members, fiduciaries, principals, managers, predecessors, successors and assigns,

16  subsidiaries, parents, affiliates, affiliated and managed funds, attorneys, investment

17  bankers, restructuring consultants and financial advisors in their capacities as such, arising

18  out of or relating to the Debtors, the Project, Mondrian or Grigio, the Bankruptcy Cases or

19  any Claim or other right against any of the preceding arising out of or relating to the

20  Debtors, the Project, Mondrian or Grigio, the Bankruptcy Cases, and, to the extent

21  any litigation is pending relating to such matters, such litigation shall be dismissed with

22  prejudice.

23      A projection prepared by GDGE with respect to the Investment Opportunity is

24  attached as Exhibit 3.  If and to the extent Class 5 and Class 6 members and Grigio Equity

25  Interest holders decline to invest in GDG Member through membership in Investor LLC,

26  GDGE will be responsible for funding the amount needed for GDG Member's investment

27  in Purchaser.

28

270126.14



1  **C.  Cancellation of Existing Securities and Agreement.**

2  On the relevant Effective Date, and except as otherwise specifically provided for

3  herein or as otherwise required in connection with any Cure:

4  1.  all existing securities and any note, bond, indenture, or other

5  instrument or document evidencing or creating any indebtedness or obligation of Debtors,

6  except such notes or other instruments evidencing indebtedness or obligations of Debtors

7  as are reinstated or unchanged under this Plan, shall be cancelled, provided however that

8  security interests shall be released upon receipt of Distributions;

9  2.  the obligations of and/or, Claims against, Debtors under, relating, or

10  pertaining to any agreements, indentures, certificates of designation, articles of

11  organization, operating agreement, warrant, and any other note, bond, indenture, or other

12  instrument or document evidencing or creating any such cancelled indebtedness or

13  obligation of Debtors, shall be released; and

14  3.  Mondrian and Grigio's Equity Interests will remain intact until

15  completion of their respective Plan distributions, then shall be dissolved and wound up in

16  accordance with applicable state law.  Interests in those entities will be extinguished upon

17  the completion of the winding up.

18  **D.  Objections to Claims and Interests/Actions to Subordinate.**

19  Except as otherwise provided above (regarding allowance of Administrative

20  Expenses), objections to any Claims or Interests, and any action to subordinate a Claim or

21  Interest, shall be filed and served upon the holder of such Claim or Interest no later than

22  the Claims/Interests Objection Deadline.  After the Mondrian Effective Date, only

23  Reorganized Mondrian and Purchaser shall have the authority to file, settle, compromise,

24  withdraw or litigate to judgment objections to Claims and Interests, or any action to object

25  to or subordinate the Claims of Insiders, as to both the Mondrian and Grigio Estates.

26  **E.  Compliance with Tax Requirements.**

27  Each Debtor shall comply with all withholding and reporting requirements imposed

28  on such Debtor by Governmental Units, and all distributions pursuant to the Plan shall be

270126.14



1    subject to such withholding and reporting requirements, if any. Notwithstanding any other

2    provision of this Plan, Debtors, each holder of an Allowed Claim that has received a

3    distribution pursuant to this Plan, and each holder of an Interest, shall have sole and

4    exclusive responsibility for the satisfaction or payment of any tax obligation imposed by

5    any Governmental Unit, including income, withholding and other tax obligations on

6    account of its respective receipt of such distribution or on account of the transactions

7    undertaken with respect to its Claim or Interest pursuant to the Plan. Debtors shall have

8    no responsibility for the satisfaction or payment of any tax obligation assessed or

9    assessable upon Debtors after the relevant Effective Date, or upon holders of Claims or

10    Interests for any time period.

11        **F.**      **Conditions to Effectiveness of the Plan.**

12           **1.**      **Conditions.**

13       The Plan shall not become binding unless and until the relevant Effective Date

14    occurs. As to Mondrian, the Effective Date is the first Business Day (a) that is at least 14

15    days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in

16    effect; (c) no request for revocation of the Confirmation Order under Code § 1144 shall

17    have been made, or, if made, shall remain pending; and (d) on which all of the following

18    conditions have been satisfied or waived by Debtors and Purchaser:

19             a.     The Bankruptcy Court shall have approved by Final Order a

20    Disclosure Statement with respect to this Plan and a Sale Procedure Order providing for

21    sale to the Purchaser in form and substance acceptable to Debtors.

22             b.     The Confirmation Order shall be in form and substance

23    acceptable to Debtors, and Purchaser shall be reasonably satisfied with the terms of the

24    Confirmation Order to the extent that such terms would have a material impact on

25    Purchaser's purchase of the Project.

26             c.     All of the conditions to Closing under the APA have been

27    satisfied or waived.

28

          270126.14



d.     Any outstanding fees of the United States Trustee under 28 U.S.C. § 1930 have been paid in full.

e.     Any disputes over Cure Payments have been resolved; and

f.     All other agreements, writings and undertakings required under the Plan shall be executed and ready for Consummation.

As to Grigio, the Effective Date is 30 days after the Mondrian Effective Date.

**2.     Waiver of Conditions.**

The conditions to the occurrence of the relevant Effective Date, as specified above, may be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended, by the written direction of Debtors and Purchaser. The failure to satisfy or waive any of such conditions may be asserted by Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by Debtors. Debtors' failure to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed ongoing and assertable at any time.

**G.     Corporate Action**

Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall, as of the relevant Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the relevant Effective Date, ratified in all respects without any requirement of further action by members, creditors, or managers of any Debtor or Reorganized Debtor.

**H.     Effectuating Documents; Further Transactions.**

Brian Kearney, or any manager of any Debtor, or their respective designees, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to

270126.14



1  otherwise comply with applicable law.  The manager of the respective Debtors shall be

2  authorized to certify or attest to any of the foregoing actions.

3      **I.**    **Discharged Claims and Terminated Interests.**

4      Pursuant to Code § 1141(d)(3), Confirmation will not discharge Claims against

5  Debtors; provided, however, that, under the terms of the Plan, no Holder of a Claim

6  against any Debtor may, on account of such Claim, seek or receive any payment or other

7  distribution from, or seek recourse against, any of Debtors' respective successors or their

8  respective property, except as expressly provided herein.  Accordingly, except as

9  otherwise provided herein, the Confirmation Order shall provide, among other things, that

10  no Holder of a Claim against any Debtor may, on account of such Claim, seek or receive

11  any payment or other distribution from, or seek recourse against, any of Debtors'

12  respective successors or their respective property, except that from and after the

13  Confirmation Date, all Persons who have held, hold, or may hold Claims against or

14  Interests in Debtors are permanently enjoined from taking any of the following actions

15  against Purchaser, or any of their property on account of such Claims or Interests: (A)

16  commencing or continuing, in any manner or in any place, any action or other proceeding;

17  (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award,

18  decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; and (D)

19  commencing or continuing, in any manner or in any place, any action that does not comply

20  with or is inconsistent with the provisions of the Plan. Notwithstanding anything to the

21  contrary in the Plan, creditors' rights of setoff and recoupment are preserved, and the

22  injunctions referenced in the Plan shall not enjoin the valid exercise of such rights of setoff

23  and recoupment.  By accepting Distributions pursuant to the Plan, each Holder of an

24  Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the

25  injunctions set forth herein.

26

27

28

270126.14



**J.    Compromises And Settlements.**

Subject to Bankruptcy Rule 9019(a), Debtors may compromise and settle various (a) Claims against, or Interests in, Debtors and (b) Causes of Action that Debtors have against other Persons up to and including the Effective Date.

**K.    Setoffs.**

Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that Debtors may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtors or Reorganized Debtors of any such claim that Debtors or Reorganized Debtors may have against such holder of such Claim.

**L.    Releases by Debtors**

Debtors request for entry of the Confirmation Order shall constitute a motion to compromise claims under Bankruptcy Rule 9019. Pursuant to such compromise, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all Released Claims except for acts of gross negligence or willful misconduct.

**M.    Exculpation and Limitation of Liability**

None of (a) Debtors, (b) Purchaser, (c) Debtors' affiliates participating in the treatment of Claims under the Plan, and (d) with respect to each of the foregoing Persons, each of their respective existing and former directors, officers, employees, agents, representatives, shareholders, partners, members, fiduciaries, principals, managers, predecessors, successors and assigns, subsidiaries, parents, affiliates, affiliated and managed funds, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or

270126.14


1  arising out of the Chapter 11 Cases, the formulation, negotiation, implementation,

2  confirmation or consummation of this Plan, the Disclosure Statement, or any contract,

3  instrument, release or other agreement or document entered into during the Chapter 11

4  Cases or otherwise created in connection with this Plan; provided, however, that nothing

5  in this section shall be construed to release or exculpate any Exculpated Party from willful

6  misconduct or gross negligence as determined by a Final Order, or from compliance with

7  Plan provisions.

8  **Article XI.**

9  **General Considerations and Risk Factors To Be Considered**

10  Every holder of a Claim against or Interest in a Debtor should read and carefully

11  consider the following factors, as well as the other information set forth in this Disclosure

12  Statement (and the documents delivered together herewith and/or incorporated by

13  reference herein) before deciding whether to vote to accept or to reject the Plan.

14  **A.    General Considerations**

15  The formulation of a reorganization plan is the principal purpose of a chapter 11

16  case.  The Plan sets forth the means for satisfying the holders of Claims against and

17  Interests in the Debtors.  The sale to Purchaser captures value for creditors who will

18  receive more than the appraisal offered by Picerne/Key would suggest can be had.

19  **B.    Certain Bankruptcy Considerations**

20  If the Plan is not confirmed and consummated, there can be no assurance that the

21  Reorganization Cases will continue rather than be converted to liquidation or that any

22  alternative plan of reorganization would be on terms as favorable to the holders of Claims

23  and Interests as the terms of the Plan.  Failure of the reorganization would leave repayment

24  of creditors in Picerne's hands as it holds the senior lien on the Project.

25  **C.    Future Payments**

26  Payments to creditors on the Effective Date or the Distribution Date will be made

27  from proceeds of the Sale.  Future payments to Tempe and Picerne/Babson will be made

28  from the sources indicated above.



**Article XII.**

**Feasibility Of The Plan And The Best Interest Test**

**A.      Feasibility Of The Plan**

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtors.  This requirement is imposed by Code § 1129(a)(11) and is referred to as the "feasibility" requirement.  Debtors believe that they will be able to timely perform all obligations described in the Plan, and, therefore, that the Plan is feasible.

Purchaser's willingness to enter into the APA, the history of a CJUF III/Gray entity refinancing of a similar Tempe apartment project, Grigio Metro, and the investment history and financial capability of CJUF as described on its website, demonstrate the feasibility of selling the Mondrian Project to the Purchaser and making the payments due on the Effective Date and the Distribution Date.

Accordingly, Debtors believe that the Plan satisfies the feasibility requirement of Code § 1129(a)(11).  Debtors caution that no representations can be made as to the accuracy of any projections or as to the ability of parties under the Plan to achieve the projected results.  Many of the assumptions upon any projections in this Disclosure Statement are based are subject to uncertainties outside the control of Debtors.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which any projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect actual financial results.  Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.  This Disclosure Statement contains a discussion of certain risk factors that may affect financial feasibility of the Plan.

THE ATTACHED PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE

270126.14



1 PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY

2 ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS

3 OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS

4 HAVE NOT BEEN AUDITED OR REVIEWED BY DEBTORS' INDEPENDENT

5 CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH PRESENTED WITH

6 NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY

7 OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN

8 ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE

9 SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE

10 UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND

11 DEBTORS' CONTROL.

12      CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A

13 REPRESENTATION OR WARRANTY BY DEBTORS, GDG ENTERPRISES, L.L.C.

14 OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.

15 ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN

16 THE PROJECTIONS.

17     **B.**    **Acceptance of the Plan**

18      As a condition to confirmation, the Bankruptcy Code requires that each Class of

19 impaired Claims and Interests vote to accept the Plan, except under certain circumstances.

20 Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance

21 by holders of at least two-thirds in dollar amount and more than one-half in number of

22 Claims in that Class, but for that purpose counts only those who actually vote to accept or

23 to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-

24 thirds in amount and a majority in number actually voting cast their Ballots in favor of

25 acceptance. Under Code § 1126(d), a Class of Interests has accepted the Plan if holders of

26 such Interests holding at least two-thirds in amount actually voting have voted to accept

27 the Plan. Holders of Claims or Interests who fail to vote are not counted as either

28 accepting or rejecting the Plan.



1    **C.    Best Interests Test**

2    Even if a plan is accepted by each class of holders of claims and interests, the

3 Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best

4 interests" of all holders of claims and interests that are impaired by the plan and that have

5 not accepted the plan. The "best interests" test, as set forth in Code § 1129(a)(7), requires

6 a bankruptcy court to find either that (i) all members of an impaired class of claims or

7 interests have accepted the plan or (ii) the plan will provide a member who has not

8 accepted the plan with a recovery of property of a value, as of the effective date of the

9 plan, that is not less than the amount that such holder would recover if the debtor were

10 liquidated under chapter 7 of the Bankruptcy Code.

11    To calculate the probable distribution to members of each impaired class of holders

12 of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court

13 must first determine the aggregate dollar amount that would be generated from the

14 debtor's assets if its chapter 11 case was converted to a chapter 7 case under the

15 Bankruptcy Code. In the Mondrian cases, this "liquidation value" would consist primarily

16 of the proceeds from orderly sale of Debtors' assets. The amount of liquidation value

17 available to unsecured creditors would be reduced by, first, the claims of secured creditors

18 to the extent of the value of their collateral, and, second, by the costs and expenses of

19 liquidation, as well as by other administrative expenses and costs of both the chapter 7

20 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code

21 would include the compensation of a trustee, of counsel and other professionals retained

22 by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its

23 bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring

24 consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from

25 the operations of the debtor during the pendency of the bankruptcy case. The liquidation

26 itself would trigger certain priority payments that otherwise would be due in the ordinary

27 course of business. Those priority claims would be paid in full from the liquidation

28 proceeds before the balance would be made available to pay general unsecured claims or

270126.14



1  to make any distribution in respect of equity interests. The liquidation also could prompt

2  the rejection of a large number of executory contracts and unexpired leases and thereby

3  create a significantly higher number of unsecured claims.

4      Once the Court ascertains the recoveries in liquidation of secured creditors and

5  priority claimants, it must determine the probable distribution to general unsecured

6  creditors and equity security holders from the remaining available proceeds in liquidation.

7  If such probable distribution has a value greater than the distributions to be received by

8  such creditors and equity security holders under a debtor's plan, then such plan is not in

9  the best interests of creditors and equity security holders.

10      **D.**    **Estimated Valuation Of The Reorganized Debtors**

11      Section IV.A.1 of this Disclosure Statement sets forth information with respect to

12  the value of the Project. The APA is further evidence of market value. On the respective

13  Effective Dates of the Plan, the Debtors will become Reorganized Debtors, and their assets

14  and liabilities will be treated in accordance with the Plan.

15
16      **E.**    **Application Of The Best Interests Test To The Liquidation Analysis And The Valuation Of The Reorganized Debtors**

17      Since essentially all of Mondrian's assets are security for Picerne/Key, and then

18  Tempe, unsecured and priority Claims would receive no distribution in a liquidation, and

19  if Picerne/Key's appraisal is to be believed, Tempe would receive less than the amount

20  proposed in the Plan.

21      Debtors believe that, taking into account the liquidation analysis and the valuation

22  analysis of Reorganized Debtors, the Plan meets the "best interests" test of Code

23  § 1129(a)(7). Debtors believe that the members of each impaired Class will receive at

24  least as much under the Plan as they would in a liquidation in a hypothetical chapter 7

25  case. Holders of Claims and Interests will receive a better recovery through the

26  distributions contemplated by the Plan because Debtors' continued operation as going

27  concerns, supplemented by Purchaser's support, rather than a forced liquidation will allow

28  the realization of more value for Debtors' assets.

    270126.14



# Article XIII.

## Alternatives To Confirmation And Consummation Of The Plan

Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Reorganization Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.      Continuation Of The Bankruptcy Case

If Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether Debtors could survive as a going concern in protracted Reorganization Cases without Purchaser's support. In particular, Debtors could have difficulty sustaining the high administrative costs and the erosion of market confidence which may be caused if Debtors remain chapter 11 debtors-in-possession.

### B.      Alternative Plans Of Reorganization

If the Plan is not confirmed, Debtors or any other party-in-interest in the Reorganization Cases, could propose a different plan or plans. Picerne in particular, is free to propose a plan. Such plans might involve either a reorganization and continuation of Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### C.      Liquidation Analysis

If no plan is confirmed, Debtors' Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate Debtors' assets. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in Debtors.

270126.14



However, as discussed above, Debtors believe that creditors would lose substantially higher going concern value if Debtors were forced to liquidate. In addition, Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of Debtors' assets.

Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.

Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to holders of Claims and Interests under a chapter 11 liquidation plan probably would be delayed substantially.

In Debtors' opinion, as explained above, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

## Article XIV.

### Tax Consequences Of The Plan

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to

270126.14



1  the Debtors and to holders of Claims and Interests who are entitled to vote to accept or

2  reject the Plan are described below.  No opinion of counsel has been sought or obtained

3  with respect to any tax consequences of the Plan.  No rulings or determinations of the IRS

4  or any other tax authorities have been sought or obtained with respect to any tax

5  consequences of the Plan, and the discussion below is not binding upon the IRS or such

6  other authorities.  In addition, a substantial amount of time may elapse between the date of

7  this Disclosure Statement and the receipt of a final distribution under the Plan.  Events

8  occurring after the date of this Disclosure Statement, including changes in law and

9  changes in administrative positions, could affect the United States federal income tax

10  consequences of the Plan.  No representations are being made regarding the particular tax

11  consequences of the confirmation and consummation of the Plan to Debtors or any holder

12  of Claims or Interests.  No assurance can be given that the IRS would not assert, or that a

13  court would not sustain, a different position from any discussed herein.

14      The discussion of United States federal income tax consequences below is based on

15  the Internal Revenue Code ("IRC"), Treasury Regulations promulgated thereunder,

16  judicial authorities, published positions of the IRS and other applicable authorities, all as

17  in effect on the date of this document and all of which are subject to change or differing

18  interpretations (possibly with retroactive effect).

19      The following discussion does not address foreign, state or local tax consequences

20  of the Plan, nor does it purport to address the United States federal income tax

21  consequences of the Plan to special classes of taxpayers (e.g., banks and certain other

22  financial institutions, insurance companies, tax-exempt organizations, governmental

23  entities, persons that are, or hold their Claims or Interests through, pass-through entities,

24  persons whose functional currency is not the United States dollar, foreign persons, dealers

25  in securities or foreign currency, employees, persons who received their Claims or

26  Interests pursuant to the exercise of an employee stock option or otherwise as

27  compensation and persons holding Claims or Interests that are a hedge against, or that are

28  hedged against, currency risk or that are part of a straddle, constructive sale or conversion

270126.14



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   transaction).  Furthermore, the following discussion does not address United States federal

2   taxes other than income taxes.

3           Each holder is strongly urged to consult its own tax advisor regarding the United

4   States federal, state, and local and any foreign tax consequences of the transactions

5   described herein and in the Plan.

6           IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of

7   Claims or Interests are hereby notified that: (i) any discussion of federal tax issues

8   contained or referred to in this Disclosure Statement is not intended or written to be used,

9   and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties

10  that may be imposed on them under the IRC, (ii) such discussion is written in connection

11  with the promotion or marketing of the transactions or matters discussed herein, and (iii)

12  holders of Claims or Interests should seek advice based on their particular circumstances

13  from an independent tax advisor.

14          **A.      Debtors' Tax Consequences**

15          In general, Debtors will have to recognize gain or loss based upon the Sale.

16  Payment of creditors' claims in full should not result in material tax consequences.

17  Modification of the Tempe claim under the Payment Agreement and payment of less than

18  the full amount of unsecured claims may result in cancellation of debt income reported to

19  Grigio.

20          **B.      United States Federal Income Tax Consequences to Holders of Claims
                     Against and Interests in Debtors**
21

22          The following discusses certain United States federal income tax consequences of

23  the transactions contemplated by the Plan to holders of Claims or Interests that are "United

    States holders" as defined below.  The United States federal income tax consequences of
24
    the transactions contemplated by the Plan to holders of Claims or Interests (including the
25
    character, timing and amount of income, gain or loss recognized) will depend upon,
26
    among other things, (1) whether the Claim or Interest and the consideration received in
27
    respect thereof are "securities" for United States federal income tax purposes; (2) the
28

51                                          270126.14



LEWIS
AND
ROCA
LLP
L A W Y E R S

1   manner in which a holder acquired a Claim or Interest; (3) the length of time the Claim or

2   Interest has been held; (4) whether the Claim or Interest was acquired at a discount; (5)

3   whether the holder has taken a bad debt deduction or worthless stock deduction with

4   respect to the Claim or Interest (or any portion thereof) in the current or prior years; (6)

5   whether the holder has previously included in its taxable income accrued but unpaid

6   interest with respect to the Claim or Interest; (7) the holder's method of tax accounting;

7   and (8) whether the Claim or Interest is an installment obligation for United States federal

8   income tax purposes.  Therefore, holders of Claims or Interests should consult their own

9   tax advisors for information that may be relevant based on their particular situations and

10   circumstances regarding the particular tax consequences to them of the transactions

11   contemplated by the Plan.  This discussion assumes that the holder has not taken a bad

12   debt deduction with respect to a Claim or Interest (or any portion thereof) in the current or

13   any prior year and such Claim or Interest did not become completely or partially worthless

14   in a prior taxable year.  Moreover, Debtors intend to claim deductions to the extent they

15   are permitted to deduct any amounts they pay in cash, stock or other property pursuant to

16   the Plan.

17       For purposes of the following discussion, a "United States holder" is a holder of

18   Claims or Interests that is (1) a citizen or individual resident of the United States, (2) a

19   corporation created or organized in the United States or under the laws of the United

20   States or any political subdivision thereof, (3) an estate the income of which is subject to

21   United States federal income taxation regardless of its source, or (4) a trust if (i) a court

22   within the United States is able to exercise primary supervision over the administration of

23   the trust and one or more United States fiduciaries have the authority to control all

24   substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and

25   properly elected to be treated as a United States person.

26       **1.    Claim Holders' Tax Consequences**

27       Debtors pay cash to holders of Claims to discharge such Claims. The following

28   discussion relates only to the holders of Claims that are not paid in full.

52                                                                  270126.14



The United States federal income tax consequences arising from the Plan to such holders of Claims will vary depending upon, among other things, whether such Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt instrument, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes.

Trade claims are not considered securities. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. Each holder is urged to consult its tax advisor regarding the status of its Claim.

If such Claims constitute "securities" for United States federal income tax purposes, the exchange of such Claims for cash should constitute a "recapitalization" for United States federal income tax purposes. As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a holder of such Claims should recognize gain, but not loss, with respect to each Claim surrendered in an amount equal to the lesser of (1) the amount of gain realized (i.e., the excess of the cash and fair market value of any other property received by such holder in respect of its Claim over the adjusted tax basis of such Claim), excluding any such cash or property received in respect of a Claim for accrued interest that had not been included in income, and (2) the amount of cash received by such holder in respect of its Claim (other than with respect to any Claim for accrued interest). Any such gain recognized will generally be treated as capital gain if the Claim is a capital asset in the hands of the holder.

Under the Plan, a portion of the cash distributed to holders of Claims may be treated as distributed with respect to their Claims for accrued interest. Holders of Claims for accrued pre-petition interest which previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of



1  cash received with respect to such Claims for accrued pre-petition interest. The extent to

2  which consideration distributable under the Plan is allocable to accrued interest is not

3  clear. Holders of such Claims are advised to consult their own tax advisors to determine

4  the amount, if any, of consideration received under the Plan that is allocable to accrued

5  interest.

6       If such Claims do not constitute "securities" for United States federal income tax

7  purposes, the exchange of such Claims for cash should constitute a taxable exchange for

8  United States federal income tax purposes. As a result, a holder of Claims would

9  generally recognize income, gain or loss for United States federal income tax purposes in

10  an amount equal to the difference between (1) the cash received in exchange for its Claim,

11  and (2) the holder's adjusted tax basis in its Claim. The character of such gain or loss as

12  capital gain or loss or as ordinary income or loss will be determined by a number of

13  factors, including the tax status of the holder, the nature of the Claim in such holder's

14  hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the

15  Claim was purchased at a discount, and whether and to what extent the holder has

16  previously claimed a bad debt deduction with respect to its Claim. Any such gain

17  recognized would generally be treated as ordinary income to the extent that the cash is

18  received in respect of accrued but unpaid interest or accrued market discount that, in either

19  case, have not been previously taken into account under the holder's method of

20  accounting. A holder of Claims recognizing a loss as a result of the Plan may be entitled

21  to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable

22  year.

23       **2.**     **Interest Holders' Tax Consequences**

24       A holder of an Interest that is deemed cancelled under the Plan will recognize a loss

25  for United States federal income tax purposes in an amount equal to such holder's adjusted

26  tax basis in the Interest. The character of such loss as capital loss or as ordinary loss will

27  be determined by a number of factors, including the tax status of the holder and whether

28  the holder holds its Interest as a capital asset.

270126.14


## C.    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## D.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE

270126.14



PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## Article XV.

## Definitions

The Plan contains the definitions of terms used in the Plan and this Disclosure that are not defined in the Bankruptcy Code and Rules.

## Article XVI.

## Conclusion/Recommendation

The Plan provides for an equitable and early distribution to creditors, preserves the value of the Mondrian Project for creditors other than Picerne, resulting in full payment of Allowed creditor Claims. Debtors believe that any alternative to confirmation of the Plan, such as liquidation, could result in significant delays, litigation, and costs. Moreover, Debtors believe that their creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

DATED this 1st day of September, 2010.

**MONDRIAN TTL, L.L.C., a Delaware limited liability company**
By Mondrian Manager, LLC
Its Managing Member
By GDG Enterprises, LLC
Its Sole Member and Manager

By _____

Its _____



LEWIS
AND
ROCA
LLP
LAWYERS

1
2
3
4
5
6

**GRIGIO TTL, L.L.C., an Arizona limited liability company**
By GDG Enterprises, LLC
Its Managing Member

By _____

Its _____

7  **LEWIS AND ROCA LLP**

8

9  By   s/Susan M. Freeman #4199

10       Susan M. Freeman
         Rob Charles

11  Attorneys for Debtors

12  40 North Central Avenue

13  19th Floor
    Phoenix, Arizona  85004-4429

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Exhibits

1.    Joint Plan of Reorganization dated July 23, 2010, with attached Asset Purchase Agreement

2.    GDGE Projection of Investment in GDG Member

A Schedule of Assumed and Rejected Agreements  is to be filed in a Plan  and Disclosure Statement Supplement at least 10 days before the deadline for voting on the Plan

270126.14