Steven N. Berger, SBA #009613
Scott B. Cohen, SBA #014377
Patrick A. Clisham, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Telephone: (602) 271-9090
Facsimile: (602) 222-4999
E-mail: snb@engelmanberger.com
        sbc@engelmanberger.com
        pac@engelmanberger.com

Attorneys for TPG (Grigio) Note Acquisition, LLC

James E. Cross, SBA #009063
Warren J. Stapleton, SBA #018646
**OSBORN MALEDON, P.A.**
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2794
Telephone: (602) 640-9307
Facsimile: (602) 664-2077
E-mail: jcross@omlaw.com
        wstapleton@omlaw.com

Attorneys for TPG (Grigio) Mezzanine, LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>MONDRIAN TTL, L.L.C.,<br><br>        Debtor.<br><br>In re:<br><br>GRIGIO TTL, L.L.C., an Arizona limited liability company,<br><br>        Debtor. | Chapter 11<br><br>Case No. 2:10-bk-14140-RJH<br>Case No. 2:10-bk-14141-RJH<br><br>Jointly Administered Under<br>Case No. 2:10-bk-14140-RJH<br><br>**OBJECTION BY LENDERS (FIRST LIEN AND MEZZANINE LENDER) TO CONFIRMATION OF**<br><br>**DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION**<br><br>**Hearing Date: October 26, 2010**<br>**Hearing Time: 11:30 a.m.** |

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1      Debtors have presented the creditors of these estates and the Court with a joint

2  "reorganization" plan that unabashedly proposes that Debtors' management conduct and control a

3  non-competitive liquidation sale of Debtor Mondrian's single real estate asset. Only the Debtors'

4  insiders stand to benefit from the plan.[1]  Contrary to Bankruptcy Code requirements and established

5  U.S. Supreme Court authorities, the Debtors' proposed plan fails to require any competitive bidding

6  for the asset, fails to open the acquisition process to the marketplace, fails to require that Debtors'

7  equity holders contribute new capital to the *Debtors, fails to pay* creditors in the required order of

8  priority, and allows the Debtors' equity holders to retain control over the entire process while

9  rendering worthless the contractual and collateral rights of the Lenders.  Moreover, the success of the

10  plan is premised on speculative future fundraising, with no protections to creditors if funds are in fact

11  not raised.  It is no wonder, then, that the holders of over $80 million in claims have voted to reject

12  this plan.  The infirmities in the proposed plan are not mere technical issues, but rather go to the heart

13  of inequitable use of the Chapter 11 process to the detriment of creditors rather than toward a viable

14  and proper reorganization.

15      TPG (Grigio) Note Acquisition, LLC ("Senior Lender") and TPG (Grigio) Mezzanine, LLC

16  ("Mezz Lender" and together with Senior Lender, "Lenders"), therefore object to the confirmation of

17  Debtors' "Amended Joint Plan of Reorganization" filed by the Debtors on September 1, 2010 (the

18  "Plan").[2]  Dkt. 168.[3]  Lenders request that the Court as promptly as possible order that the Plan fails

19  to meet Bankruptcy Code requirements for confirmation, both as a legal matter and as a factual

20  matter.  The Court should allow creditors in these cases to enforce their state law and contractual

21  rights, or immediately propose a plan that will in fact garner support of the creditors in these cases.

22

---

23  [1]  While Debtors have asserted that the Lenders have somehow acted onerously in this matter, it is the
24  Debtors and their counsel's relentless efforts to cram down a plan of reorganization over the
   objections of substantially all creditors (solely aimed at preserving a management contract for insiders
25  of the Debtors) that is objectionable, and is analogous to the conduct admonished by the Ninth Circuit
   in *In re Perez*, 30 F.3d 1209, 1219 (9th Cir. 1994).

26  [2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

27  [3]  Unless otherwise noted, all Dkt. references will refer to the docket in the Mondrian bankruptcy case
   no. 10-14140.

{02698.001/00198920.DOC /}

1   This Objection is supported by the following Memorandum of Points and Authorities, the

2   Omnibus Statement of Facts filed by Lenders on September 17, 2010 (Dkt.104), and the entire record

3   in these jointly administered cases.

4        DATED this 20th day of October, 2010.

5

6                          **ENGELMAN BERGER, P.C.**

7        By: __/s/ SBA #009613__
                Steven N. Berger
8               Scott B. Cohen
                Patrick A. Clisham
9               3636 North Central Avenue, Suite 700
                Phoenix, Arizona 85012
10              Attorneys for TPG (Grigio) Note Acquisition, LLC

11       OSBORN MALEDON, P.A.

12

13       By: __/s/ SBA #009063__
                James E. Cross
14              Warren J. Stapleton
                2929 North Central Avenue, Suite 2100
15              Phoenix, Arizona 85012-2794
                Attorneys for TPG (Grigio) Mezzanine, LLC

16

17   **I.   SUMMARY OF LEGAL AND FACTUAL GROUNDS PRECLUDING PLAN CONFIRMATION.**

18       As a general matter, the Supreme Court has analyzed many of the same issues before the

19   Court in this case, and set forth requirements that Debtors simply have not met. *See Bank of America*

20   *National Trust and Savings Assoc. v. 203 North LaSalle Street Partnership ("LaSalle")*, 526 U.S. 434

21   (1999). LaSalle establishes the following principle regarding a "new value" plan that squarely

22   governs this case:

23       ....plans providing junior interest holders with exclusive opportunities free from
24       competition and without benefit of market valuation fall within the prohibition of §
         1129(b)(2)(B)(ii).
25

26   526 U.S. at 458. As aptly summarized, "*LaSalle* holds that a new value corollary might exist, but if

27   it does, it requires either exclusivity to be terminated or some kind of opportunity for competing bids

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

to contribute the new value." Hon. Randolph J Haines, "Confirming a Chapter 11 Plan," 2006 Norton Bankruptcy Law Seminar, p. 79. In this case, insider junior interest holders propose a non-market tested sale of all of Mondrian Debtor's assets such a Plan violates the absolute priority rule / new value corollary as set forth in *LaSalle*. The Plan is premised upon a *liquidation* and sale of the Project to insiders that has not been exposed to the marketplace and denies the Debtors' creditors a meaningful opportunity to participate in and benefit from a *reorganization* of the Debtors.

In addition to failing to comply with *LaSalle*, Debtors' Plan does not satisfy confirmation standards under 11 U.S.C. § 1129(a), and does not satisfy "cram-down" requirements under 11 U.S.C. § 1129(b), in that:

1. The Mondrian Plan's *classification scheme* is unsupportable under Ninth Circuit precedent, as it separately classifies unsecured creditors without legal justification solely in order to gerrymander voting and create an accepting impaired class of creditors for cramdown;

2. The Plan violates the *absolute priority rule* by allowing existing equity to retain control and valuable rights without fully satisfying senior claims or providing for market testing, bidding or allowing creditors to propose their own plan;

3. The Grigio Plan does not have a single *accepting impaired class* of creditors (and the Court's interim ruling on the Mezz Lender's "unimpaired" status should be revisited);

4. The Plan is not feasible in that:

   a.  The Plan underestimates the funding necessary to pay administrative costs and acquisition costs by several million dollars, which the Debtor does not have the ability to fund; and

   b.  The Plan fails to compensate the Mezz Lender for the post-petition loss in value of its collateral incurred while the automatic stay has been in place, and the Plan does not provide for payment of the Mezz Lender's administrative priority claim for such losses.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## II. DEBTORS AND THE AMENDED PLAN.

### A. Summary of Debtors' Bankruptcy Filing.

The Debtors filed their voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on May 9, 2010. Dkt. 1. Mondrian's primary asset consists of the Project, a 523 unit apartment building on the north side of Tempe Town Lake, Tempe, Arizona. Dkt. 66. Grigio's primary asset consists of 100% of the membership interests in Mondrian. Grigio Dkt. 25. Mondrian does not operate any business or hold any interests beyond the Project. Dkt. 66. Grigio does not operate any business or hold any interests beyond the membership interests in Mondrian. Grigio Dkt. 25.

Senior Lender is Mondrian's senior secured lender holding a note in the principal amount of $62,675,000 that is secured by a first position lien on the Project. Dkt. 194 at ¶¶ 2-3. Mezz Lender is the holder of a mezzanine note by Mondrian in the principal amount of $8,600,000 that is secured by a pledge of Grigio's 100% membership interests in Mondrian (the "Mezzanine Note"). *Id.* at ¶¶ 5-6.

The City of Tempe ("Tempe") holds a second position secured interest in the Debtor securing $9,800,000 of obligations by Mondrian. *Id.* at ¶ 21. Tempe is both an unsecured and secured creditor of the Debtors and is, after the Mezz Lender, the Debtors' single largest unsecured creditor. *Id.* In addition, Tempe holds fee title to the real property underlying the Project and is a party to a lease agreement pursuant to which Mondrian leases the real property from Tempe (the "GPLET Lease"). *Id.* at ¶ 24. Tempe is also a creditor of Mondrian with respect to certain development taxes and water and sewer assessments resulting from its development and operation of the Project. *Id* at ¶ 27. In total, Tempe is owed approximately $12 million by the Mondrian Debtor. *Id.* at 21-26. Combined, the Senior Lender, the Mezz Lender and Tempe hold more than 99.7% of the Debtors' approximately $84 million prepetition claims. Each of these entities lacks confidence in the Debtors' management and opposes confirmation of the Plan.

### B. Debtors' Reorganization Efforts to Date.

At the first hearing held before this Court, the Debtors represented that their bankruptcies were filed in order to thwart the efforts of the Lenders to purchase the Mezz Note and foreclose on the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Mondrian membership interests. *Id.* at ¶ 31. Counsel for the Debtors advised that he anticipated that the Debtors would effectuate a quick restructuring of their obligations through refinancing. *See* Dkt. 118. Counsel further advised that the Debtors did not intend to reorganize through a chapter 11 plan but would simply dismiss their chapter 11 cases upon a successful restructuring or refinancing, which was likely to take place in less than 120 days. Dkt. 118 at p. 30-32. After failing to secure the agreements necessary to refinance or restructure their obligations consensually, the Debtors filed their first Joint Plan of Reorganization (the "First Plan") on July 23, 2010. Dkt. 119.

The First Plan proposed to sell the Project for $70,105,000 to the Purchaser, whose members are to be comprised of an affiliate of Canyon Johnson Urban Funds ("CJUF") and the current equity holders of the Debtors (or their affiliates). *Id.* The proceeds of the proposed sale were to be used to satisfy the Senior Lender in full and to fund a $5 million pot of money to be shared *pro rata* among the Mezz Lender and certain other limited unsecured creditors. *Id.* The Debtors' obligations to Tempe were to be modified to effectuate a release of Tempe's lien such that Tempe would receive approximately $2.7 million on the Effective Date and an additional approximately $7.4 million in Plan and GPLET payments over approximately 4 years. *Id.*

In documents and pleadings filed with and argued before the Court, the Lenders raised significant concerns about the First Disclosure Statement and the confirmability of the Debtors' First Plan. See Dkts. 125, 145, 151, 152, 160, 175, 182, and 191. *See also* Dkt. 194 (Tempe's joinder to Lender's motion to terminate exclusivity). After independently reviewing the First Plan and considering presentations by the Debtors, Tempe resolved not to support the First Plan and advised the Court of its opposition when it appeared at the Court's August 26, 2010 hearing. Dkt. 160.

**C.    Summary of the Amended Plan.**

On September 1, 2010, the Debtors filed their amended Plan. The Plan contemplates $78 million of capitalization of the Purchaser entity that again would be owned by CJUF and the current equity holders of the Mondrian Debtor and will purchase the Project for a total of $75,342,540.[4] Dkt.

---

[4] The Debtors have offered no explanation as to why they determined the Project was worth only $70 million on July 23, 2010 and then just over a month later determined it was worth over $75 million. The Debtors have not retained a broker-postpetition.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

118. Trying to give cosmetic attention to the glaring confirmation deficiencies, Debtors amended the Plan in part to offer creditors such as the Mezz Lender an "opportunity" to participate in the equity of the Purchaser. Dkt. 168 at § X, B. The "opportunity" is not commercially viable, does not open the process to the market, and is not on par with the opportunities and benefits enjoyed by the Debtors' insiders, who will retain complete and autonomous control over the Project under the Plan.

The Plan contemplates the satisfaction of the Senior Lender from proceeds of the sale as well as payment to Tempe of all amounts due to Tempe as of the Petition Date without interest, an amount that is estimated by the Debtors to be $11,752,340. Dkt. 169 at pp. 4-5. With respect to unsecured creditors, the Debtors have separated them into two classes, Class 4 and Class 5. Dkt. 168 at § X, B. Class 4 includes Mondrian vendor claims comprising of trade creditors (suppliers of goods and services for the Project) agreeing to continue to provide typical goods and services for an apartment project to the *Buyer* (not the Debtor) on 30-day credit terms. *Id.* Class 4 creditors will be paid 100% of their claims (without interest) on the Effective Date. *Id.* Class 5 includes the Mezz Lender's claims and the claim of any other trade creditor that would prefer not to be paid in full on the Effective Date. *Id.* Members of Class 5 (the Mezz Lender) will share in a pot of $150,000 to be distributed *pro rata* among its class members. *Id.* Creditors in Class five will be paid no more than 1.4% of their claims. *Id.*

## III. PLAN CONFIRMATION IS PRECLUDED ON THE LAW AND FACTS OF THIS MATTER.

### A. The Proposed Plan Violates the Word and Spirit of *LaSalle.*

As summarized above, the Supreme Court has weighed in on the issues surrounding insider control of a Chapter 11 case where the insiders do not show that they have tested the market or solicited competing offers. In *LaSalle*, the debtor sought to confirm a plan of reorganization that allowed existing equity to retain control and ownership of the post-confirmation debtor. In order to try to avoid an absolute priority rule violation, existing equity proposed to make a new value contribution. 526 U.S. at 440. While much of the *LaSalle* decision is dedicated to a discussion of the absolute priority rule and whether a new value corollary to the rule exists, the Court deferred making

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

such a determination and instead held that the debtor's plan could not be confirmed on the basis that the debtor's creditors were not given an opportunity to compete for the equity of the reorganized debtor or propose a competing plan of reorganization. *Id.* Particularly troubling for the Supreme Court was that the debtor's existing equity had a *valuable* right to use the exclusivity period to propose "a plan under which the benefit of equity ownership may be obtained by no one but old equity." *Id.* at 454-455 ("before the Debtor's Plan was accepted no one else could propose an alternative one, and after its acceptance no one else could obtain equity in the reorganized entity. At the moment of the plan's approval the Debtors' partners enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder"). The Supreme Court held that "plans providing junior interest holders with exclusive opportunities free from competition and without the benefit of market valuation, fall within the prohibition of § 1129(b)(2)(B)(ii)." *Id.* at 457-458 ("Under a plan granting an exclusive right, making no provision for *competing bids* or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas *the best way to determine value is exposure to the marketplace*) (emphasis added). *See, In re Situation Management Systems, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (a new value plan must both include an auction mechanism and exclusivity being terminated); *In re Davis*, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001) (*LaSalle* broadly suggests that "*either* the right to bid for equity under a plan *or* the opportunity to propose a competing plan would suffice.").

Debtors' Plan provides no opportunity for alternative equity bids. Debtor's Plan does not allow for credit bids. Dkt. 168. Debtors' Plan and assets are still subject to Debtors' sole control, as no exclusivity termination has been ordered in the case. Dkts. 191, 195, 196 and 198. Debtors' own CEO/Consultant Lee Johnson has confirmed the value of this control right in acknowledging that Gray Affiliates bid over $2.6 million for the Mezzanine Loan and attendant. *See* transcript excerpts from deposition of Debtors' Rule 30(b)(6) witness Lee Johnson attached hereto as **Exhibit A**.

Debtors' use of a sale format is not the antidote for the Plans' plain violations of *LaSalle*. Debtors and their equity holders have used the bankruptcy process and the exclusivity period to

1    develop a plan of reorganization that sells the Project to insiders and business affiliates without any

2    effort to determine its value, expose the Project to the marketplace or provide any meaningful

3    opportunity for creditors to participate in equity on par with insiders.

4    Indeed, representatives of the Debtors and their affiliates have testified consistently that the

5    Debtors have made no significant efforts to market the Project to third parties. *See* Exhibit A; *see*

6    *also* transcript of September 23, 2010 hearing in adv. no. 10-1210, Dkt. 35, pp. 96-97. The only

7    "opportunity" creditors have to participate in the Project, is a limited option to invest up to $2 million

8    in the Debtor affiliate member of the Purchaser in exchange for an interest in the Project that would

9    be deeply subordinated to the repayment of CJUF's investment and the payment of a 19% preferred

10   return on the CJUF investment, have no voting or management rights, and require such creditors (*i.e.*,

11   the Mezz Lender) to waive rights against third party guarantors. Dkt. 168 at § X, B; Dkt. 194 at ¶¶

12   44-50. This is not a meaningful exposure to the marketplace. It is a hollow gesture to the notion of

13   equity participation. One only need read *LaSalle* to know that control is recognized as a valuable part

14   of the equity position; the gesture of offering a non-voting right to invest funds in the Debtors' plan is

15   not a substitute for the 100% management and control of the Project being retained by Debtors under

16   their sale plan. According, the Plan is unconfirmable under the standards proscribed by the Supreme

17   Court in *LaSalle*.

18   **B.    The Plan Otherwise Violates the Absolute Priority Rule.**

19   The absolute priority rule, which has in part been codified in Section 1129(b), forbids

20   confirmation of a plan over the objection of an impaired class of claimants unless junior claimants

21   will not receive or retain any property on account of their junior claims. *LaSalle*, 526 U.S. at 442.

22   This confirmation requirement is a strict one, and "creditors may insist on priority of payment:

23   secured creditors must be paid in full before unsecured creditors retain any interest, and unsecured

24   creditors must be paid off before equity holders retain an interest." *Wilkow v. Forbes, Inc.*, 241 F.3d

25   552, 554 (7th Cir. 2001).

26   The Mondrian Plan effects a *de facto* transfer of equity interests in the sole asset of the

27   Mondrian Debtor to insiders without paying Mezz Lender's senior claim in full. TPG Mezz Lender

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

has not consented to this treatment. As such, the Plan violates the absolute priority rule and cannot be confirmed. *See, e.g., In re Woodbrook Assoc.*, 19 F.3d 312, 320 (7th Cir. 1994) ("A Chapter 11 plan that violates the absolute priority rule cannot be confirmed over a creditor's legitimate objections."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990) ("Priority is 'absolute' in the sense that every cent of each class comes ahead of the first dollar of any junior class.").

Moreover, the Plan violates the prepetition agreements between the Senior Lender, the Debtors' affiliate GDG Partners, LLC and Tempe, which provides that Tempe may take nothing on account of its claim unless and until the Senior Lender is paid for all liabilities due and owing by Mondrian. Such liabilities include *all* default interest and attorneys fees incurred in connection with the Senior Loan, which are not being paid to the Senior Lender under the Plan. A true and correct copy of the intercreditor agreement executed between the parties is attached as **Exhibit B**.

### C. The Plan's Classification Scheme is Not Valid and Unfairly Discriminates Among Similarly Situated Claims.

The Bankruptcy Code allows for confirmation of a plan, even though an impaired class of claims has voted to reject it, provided that such plan does not "discriminate unfairly" against the dissenting class of impaired claimants. *See* 11 U.S.C. § 1129(b)(1). In the Ninth Circuit, a clear rule has developed that a debtor cannot classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan. *In re Barakat*, 99 F.3d 1520 (9th Cir. 1996); *see also Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage)*, 166 B.R. 892 (9th Cir. BAP 1994); *Montclair Retail Ctr. L.P. v. Bank of the West (In re Montclair Retail Ctr.)*, 177 B.R. 663, 665-66 (9th Cir. BAP 1995) (following *Tucson Self-Storage*). Separate classification absent a business or economic justification, is an impermissible classification in violation of § 1122(a). *Tuscon Self Storage* at 897-898; *see also In re Boston Post Rd.*, 21 F.3d 477, 483(2nd Cir. 1994) (Second Circuit held that separate classification for the purpose of preventing the undersecured creditor from rejecting the plan is contrary to the principles underlying the Bankruptcy Code, that is, that creditors holding greater debt should have a comparably greater voice in reorganization).

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Debtors' Plan impermissibly places Mezz Lender's unsecured claim in a separate class (Class 5) from Debtor's routine vendor claims (Class 4), and then specifies a substantially greater percentage recovery to the holders of the vendors' claims. The disparity in the treatment is significant. Under the Plan, vendor claims are entitled to payment of 100% payment of their claims on the Effective Date, while the Mezz Lender's unsecured claim will be paid *less than 1.4%*. [5]

The Debtors' proposed separate classification of the Mondrian trade vendors from the Mezz Lender Claim is pure gerrymandering. In order to justify the contrived classification, the Debtors must establish that the separate classification and treatment is reasonable and necessary for the Debtor's *reorganization*. *Boston Post Rd.,* 21 F.3d at 483. They cannot. The Debtors are not *reorganizing*, they are *liquidating*. Any benefit that the Debtors allege may be derived by separate classification and treatment is for existing equity and the Purchaser and not for the Debtors or their creditors. Indeed, the reorganized Debtors will have no need for the services of the Mondrian trade vendors after the Project is sold and will themselves achieve no benefit from the trade vendors' continued cooperation with the Purchaser going forward. There is no authority that would allow the Debtors to separately classify and disproportionally treat trade creditors where the benefit will only be derived by a "third party" purchaser.

Even if the Plan proposed a true reorganization, the separate classification proposed by Debtor is precluded by Ninth Circuit precedent. *See Barakat,* 99 F.3d 1520. On strikingly similar facts, the debtor in *Barakat* attempted to separately classify its trade vendors (service and materials providers for an apartment building) from a secured creditor's deficiency claim. *Id.* After considering debtors' arguments that it was appropriate and necessary to separately classify such creditors because their claims arose on distinct legal grounds and because they were necessary to the debtor's reorganization, the Ninth Circuit rejected those arguments and upheld the bankruptcy court's finding that there was no business justification for separately classifying trade creditor claims related to the apartments

---

[5] Notably, in a Chapter 7 case, the holders of Class 4 Claims and the holders of Class 5 Claims would receive the same ratable distribution at the same time. And, since there has been no market testing, Debtors have not established that a Chapter 7 liquidation would not return as least as much as their Plan (another ground for disapproval under Section 1129(b)).

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

(upholding bankruptcy court's finding that "literally thousands of companies are available to provide the [ ] services of the trade creditors"). *Barakat*, 99 F.3d at 1529; *cf Boston Post Rd.,* 21 F.3d at 483 (holding that a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code.)

To gain confirmation, Debtors need an accepting impaired class, but all legitimate classes have or are expected to vote to reject the Plan. Precedent precludes Debtors from manufacturing an accepting class by creation of a class of creditors based on artificial distinctions between unsecured claims. *Id.* The Debtors' Plan suffers the exact same flaws as the plan at issue in *Barakat*. The Debtors' trade vendors are comprised of landscapers, maintenance companies, management companies and foodservice suppliers. None of these creditors is unique and none provide services that could not otherwise be replaced on a moment's notice by the Debtors or the Purchaser. Accordingly, Debtors' classification scheme must be disapproved. When taken together, Class 4 and Class 5 have voted to reject the Plan.

Debtors' compound their unlawful classification scheme by also separately classifying the unsecured claims of Tempe from other unsecured claims. Tempe is owed $1,656,948 as a general unsecured creditor for sewer and water and another $10,479.52 for unpaid utilities. Tempe opposes the Plan. Obviously, if Tempe's general unsecured claims are classified with the limited trade claims that exist then the Debtor will never get unsecured creditors to be an accepting impaired class. To avoid this risk, the Debtor again resorts to separate classification without a meaningful distinction or legal basis.

As there is no accepting impaired class of claims, the Plan cannot be confirmed.

**D.    The Grigio Debtor Cannot Achieve Plan Consent.[6]**

To satisfy Section 1129(a), the *Grigio* Debtor must either have the consent of all classes, *see*

---

[6] On August 26, 2010 and in connection with the Mezz Lender's motion for stay relief, the Court made a preliminary ruling that the Mezz Lender was not impaired under the Debtors' First Plan. Although the Mezz Lender's treatment under the Grigio portion of the current Plan is essentially unchanged, the Court has not made such a determination with respect to the Debtors' current Plan nor has it entered a final order denying the Mezz Lender's request for stay relief.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

11 U.S.C. § 1129(a)(8)(B), or have an impaired accepting class. *See* 11 U.S.C. § 1129(a)(10); *In re YL West 87th Holdings, LLC*, 423 B.R. 421, 444 n.48 (Bankr. S.D.N.Y. 2010). Although the Debtors' Plan lumps all of the creditor classes of both Debtors into one "super set" of creditors, the Debtors have not moved for substantive consolidation. In fact, the Plan indicates that the cases "are being jointly administered pursuant to an order of the Bankruptcy Court for procedural purposes only" and counsel for the Debtors has clarified that they do not seek substantive consolidation of the Debtors through the Plan. *See* Dkts. 36 and 168, p. 4. Without substantive consolidation, each Debtor must separately satisfy the plan confirmation requirements set forth in 11 U.S.C. § 1129(a). *See In re N.S. Garrott & Sons*, 43 B.R. 13, 18 (Bankr. E.D. Ark. 1984). The Debtors cannot simply lump their assets together in order to circumvent confirmation obstacles they would face if forced to file "stand alone" plans.

When the Debtors are appropriately disconnected, the Grigio Debtor has only two classes of creditors:    1 - Class 8, the Mezz Lender's Secured claim, and

2 - Class 9, the claims of two affiliates of the Grigio Debtor.[7]

The Mezz Lender comprises the only class of creditors entitled to vote and it opposes the Plan. Further, the Plan acknowledges that Class 9 consists of insider claims (and proposes that these claims be waived). *See* 11 U.S.C. § 101(31) (the definition of "insider" includes affiliates); Dkt #119, pp. 11-12. Because all of the Class 9 claims are held by insiders, Class 9 cannot constitute the accepting impaired class needed to satisfy the "impaired accepting class" requirement set forth in 11 U.S.C. § 1129(a)(10). Accordingly, the Grigio Debtor cannot satisfy § 1129(a)(8)(B) and the Plan cannot be confirmed. *See YL West 87th Holdings,* 423 B.R. at 444 n.48.

Under these circumstances, the only way the Grigio Debtor could satisfy § 1129(a) is to treat the secured claim of the Mezz Lender unimpaired. On August 26, 2010 and in connection with the

---

[7] *Those two claims are:* (1) Mondrian – an insider because Mondrian is wholly owned by Grigio. *See* Dkt #11, ¶3, Dkt #24 (Case No. 14141). (Mondrian has an unsecured claim in the amount of $1,776,203.) And, (2) GDG Enterprises, LLC ("GDG") another insider because it is the manager of Grigio. *See* Dkt #11, ¶2; Dkt #24 (Case No. 14141), Schedule F. GDG has an unsecured claim for $1,000.

{02698.001/00198920.DOC /}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1    Mezz Lender's motion for stay relief, the Court made a preliminary ruling that the Mezz Lender was

2    not impaired under the Debtors' First Plan.  Although the Mezz Lender's treatment under the Grigio

3    portion of the current Plan is essentially unchanged, the Court has not made such a determination with

4    respect to the Debtors' current Plan nor has it entered a final order denying the Mezz Lender's request

5    for stay relief.  Instead, the matter has been continued for an evidentiary hearing to be held in

6    conjunction with the hearing on confirmation of the Plan.  As part of this Objection, Mezz Lender

7    requests reconsideration of the Court's August 26, 2010 preliminary ruling or an appropriate ruling as

8    to the terms of the Amended Plan.

9           The Plan provides the following treatment for the Mezz Lender's secured claim against the

10   Grigio Debtor: "Picerne/Babson [the Mezz Lender] retains its security interest in Grigio's equity

11   ownership of Mondrian.  Picerne/Babson [the Mezz Lender] retains all of its rights against Grigio, is

12   unimpaired, and is not entitled to vote on the Plan."  *See* Dkt 168, p. 10.  Respectfully, the Mezz

13   Lender is impaired.

14          Section 1124 provides that a class of claims is impaired unless "'the plan . . . leaves unaltered

15   the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such

16   claim or interest.'"  *In re L&J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993) (quoting 11 U.S.C.

17   § 1124(1)).  "It is well established that, with this language, 'Congress define[d] impairment in the

18   broadest possible terms.'"  *Id.* (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984)

19   (quoting *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982)).  The Ninth Circuit has indicated that "'*any*

20   *alteration of rights* constitutes impairment even if the value of the rights is enhanced.'"  *L&J*

21   *Anaheim*, 995 F.2d at 942 (emphasis added) (quoting *In re Acequia*, 787 F.2d 1352, 1363 (9th Cir.

22   1986)).  Thus, where the plan does not provide a creditor with exactly the same bundle of rights that

23   the creditor received in its pre-petition contract, that creditor is impaired under Section 1124.  *See*

24   *L&J Anaheim*, 995 F.2d at 943.

25          The Plan substantially alters the rights that the Mezz Lender can exercise under its agreements

26   with the Debtors.  The pre-petition contracts establishing the Mezz Lender's rights against the

27   Debtors are the Promissory Note, the Pledge Agreement, and the Loan Agreement.  *See* Dkt #84,

{02698.001/00198920.DOC /}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Exhs. A (Promissory Note) and B (Pledge Agreement); Dkt. 143, Exh. 2 (Loan Agreement)  Under the Pledge Agreement, the Grigio Debtor pledged its 100% membership interests in Mondrian as collateral for the $8,600,000 mezzanine financing to Mondrian.  If the Mondrian Debtor fails to repay the mezzanine note – the note matured in March 2009 – the holder of the Pledge Agreement (the Mezz Lender) has certain rights and remedies including the right to vote the membership interests of the Mondrian Debtor and, derivatively, the right to determine and control the future of the Project.

**1.  The Plan Denies Mezz Lender's Rights to Control Project.**  The Plan prevents the Mezz Lender from exercising the voting rights of the membership interests to control Mondrian and disposition or reorganization of the Project.  The Debtors' position may be that the Mezz Lender can vote the Mondrian membership interests in any way that it may choose after plan confirmation, but after plan confirmation, the Mondrian Debtor will have no assets and its rights to control the Project will be gone.  Retaining the right to vote the membership interests that control an entity with no assets is substantially different than the right to vote the membership interests that control an entity with assets that are valued at more than $75 million by the Debtors.  By stripping the Mezz Lender of the right to control the reorganization and disposition of the Project, the Plan plainly impairs the Mezz Lender's rights under its pre-petition contract with the Grigio Debtor.  *See L&J Anaheim*, 995 F.2d at 943.

**2.  The Plan Denies Mezz Lender the Benefits of Foreclosure.**  Moreover, under the Pledge Agreement, the Mezz Lender had the right to foreclose upon and sell the membership interests of Mondrian upon a payment default.  Exh. 1, §§ 9(a), 9(c), and 10.  If the Mezz Lender were to sell the membership interest under Arizona's version of the UCC, the now asset-less membership interests would have substantially less value than the asset-backed Mondrian membership interests.

**3.  The Plan Denies the Mezz Lender a Deficiency Claim.**  The Mezz Lender's UCC sale rights include a right to obtain a deficiency judgment against the obligor.[8]  *See* A.R.S. § 47-

---

[8]  Debtors may assert that the Grigio Debtor is not an "obligor" under the Pledge Agreement or Loan Agreement because it is not the borrower.  Grigio satisfies the definition of an obligor under the UCC, however, because Grigio owes performance under the security agreement, and "is otherwise accountable in whole or in part for payment or other performance of the obligation." *See* A.R.S. § 47-9102(59).

9608(c)(4). The Debtors' Plan does not provide a class for the Mezz Lender's unsecured deficiency claim – or propose payment of any kind to Grigio's unsecured creditors. Moreover, the Bankruptcy Code and loan documents grant the Mezz Lender a right to a deficiency claim against the Grigio Debtor. The non-recourse provision of the Loan Agreement specifically provides: "[n]othing herein shall be deemed to be a waiver of any right which the Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Pledge Agreement or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with the Note, the Pledge Agreement, and the other Loan Documents." Loan Agreement at § 9.15(b). Section 1111(b)(1)(A) provides that a secured claim "shall be allowed as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has recourse unless, (a) the class to which the secured claim belongs elects treatment under Section 1111(b)(2); or (b) "such holder does not have such recourse and such property is sold under Section 363 of this title or is to be sold under the plan." *See* 11 U.S.C. § 1111(b)(1)(A). Thus, the Mezz Lender does have a deficiency-based claim directly against the Grigio Debtor and that claim is not treated under the Plan. Accordingly the Mezz Lender's legal rights are altered (impaired) by the Plan.

**4. The Plan Denies the Mezz Lender Other Property Conveyed or Extinguished Under the Plan.** The Plan deprives the Mezz Lender of its ability to assign its right to distributions (the Plan indicates that there will not be any *see* Pledge Agreement at § 8(a); Dkt # 168, p 12) and the Mezz Lender has also lost its right to pursue claims on behalf of its ownership in the Mondrian membership interests. *See* Pledge Agreement at §§ 13(a) and 13(c). Under the Plan, the Mondrian Debtor's causes of action are sold to the Purchaser. *See* Dkt #169, pp. 32-33. *See L&J Anaheim*, 995 F.2d at 942; *In re Rhead*, 179 B.R. 169, 177 (Bankr. D. Ariz. 1994).

**5. The Plan Forces An Improper Impairment Election on the Mezz Lender in Mondrian Plan.** Class 6 of the Plan ostensibly treats the Mezz Lender's unsecured claim in the Mondrian Plan by providing the Mezz Lender a prorated share of a $150,000 fund with any trade creditors that decline to be paid in full as Class 4 Claimants. Dkt. 168 at § I, B. However, in the event that the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Mezz Lender declines to support the Plan, the Debtors' ballot and the Plan attempt to force Mezz Lender to impair itself under the Plan by either acquiescing to a violation of the absolute priority rule in the Mondrian case (by electing to allow Mondrian's equity to survive, despite the Mondrian's failure to repay all creditors in full) or electing cancellation of the Mondrian Interests and elimination of its security in the Grigio case. Neither is proper in the context of the Mezz Lender's vote to accept or reject the Plan as an unsecured creditor and neither is required of a creditor under the Bankruptcy Code. A copy of the ballot filed by the Mezz Lender is attached hereto as **Exhibit C**.

The Plan impairs the Mezz Lender for the benefit of insiders/old equity by denying the Mezz Lender the benefit of the mezzanine note-holder's pre-petition bargain, by failing to vindicate the Mezz Lender's authority to control the corporate governance of the Mondrian Debtor and disposition and reorganization of the Project, by substantially altering the Mezz Lender's ability to utilize its pre-petition remedies under Arizona's version of the UCC, and by taking away the attributes of control of the Project that are contractually available to the Mezz Lender. Given that all parties agree that the Project is worth less than all liens encumbering it, it is the Mezz Lender with the most direct interest in maximizing the value of the Project to maximize return. Thus, the treatment of the Mezz Lender under the Plan versus the control given to the insider/old equity makes no legal or economic sense.

Indeed, the Debtors' failure to designate an unsecured class to deal with the Mezz Lender's deficiency claim against the Grigio Debtor alone establishes that the Debtors cannot comply with the Bankruptcy Code's requirements for confirmation. Given these failures, Grigio will have at least one, and more likely two impaired class claims against the Grigio Debtor. Accordingly, the Grigio Debtor cannot have an impaired consenting class as is required by § 1129(a)(10) and the Plan cannot be confirmed.[9]

---

[9] The Debtors assert that all of the impairment occurs before the Effective Date, and thus it is not the Plan that impairs the Mezz Lender Claim, but rather the automatic stay. If that assertion is accepted, then all of the losses and damages described above are the foundation for immediate stay relief on account of a lack of adequate protection. 11 U.S.C. § 262(d)(1). The Debtor has not compensated and has not proposed to compensate the Mezz Lender for these losses. The Mezz Lender's stay relief motion is still pending and on calendar for the hearing on this objection.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

### E.    The Plan is Not Feasible.

A plan proponent must establish that a plan is feasible before it can be confirmed.  11 U.S.C. § 1129(a)(11).  Feasibility determinations require proof that confirmation is "not likely to be followed by the liquidation, or the need for further reorganization, of the debtor ..., unless such liquidation or reorganization is proposed under the plan." 11 U.S.C. § 1129(a)(11). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation" *Pizza of Hawaii, Inc. v. Shakey's, Inc.* ( *In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1382 (9th Cir.1985).  The Debtors' Plan is not feasible because the Purchaser has no hope of raising the funds required to consummate its purchase of the Project and funding all of the acquisition costs and Effective Date payments that are required under the plan. *See In re Clarkson,* 767 F.2d 417,420 (8th Cir. 1995) (holding that feasibility is rooted in analysis of objective facts and "the test is whether the things which are to be done after confirmation can be done as a practical matter under the facts").

On September 9, 2010, Bruce Gray appeared and was deposed by the Lenders in connection with the Senior Lender's now pending motions for stay relief [Dkt. 87].  Dkt. 194 at ¶¶ 43-44; *see also* transcript of September 23, 2010 hearing in adv. no. 10-1210, Dkt. 35.  At his deposition, Bruce Gray testified that he intends to solicit investors to fund the purchase of the Project but that he has not yet secured the approximately $8 million needed to fund the Second Plan.  Dkt. 194 at ¶ 44.  Gray further confirmed that neither he nor his entities have sufficient liquidity to fund the Purchasers' obligations at this time. *Id.*[10]After reviewing and analyzing the documents produced by the Debtors and their affiliates to date, the Lenders and their advisors have concluded that the projections and assumptions used to derive the figures contained therein are so wildly speculative and lacking any basis in reality that no prudent investor would agree to invest in the Purchaser. *Id.* at ¶ 45.  The Lenders' advisors reviewed the projections attached to the Amended Disclosure Statement, in the

---

[10]  Bruce Gray's deposition was continued pending the Debtors' production and counsel's review of additional documents.  The Lenders have subsequently subpoenaed additional records from Bruce Gray and noticed a continued deposition but, as of this writing, Gray has refused to produce additional documents or appear for his scheduled continued deposition.  Lenders anticipate filing a motion to compel shortly.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

context of section 6.2 Distribution of Net Cash Flow and Net Proceeds, as noted in the Purchaser's Amended Operating Agreement dated September 1, 2010 (the "Operating Agreement"). There are no assumptions presented to support the projected results. *Id.* at ¶ 46. The projected NOI, as noted below, increases from $4,027,970 in Year 1, to $6,834,119 in Year 5, an increase of $2,806,149 or 69.7%, which equates to an annual increase of 14.1%. *Id.* As the Project is currently 90% occupied the projected increase in NOI would come primarily from increases in realized rental rates. *Id.* There is no evidence in the marketplace to suggest that realized rental rates have or could increase by such a large amount. *Id.*

The projected NOI for the MID projections is as follows:

| Year | |
|------|------|
| 1 | $4,027,970 |
| 2 | $4,943,820 |
| 3 | $5,713,195 |
| 4 | $6,418,440 |
| 5 | $6,834,119 |

If the $44,000,000 Bridge Loan[11] converts to equity (by the sixth month after the Closing Date), the investors behind CJUF would not recover their investment. CJUF will receive a preferred return rate of 19%. If the contemplated Bridge Loan converts, CJUF's preferred equity account would be $70,000,000. A 19% return on this amount is $11,200,000 per year, significantly higher than the projected NOI. *Id.* at ¶¶ 47-48.

If the Bridge Loan does not convert, the projected NOI would be insufficient to make any payments to the investors behind CJUF during their five year projection period. If you assume the Bridge Loan is replaced with an interest only mortgage of 5% (for discussion purposes only), the annual interest payment on the new mortgage would be $2,200,000. The annual Preferred Return Rate of 19% on $26,000,000 of Preferred Member equity is $4,940,000. The total of these two obligations, $7,140,000, is significantly higher than the projected NOI. *Id.* at ¶ 49.

---

[11] As defined in the Operating Agreement.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

The cap rate used in the projection ranges from 4.75% – 5.25%. This range of cap rate is not supported in the market, further adding to the uncertainty of repayment to the Gray Members investment. *Id.* at ¶ 50. A return to any of the investors subordinate to CJUF is speculative and Gray has insufficient personal assets and no ability to attract capital investments to fund all of the acquisition and confirmation payments required to consummate the Plan. *Id.* at 51.

The substantial uncertainty that the Purchaser will raise sufficient capital to consummate the sale post-confirmation and fund the Plan renders the Plan infeasible and its confirmation must be denied. *See In re SIS Corp.*, 120 B.R. 93, 99 (Bankr. N.D. Ohio 1990) (liquidating plan was not feasible due to lack of certainty of performance).

**G.    Mezz Lender's § 507(b) Claim Will Render the Grigio Plan Unconfirmable.**

The Mezz Lender is either impaired under the Plan or is entitled to adequate protection for the loss in the value of its collateral (i.e. control over the Project and its reorganization) as a result of the automatic stay. *See LaSalle* 526 U.S. at 455 ("the law is settled that any otherwise cognizable property interest must be treated as sufficiently valuable to be recognized under the bankruptcy code." Such a right "might indeed be valuable to another precisely as a way to keep the Debtor from implementing a plan that would avoid a Chapter 7 liquidation"). *See* Footnote 9, supra. To the extent the Court determines that it is the latter, the Mezz Lender shall be entitled to recover the value it has lost during the pendency of these cases pursuant to 11 U.S.C. § 507(b). Any such claim will be entitled to an administrative priority over and above any administrative claims allowed under 11 U.S.C. § 507(a)(2) and must be paid in full on the Effective Date:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, not withstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from . . . the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section

364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

*Id.*

By the Debtors' own testimony, control of the Mondrian Debtor during these proceedings has a value of $2.6 million. *See* Exhibit A. The Mezz Lender agrees. Given that the value derives from the parties' ability to control the reorganization of the Project, and that value will be lost upon the Sale of the Project under the Plan, Mezz Lender is entitled to an allowed claim under § 507(b) of not less than $2.6 million. As discussed above, the Debtors plan is not feasible because the Purchaser cannot demonstrate its ability to raise approximately $78 million in funds sufficient to pay the substantial acquisition costs and fund the Effective Date payments required under the Plan. To the extent that the Mezz Lender is not impaired under the Plan and but has $2.6 million claim under § 507(b), such claim will serve only to increase the amounts required to consummate the Plan and further render the plan infeasible.

## IV. CONCLUSION.

What the Debtors seek to do by their Plan is violative of the Bankruptcy Code and contrary to the notions of equity upon which the Bankruptcy Code is formed. The Plan seeks to sidestep the Debtor's financial obligations and the legal rights of their creditors through a sham sale of the Project for which there is no funding and that will allow the Debtors and their affiliates to maintain an ownership interest in and control over the Project without payment to their creditors. The Bankruptcy Code prohibits the Debtors from doing so while also denying their creditors any meaningful opportunity to participate in the Debtors' reorganization or otherwise compete to reorganize the Debtors and maximize the return on their claims. As such the Plan is unconfirmable.

Based on the foregoing, the Plan should not be confirmed by this Court.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

DATED this 20th day of October, 2010.

**ENGELMAN BERGER, P.C.**

By: _/s/ SBA #009613_
    Steven N. Berger
    Scott B. Cohen
    Patrick A. Clisham
    3636 North Central Avenue, Suite 700
    Phoenix, Arizona 85012
    Attorneys for TPG (Grigio) Note Acquisition, LLC

OSBORN MALEDON, P.A.

By: _/s/ SBA #009063_
    James E. Cross
    Warren J. Stapleton
    2929 North Central Avenue, Suite 2100
    Phoenix, Arizona 85012-2794
    Attorneys for TPG (Grigio) Mezzanine, LLC

COPY of the foregoing
transmitted as indicated
this 20th day of October, 2010, to:

Susan M. Freeman
Rob Charles
Marvin C. Ruth
Lewis and Roca
40 N. Central Avenue
Phoenix, AZ 85004-4429
Attorneys for Debtors
**Via Email:  sfreeman@lrlaw.com; rcharles@lrlaw.com; mruth@lrlaw.com**

William Novotny, Esq.
Mariscal, Weeks, McIntyre & Friedlander, P.A.
2901 N. Central Ave., Suite 200
Phoenix, AZ  85012
Counsel for City of Tempe
**Via Email: William.Novotny@mwmf.com**

Office of the U.S. Trustee
230 N. First Avenue
Suite 204
Phoenix, AZ 85003
**Via Facsimile: 602-514-7270**

_/s/ Cynthia L. Worne_