Steven N. Berger, SBA #009613
Scott B. Cohen, SBA #014377
Patrick A. Clisham, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Telephone: (602) 271-9090
Facsimile: (602) 222-4999
E-mail: snb@engelmanberger.com
        sbc@engelmanberger.com
        pac@engelmanberger.com

Attorneys for TPG (Grigio) Note Acquisition, LLC

James E. Cross, SBA #009063
Warren J. Stapleton, SBA #018646
**OSBORN MALEDON, P.A.**
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2794
Telephone: (602) 640-9307
Facsimile: (602) 664-2077
E-mail: jcross@omlaw.com
        wstapleton@omlaw.com

Attorneys for TPG (Grigio) Mezzanine, LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>MONDRIAN TTL, L.L.C.,<br><br>                  Debtor.<br><br>In re:<br><br>GRIGIO TTL, L.L.C., an Arizona limited liability company,<br><br>                  Debtor. | Chapter 11<br><br>Case No. 2:10-bk-14140-RJH<br>Case No. 2:10-bk-14141-RJH<br><br>Jointly Administered Under<br>Case No. 2:10-bk-14140-RJH<br><br><br>**Disclosure Statement in Support of Lenders' Joint Plan of Reorganization Dated November 9, 2010** |

{02698.001/00203312.DOC / 3}

**Table of Contents**

Article I........................................................................................................................5
Introduction ...............................................................................................................5
Article II.......................................................................................................................5
Disclaimers and Nature of Information Contained in Disclosure Statement ...............5
Article III......................................................................................................................6
Answers to Commonly Asked Questions......................................................................6
   A.  Who are the Lenders?.....................................................................................6
   B.  Who are the Debtors? ....................................................................................6
   C.  How long have Debtors been in Chapter 11?.................................................7
   D.  What is Chapter 11?......................................................................................7
   E.  What are the Lenders attempting to do through the Lenders' Plan? ...............7
   F.  If The Plan Of Reorganization Governs How My Claim Is Treated, Why Am I Receiving This Disclosure Statement? ...............................................................................7
   G.  Has this Lenders' Disclosure Statement been approved by the Court?............8
   H.  Who provided the information in this Lenders' Disclosure Statement?............8
   I.  How will the Lenders' Plan of Reorganization Treat my Claim? ...................8
   J.  Why is confirmation of the Lenders' Plan of Reorganization important? .......11
   K.  What is necessary to confirm the Lenders' Plan of Reorganization? ..............11
   L.  Are creditors entitled to vote on the Lenders' Plan of Reorganization?..........12
   M.  When is the deadline for returning my ballot?................................................13
Article IV......................................................................................................................13
Background and History of Debtors..............................................................................13
   A.  Structure and Ownership of the Debtors .......................................................13
      1.  Mondrian TTL, L.L.C. ("Mondrian") ..................................................13
      2.  Grigio TTL, L.L.C. ("Grigio")...............................................................13
   B.  Overview of the Debtors and Project .............................................................14
   C.  Project Construction Indebtedness..................................................................14
   D.  City of Tempe Government Property Lease Excise Tax Abatement ...............15
   E.  Debtors' Need For Restructuring....................................................................16
   F.  Debtors' Current Management By Gray Affiliates..........................................16
Article V........................................................................................................................16
Summary of Debtors' Assets ........................................................................................16
   A.  Mondrian Project ...........................................................................................16
   B.  Grigio Property...............................................................................................16
   C.  Potential Avoidance Actions ..........................................................................17
Article VI......................................................................................................................17
Overview of Debtors' Debt and Claims........................................................................17
   A.  Mondrian's Secured Creditors.......................................................................17
      1.  KeyBank Loan........................................................................................17
      2.  City of Tempe.........................................................................................18
   B.  Mondrian's Unsecured Creditors ...................................................................18
      1.  Babson Loan ..........................................................................................18
      2.  City of Tempe.........................................................................................19
      3.  Mondrian Unsecured Claims ..................................................................19
   C.  Grigio Claims .................................................................................................19
      1.  Mezz Lender ..........................................................................................19
      2.  Grigio Unsecured Claims .......................................................................19
Article VII. ...................................................................................................................19
Actions And Proceedings During The Chapter 11 Case................................................19
   A.  Professionals Retained ...................................................................................19
   B.  Request to Pay Prepetition Claims .................................................................19
   C.  Request to Use Cash Collateral......................................................................20

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

D.  Bankruptcy Proceedings ........................................................................................20
E.  Automatic Stay ....................................................................................................20
F.  Leases and Contracts ..........................................................................................20
Article VIII. .......................................................................................................................21
Debtors' Business Operations After Filing The Chapter 11 Case ...................................21
Article IX. ..........................................................................................................................21
Summary of the Lenders' Plan .........................................................................................21
A.  Overview ..............................................................................................................21
B.  Unclassified Claims ............................................................................................21
C.  The Classes Of Claims Designated Under This Plan And Treatment Of Such Claims Are
    As Follows: ..........................................................................................................23
D.  Treatment Of Executory Contracts And Unexpired Leases ...............................26
Article X. ...........................................................................................................................27
Means of Execution and Implementation of the Lenders' Plan .......................................27
A.  Senior Refinancing. ............................................................................................27
B.  Management of Reorganized Debtor. .................................................................28
C.  Cancellation of Existing Securities and Agreement. ..........................................28
D.  Objections to Claims and Interests/Actions to Subordinate or Recharacterize Claims or
    Equity. ..................................................................................................................29
E.  Other Litigation and Avoidance Actions. ...........................................................29
F.  Retention and Payment of Professionals. ...........................................................29
G.  Compliance with Tax Requirements. ..................................................................30
H.  Corporate Action. ...............................................................................................30
I.  Effectuating Documents; Further Transactions. ................................................30
J.  Discharged Claims and Terminated Interests. ...................................................31
K.  Setoffs. .................................................................................................................32
L.  Exculpation and Limitation of Liability. ............................................................32
Article XI. ..........................................................................................................................32
General Considerations and Risk Factors To Be Considered ..........................................32
A.  General Considerations ......................................................................................33
B.  Certain Bankruptcy Considerations ...................................................................33
Article XII. .........................................................................................................................33
Feasibility Of The Plan And The Best Interest Test ........................................................33
A.  Feasibility Of The Plan ......................................................................................33
B.  Acceptance of the Lenders' Plan ........................................................................35
C.  Best Interests Test ...............................................................................................35
D.  Estimated Valuation Of The Reorganized Debtors ............................................36
E.  Application Of The Best Interests Test To The Liquidation Analysis And The Valuation Of
    The Reorganized Debtors ....................................................................................36
Article XIII. ........................................................................................................................37
Alternatives To Confirmation And Consummation Of The Lenders' Plan ......................37
A.  Continuation Of The Bankruptcy Case ..............................................................37
B.  Alternative Plans Of Reorganization ..................................................................37
C.  Liquidation Analysis ...........................................................................................37
Article XIV. ........................................................................................................................38
Tax Consequences Of The Plan .......................................................................................38
A.  Debtors' Tax Consequences ................................................................................40
B.  United States Federal Income Tax Consequences to Holders of Claims Against and Interests
    in Debtors ............................................................................................................40
    1.  Claim Holders' Tax Consequences ..............................................................41
    2.  Interest Holders' Tax Consequences ...........................................................43
C.  Information Reporting and Backup Withholding ................................................43
D.  Importance of Obtaining Professional Tax Assistance ......................................44
Article XV. .........................................................................................................................44

**Definitions** ......................................................................................................................44
**Article XVI.** ....................................................................................................................44
**Conclusion/Recommendation** ........................................................................................44

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

{02698.001/00203312.DOC / 3}

# Article I.

## Introduction

TPG (Grigio) Note Acquisition, LLC and TPG (Grigio) Mezzanine, LLC, (collectively the "Lenders") submit this Lenders' Disclosure Statement in connection with their Lenders' Joint Plan of Reorganization dated November 9, 2010, (the "Lenders' Plan"). A copy of the Lenders' Plan is attached to this Lenders' Disclosure Statement as **Exhibit 1**. This Disclosure Statement is intended to provide Creditors and interested parties with sufficient information from which to make an informed decision when voting to accept or reject the Lenders' Plan. The Lenders have submitted this Lenders' Disclosure Statement for approval by the Bankruptcy Court pursuant to 11 U.S.C. §1125. Section 1125(b) prohibits solicitation of an acceptance or rejection of a plan unless a copy of the plan or summary of the plan is accompanied by a disclosure statement approved by the Bankruptcy Court.

All words or phrases used in this Lenders' Disclosure Statement shall have their usual and customary meanings. Capitalized words or phrases have the definitions set forth in the last Article of the Lenders' Plan.

## Article II.

## Disclaimers and Nature of Information Contained in Disclosure Statement

The Lenders neither warrant nor represent that there are no inaccuracies in this Lenders' Disclosure Statement, although the information provided is accurate to the best of the Lenders' knowledge, information and belief.[1] Creditors and interested parties should be aware that the Lenders have not audited the Debtors' books and records, and that the information contained herein was primarily derived from materials created by the Debtors, and therefore could contain inaccurate information. The Lenders have relied upon the Debtors' materials with respect hereto, and the Debtors had previously

---

[1] This Disclosure Statement is substantially derived from and incorporates information and disclosures made by the Debtors in their Disclosure Statement for Debtors' Joint Plan of Reorganization Dated July 23, 2010 as Amended September 1, 2010. Dkt. 169. Lenders have made no independent inquiry concerning the accuracy or continued accuracy of such information and data but have merely relied upon such information as creditors of the Debtors' Estates in formulating this Lenders' Plan.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

avowed that they had taken reasonable steps to ensure that the information provided is materially accurate to the best of their knowledge and belief. Respecting information herein provided by the Lenders, the Lenders have taken reasonable steps to ensure that it is materially accurate to the best of their knowledge and belief.

MOREOVER, THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE COURT'S APPROVAL HEREOF ONLY SIGNIFIES THAT IF THE INFORMATION CONTAINED HEREIN IS ACCURATE, IT IS SUFFICIENT TO PROVIDE CREDITORS AND INTERESTED PARTIES AN ADEQUATE BASIS TO DECIDE WHETHER TO ACCEPT OR REJECT THE LENDERS' PLAN. COURT APPROVAL IS NOT A JUDICIAL ENDORSEMENT OF THE LENDERS' PLAN.

## Article III.

### Answers to Commonly Asked Questions

As part of the Lenders' effort to inform Creditors regarding the Lenders' Plan and the plan confirmation process, the following summary provides answers to various questions, which are often asked by a party receiving a disclosure statement.

THE FOLLOWING SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE LENDERS' PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.

**A.      Who are the Lenders?**

Senior Lender is Mondrian's senior secured lender holding a note in the principal amount of $62,675,000 that is secured by a first position lien on Mondrian's 523-unit Mondrian Tempe Town Lake project (the "Project"). Mezz Lender is the holder of a mezzanine note by Mondrian in the principal amount of $8,600,000 that is secured by a pledge of Grigio's 100% membership interests in Mondrian. The Lenders are affiliates of The Picerne Group, Inc., ("TPG"), an entity in the business of investing in non-performing loan portfolios, performing and non-performing loans, loan participations, and commercial real estate.

**B.      Who are the Debtors?**

Mondrian TTL, L.L.C., a Delaware limited liability company, and Grigio TTL, L.L.C., an Arizona

limited liability company. Mondrian owns the Grigio Apartments at Tempe Town Lake, 1001 E. Playa Del Norte, Tempe, AZ 85281. Grigio owns Mondrian.

**C.    How long have Debtors been in Chapter 11?**

Since May 9, 2010.

**D.    What is Chapter 11?**

Chapter 11 is the business reorganization section of the Bankruptcy Code. As applicable here, it allows a debtor or creditor to submit a plan providing new terms for the payment of one or more of debtor's debts.

**E.    What are the Lenders attempting to do through the Lenders' Plan?**

The principal objective of a Chapter 11 case is confirmation of a plan of reorganization that provides for payment of creditors in a fair way. A plan of reorganization sets forth the means for treating impaired and unimpaired Claims against a debtor. A Claim is impaired under a Plan of Reorganization if the plan provides that such Claim will not be repaid in full or that the legal, equitable, or contractual rights of the holder of such Claim will be altered. A Claim is unimpaired if it will be paid in full or the legal, equitable or contractual rights of the holder of such Claim are not altered by the plan of reorganization. A holder of an impaired Claim generally is entitled to vote on a plan of reorganization if such Claim has been allowed under Bankruptcy Code § 502.

**F.    If The Plan Of Reorganization Governs How My Claim Is Treated, Why Am I Receiving This Disclosure Statement?**

The Bankruptcy Code requires that the proponent of a plan solicit acceptances and rejections of a proposed plan before a plan may be confirmed by the Bankruptcy Court. Before the Lenders can solicit acceptances of their Plan, the Bankruptcy Court had to approve the Lenders' Disclosure Statement and determine that the Lenders' Disclosure Statement contains information adequate to allow Creditors to make informed judgments about the Lenders' Plan. After Bankruptcy Court approval of the Lenders' Disclosure Statement, the Lenders' Disclosure Statement, proposed Plan, and a ballot are sent to the holders of Claims. The Creditors then have the opportunity to vote on the Lenders' Plan and should consider this Lenders' Disclosure Statement when voting.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

**G.     Has this Lenders' Disclosure Statement been approved by the Court?**

Yes. The Bankruptcy Court approved this Lenders' Disclosure Statement as containing information of a kind, and in sufficient detail, as is reasonably practicable in light of the nature and history of Debtors and the condition of Debtors' books and records, to enable a hypothetical, reasonable investor typical of holders of Claims of the relevant Classes to make an informed judgment whether to vote to accept or reject the Lenders' Plan. The Bankruptcy Court's approval of this Lenders' Disclosure Statement does not constitute an endorsement of any of the information contained in either the Lenders' Disclosure Statement or the Lenders' Plan.

**H.     Who provided the information in this Lenders' Disclosure Statement?**

The information in this Lenders' Disclosure Statement, including projections and financial information, has been provided by the Debtors, the Lenders, their counsel and advisers, who have utilized information believed to be accurate in preparing this Lenders' Disclosure Statement. However, neither the Lenders nor their counsel warrant the accuracy of the information contained in or relied upon in preparing this Lenders' Disclosure Statement, nor should this Lenders' Disclosure Statement be construed to be any representation or warranty whatsoever express, implied or otherwise, that the Lenders' Plan of Reorganization is free from risk, that acceptance or confirmation of the Lenders' Plan will result in a risk-free or assured restructuring of the debts of the Debtor, or that the projections or plans for payment will be achieved.

**I.     How will the Lenders' Plan of Reorganization Treat my Claim?**

Creditors who are owed money by the Debtors hold what is known as a "Claim." The Plan organizes Claims into Classes based upon when the Claim arose, the nature of the Claim, and the treatment that the Claim will receive under the Lenders' Plan. In order to determine how the Lenders' Plan treats your Claim, you must first determine which Class covers your Claim.

The table below summarizes the treatment of certain administrative and priority claims and sets forth the Lenders' estimates of the amount of Claims that will ultimately be Allowed in each category, as well as the treatment of Interests (owners of Debtors) and the source of Plan funding. The amounts of claims set forth therein are estimates and not admissions by the Lenders.

{02698.001/00203312.DOC / 3}

| Class | Description | Estimated Amount of Claim | Proposed Treatment | Estimate of Treatment Cost |
|---|---|---|---|---|
| | | *Unclassified* | | |
| | Administrative | TBD | Payment in full, in cash, on later of Effective Date or Final Order allowing. | TBD |
| | Priority Taxes (Tempe) | $245,340 | Payment in full, in cash, on Effective Date | $245,340 |
| | Insider Claims | | Treated as Equity and cancelled | N/A |
| | | *MONDRIAN CLAIMS AND CLASSES* | | |
| | | *Priority Claims* | | |
| 1 | Employees and providers of employee benefits for employees at the Project | | Cash on the Effective Date. | De minimis |
| | | *Secured Claims* | | |
| 2 | Senior Lender | $62,675,000 | Partially repaid on the Effective Date from proceeds of Senior Refinancing with remaining claim sharing pro rata in equity of Reorganized Debtor | TBD |

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

{02698.001/00203312.DOC / 3}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

| 3 | Tempe | 1) $9,786,681 plus postpetition interest and attorneys' fees<br><br>2) Tax Lien for annual 2010 Miller Road Assessment $104,509.40<br><br>3) Tax Lien for annual 2010 Rio Salado Assessment $153,178.83 | Modification and assumption of GPLET Lease providing payments totaling $10,943,020 over remaining 33-year term **plus** payment in full of unpaid annual Miller Road and Rio Salodao 2010 Assessments on Effective Date | $11,200,708.23 |
|---|---|---|---|---|
| **Unsecured Claims** | | | | |
| 4 | Mondrian Vendor Claims | Approximately $165,200 | Paid in full on Effective Date | $165,200 |
| 5 | Tempe Unsecured Claim | $1,656,948 plus postpetition interest | Paid in full on Effective Date with interest | $1,656,948 + interest |
| 6 | Senior Lender Deficiency Claim | TBD | Pro rata share in equity of Reorganized Debtor | N/A |
| 7 | Mezz Lender Claim | $10,458,237.76 | Pro rata share in equity of Reorganized Debtor | N/A |
| **Equity Interests** | | | | |
| 8 | Mondrian Equity Interests | | Cancelled | |
| **GRIGIO CLAIMS AND CLASSES** | | | | |
| 9 | Mezz Lender (secured by equity interests in Mondrian) | $10,458,237.76 | Will share pro rata in equity of Reorganized Debtor | N/A |
| 10 | Grigio Equity Interests | | Cancelled | TBD |

| Means of Payment | | |
|---|---|---|
| *Source* | *Description* | *Amount* |
| Mondrian | Accumulated cash | TBD as of Effective Date |
| Senior Refinancing | Loan to partially repay Senior Lender and fund Effective Date obligations. | Minimum of $53 Million |

**J.    Why is confirmation of the Lenders' Plan of Reorganization important?**

Confirmation of the Lenders' Plan by the Bankruptcy Court is necessary for the Debtors to provide the proposed treatment to Creditors under the Lenders' Plan. Unless the Lenders' Plan is confirmed, Debtors are legally prohibited from providing creditors what has been proposed in the Lenders' Plan and Debtors may well be liquidated.

**K.    What is necessary to confirm the Lenders' Plan of Reorganization?**

At a hearing scheduled by the Bankruptcy Court, the Court will consider whether the Lenders' Plan should be confirmed. Code § 1129 contains the requirements for confirmation of a Plan of Reorganization. YOUR VOTE IS IMPORTANT. A form of ballot will accompany this Lenders' Disclosure Statement. In order for the Lenders' Plan to be accepted, at least 2/3 in amount ($) and more than 1/2 in number (#) of the voting Creditors in each Class must affirmatively vote for the Lenders' Plan. The Court must find that the Lenders' Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Lenders' Plan has also complied with the Bankruptcy Code. The Court must also find that the Lenders' Plan has been proposed in good faith and not by any means forbidden by law. The Court must find that the proponents of the Lenders' Plan, that is the Lenders, have disclosed the identity and affiliation of the persons who will manage Debtors after confirmation, that the appointment of such persons is consistent with the interest of Creditors and holders of Equity Interests and with public policy, and that the identity and compensation of any Insiders that will be employed or retained by Debtors has been disclosed. The Court must additionally find that each Class of Claims has either accepted the Lenders' Plan or will receive at least as much as it would under a Chapter 7 liquidation. The Bankruptcy Code also provides for the treatment of certain priority

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Claims. If any Classes of Claims are impaired under the Lenders' Plan, the Court must find that at least one Class of Claims that is impaired has accepted the Lenders' Plan without counting any votes by Insiders. The Court must also find that confirmation of the Lenders' Plan of Reorganization is not likely to be followed by the liquidation or the need for further reorganization of the successor(s) to the Debtors. Additionally, the Lenders' Plan of Reorganization must provide for payment of fees to the United States Trustee.

In the event the Lenders' Plan is not accepted by all the voting Classes of Claims or Interests, the Lenders may attempt to obtain confirmation under what is known *as* "cram-down." To obtain confirmation by cram-down, the Court must find that the Lenders' Plan of Reorganization does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired by the Lenders' Plan and has not accepted the Lenders' Plan. The Bankruptcy Code provides several options for a Plan of Reorganization to be "fair and equitable" to a secured Creditor. Included among these options are that a secured Creditor retains its lien and receives deferred cash payments at a market interest rate totaling either the value of the property securing the Claim or the amount of the Allowed Claim as found by the Court, whichever is less. With respect to a Class of unsecured Claims, the requirement that a Plan of Reorganization be "fair and equitable" requires that the holder of an unsecured Claim be paid the allowed amount of its Claim or that no junior interest receive or retain any property on account of its prior Claim. With respect to an Interest (or equity owner), the requirement that a Plan of Reorganization be "fair and equitable" requires that the holder of an Interest receive or retain property under the Lenders' Plan of Reorganization having a value equal to the value of the holder's Interest or that the holder of any Interest that is junior not receive or retain property under the Lenders' Plan of Reorganization on account of such junior interest.

### L. Are creditors entitled to vote on the Lenders' Plan of Reorganization?

Each Creditor holding an Allowed Claim in an impaired Class of Claims is entitled to vote on the Lenders' Plan. If you hold a Claim in an impaired Class under the Lenders' Plan, a ballot to be used for voting on the Lenders' Plan has been distributed to you with this Lenders' Disclosure Statement. If you lose your ballot, you may request another one from the Lenders' counsel. Instructions for completing and

{02698.001/00203312.DOC / 3}

returning the ballot are set forth on the ballot and should be reviewed carefully

**M.    When is the deadline for returning my ballot?**

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots must be received by the Lenders no later than 5:00 p.m. Arizona time, on _____, 2010, at the following address:

Cindy K. Solomon, CLA
Engelman Berger, P.C.
3636 N. Central Avenue, Suite 700
Phoenix, Arizona 85012
Email: cks@engelmanberger.com

**You may not vote by telecopier/facsimile.**

**Article IV.**

**Background and History of Debtors**

**A.    Structure and Ownership of the Debtors**

**1.    Mondrian TTL, L.L.C. ("Mondrian")**

Mondrian was formed on August 4, 2004, as a Delaware limited liability company. Gray Meyer Fannin LLC and BlackRock Mondrian LLC ("BlackRock") were the members of Mondrian under a Second Amended and Restated Operating Agreement dated as of February 11, 2005. In 2006, BlackRock agreed to sell its membership interest in Mondrian to Grigio TTL, L.L.C., an entity formed by the various persons and entities listed on its Schedule of Equity Security holders [DE 29] for $27,250,000.

Mondrian is managed by Mondrian Manager L.L.C., an Arizona limited liability company, managed by its sole member, GDG Enterprises L.L.C., which is the assignee of Gray Meyer Fannin, L.L.C.

**2.    Grigio TTL, L.L.C. ("Grigio")**

Grigio was formed by the filing with the Arizona Corporation Commission of its Articles of Organization on October 27, 2006. Grigio is managed by GDG Enterprises L.L.C., an Arizona limited liability company. According to its Operating Agreement, Grigio was initially capitalized by investors contributing a total of $8,300,799 in 1031 exchanges and $17,199,201 in additional non- 1031 cash exchanges and contributions.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## B.    Overview of the Debtors and Project

Founded in 1992 by Bruce Gray, Gray Development Group is a fully-integrated real estate development company, including architecture, construction and property management.    Gray Development's principals are principals of Mondrian and Grigio.

Gray Development Group was responsible for building the Project, now known as Grigio, as part of a new vision for development in Tempe.  It was one of the first residential buildings adjacent to newly-created Tempe Town Lake.  The Project was constructed under a contract between Mondrian and Gray Palmer Construction L.L.C.    The Project was developed by Gray Meyer Fannin L.L.C. under a Development Agreement dated February 11, 2005.

## C.    Project Construction Indebtedness

Construction of the Project was financed in substantial part through a KeyBank construction loan in the original principal amount of $53,050,000, later increased in November 2006 to $62,000,000, secured by a first priority deed of trust on the Project.

A dispute arose in connection with the Project construction, leading to a lawsuit by GDG Partners, L.L.C. against Tempe.  Pursuant to a Settlement Agreement and Release entered into as of June 15, 2006, the parties settled their disputes.  Under the settlement, Tempe acquired a park from GDG Partners; certain permit and processing fees paid from 2004 to date were rebated or waived, as well as certain residential development fees; the Development Agreement for the Mondrian Development was amended; the parties agreed to enter into a mutually acceptable Development and Disposition Agreement (the "Development Agreement"), also referred to as the Transit Project; GDG Partners was authorized to construct a floating dock on the Town Lake adjacent to the Project; the parties agreed to joint marketing efforts for two years; and Tempe advanced $10 million to GDG Partners, repayment of which was described in the Settlement Agreement, and secured by a second priority lien on the Project in favor of GDG Partners and assigned to Tempe.  GDG Partners became obligated to make additional payments known as the Town Lake Payments and agreed to restrictions upon development, if the development was of a certain size and within a certain radius from a freeway or light rail transit line with certain zoning.    The Development Agreement further provides for certain sales tax rebates to Mondrian (the "Tax

Rebates").

In November 2006, BlackRock sold its interests; the KeyBank loan was increased; a number of investors provided tax deferred exchange financing and cash for the Project through equity investments in Grigio; and Babson Mezzanine Realty Investors LP, now known as Cornerstone Real Estate Advisers LLC ("Babson") loaned $8,100,000 (increased within a year to $8.6 million). The total development cost for the Project was estimated at $87,550,000.

### D.    City of Tempe Government Property Lease Excise Tax Abatement

In a June 23, 2004 subordinate development parcel agreement, the GPLET structure described below was authorized. Pursuant to a Modification Agreement (amending C2006-310) entered into as of September 18, 2008, between Tempe and two Gray entities, Tempe Transit, L.L.C. and GDG Partners, L.L.C., Tempe acknowledged that if the parties reached agreement on a mutually satisfactory resolution of certain issues, and if the Gray entities satisfied the statutory conditions, then they would continue to be entitled to all statutorily-authorized property tax abatements, including, without limitation, the abatements currently available through the provisions of A.R.S. §§ 42-6201 to 6209, inclusive. The modification clarified the terms under which Tempe's junior lien on the Project could be transferred to alternative collateral. That agreement also provided that the Gray entities agreed to make an annual in-lieu payment to Tempe in an amount equal to the GPLET rate otherwise applicable pursuant to A.R.S. § 42-6201. The GPLET payment during the first 8 years would be abated and instead, an in-lieu payment would be due. The parties agreed that the amount of the in-lieu payment would be $50,000 less the total property taxes paid by other property owners in the Playa del Norte community. The total taxes paid have exceeded $50,000 annually, and thus the in-lieu payment has been zero.

In order to accomplish this transaction, the Mondrian Project was conveyed to Tempe, and then leased back to Mondrian through an Improvements Lease. The conditions were satisfied and accordingly, and as a result of a transaction closed on December 4, 2009, the fee title for the Mondrian Project is in Tempe and Mondrian leases the Project from Tempe pursuant to the Land and Improvements Lease ("GPLET Lease").

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

### E. Debtors' Need For Restructuring

The Reorganization Cases were filed by the Debtors after their efforts to acquire the KeyBank note failed and the terms of forbearance agreements with KeyBank and Babson (discussed below) expired.

### F. Debtors' Current Management By Gray Affiliates

Gray Development Group affiliates provide Mondrian with property management services and employees just as other Gray Development affiliates initially provided architecture, construction and other development services for the Project. Gray Services LLC is the employer of all of the on-site employees working at the Project, as well as the employer of people working at other Gray Development apartment communities. Salaries and benefits are currently allocated monthly among the various properties.

## Article V.

## Summary of Debtors' Assets

### A. Mondrian Project

The Project is a 523-unit luxury apartment community known as Grigio at Tempe Town Lake at the southeast quadrant of Scottsdale Road and the Red Mountain Freeway (Loop 202) or 1001 East Playa del Norte Drive, Tempe, Arizona 85281. Mondrian places tenant deposits into a segregated account, which is not reflected as an asset in this discussion. The Project is composed of 437,006 rentable square feet with a cluster of studios, one, two, three and four bedroom units among 48 floor plans within six connecting buildings that range in height from four to six stories. The buildings surround a six-story parking structure and offer an average unit size of 836 rentable square feet. The project was completed during 2008. The Project has frontage along the Tempe Town Lake, a "man-made" lake that extends approximately two miles in length within the Salt River Basin.

Mondrian valued the Project at between $70 and $78 million in its Schedules and has proposed to sell the project for $75,340,000 in Debtors' Amended Plan. Mondrian has not marketed the Project for sale but has sought to refinance the Project indebtedness.

### B. Grigio Property

Grigio's principal asset is its ownership of Mondrian. It also owns less than $25,000 in intercompany receivables from Gray entities, one of which is Mondrian.

## C. Potential Avoidance Actions

Each Debtors' Estate is granted certain avoidance powers under Bankruptcy Code §§ 544 *et. seq.* In particular, payments to creditors made within 90 days of the bankruptcy filing out of a debtor's property on account of a claim may be avoided as a preference under Bankruptcy Code § 547. Each Debtor identified payments within 90 days of the bankruptcy filing aggregating less than $5,500, and payments made to insiders within one year in the answer to question 3 in its Statement of Financial Affairs. In addition, each Debtor identified other transfers in answer to question 10 and that there were no withdrawals from the LLC in the answer to question 23. These schedules of transfers are on file with the Court or available upon request.

Sections 544 and following of the Bankruptcy Code, particularly Code § 548, allow the avoidance of other transfers, including particularly fraudulent transfers. If a trustee were to analyze each of these transfers for potential avoidance under the Bankruptcy Code, Debtors have indicated their belief that the trustee would conclude that avoidance is not possible, primarily because the payments were made in the ordinary course of business. As to transfers to insiders, Mondrian's Statement of Financial Affairs, question 3(b), identified the transfers within a year of bankruptcy, which may be avoidable and collected. Grigio had no relevant transfers in its answers to the Statement of Financial Affairs. Lenders have not yet analyzed any of the disclosed transfers. The Lenders' Plan preserves all potential avoidance actions for the benefit of the Reorganized Debtor.

## Article VI.

## Overview of Debtors' Debt and Claims

### A. Mondrian's Secured Creditors

#### 1. KeyBank Loan

The Senior Lender is successor-in-interest to KeyBank in that certain Promissory Note (as amended) originally dated February 16, 2005 (the "Senior Note") in the principal amount of $62,675,000. The Senior Note is secured by a first position lien on the Mondrian. The Senior Lender acquired the Note in April 2010 after participating in a competitive bidding process that included bidding by the Debtors and their putative financier, CJUF, and certain third parties.

## 2. City of Tempe

Tempe and GDG Partners L.L.C. are the parties to the Payment Agreement dated as of November 21, 2006, under which Tempe's Secured Claim arose. The Original Agreement was previously modified by the Modification Agreement dated as of September 18, 2008, and by the Second Modification dated as of July 2, 2009 (as amended, the "Tempe Agreement"). Repayment of the obligation is evidenced and secured by the Tempe Loan Documents.

The Tempe Agreement provided for Tempe to advance approximately $10,000,000 to GDG Partners, which in turn GDG Partners advanced such amounts to Mondrian to construct certain improvements described in the Tempe Agreement as the Mondrian Project. The debt is evidenced by a November 21, 2006 note, payable in monthly installments for 179 months with a balance (balloon payment) due in month 180, on November 1, 2024. The obligation to make payments under the Tempe Agreement is secured by a second priority deed of trust on the Project. Certain payments due under the Tempe Agreement are deferred until the earlier of a HUD Loan or other refinancing transaction closing or April 30, 2013 pursuant to the Second Modification Agreement. Monthly payments of $65,995.57 resume on May 1, 2013. In the interim, all Excess Cash (defined in the Second Modification Agreement) from the Project is payable 50-50 to Tempe and Babson. Tempe has filed a proof of claim in the amount of $9,786,681 in connection with the Tempe Agreement.

### B. Mondrian's Unsecured Creditors

#### 1. Babson Loan

The Mezz Lender is successor-in-interest to Babson in that certain Promissory Note (the "Mezz Note") dated November 21, 2010 in the principal amount of $8,600,000. The Mezz Note is secured by a lien on the 100% membership interests in Mondrian, which are held by Grigio. TPG had been in negotiations to purchase the Mezz Note before it acquired the Senior Note and the Debtors filed these chapter 11 cases. CJUF and the Debtors submitted bids for the Mezz Note in connection with the Debtors' reorganization efforts both prior to and after the Debtors filed for bankruptcy. The Mezz Lender ultimately purchased the Mezz Note in June 2010.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

### 2.    City of Tempe

Tempe is owed $1,656,948 in payment of deferred water and sanitary sewer development or impact fees that are described in Section 7.7 of the Playa del Norte Subordinate Development Parcel Agreement that was recorded on July 2, 2004, as Doc. No. 2004-0764286 ("Deferred Fees"). This is an unsecured claim. Tempe also holds a priority tax claim in the amount of $245,340.

### 3.    Mondrian Unsecured Claims

Mondrian owes other unsecured claims. The Debtors have previously estimated that Mondrian owes $165,200 to unsecured creditors, all of which is owed to vendors providing trade credit, which is the basis for their unsecured claims.

### C.    Grigio Claims

### 1.    Mezz Lender

The Mezz Lender bought the Babson loan. It is secured by Grigio's equity interest in Mondrian. The Mezz Lender also asserts a recourse claim against Grigio for all amounts due under the Mezz Note.

### 2.    Grigio Unsecured Claims

There are two claims scheduled against Grigio owed to Gray related entities. These claims are treated as Insider Claims under the Lenders' Plan.

### Article VII.

### Actions And Proceedings During The Chapter 11 Case

### A.    Professionals Retained

After the bankruptcy filings, Debtors sought authority to employ Lewis and Roca LLP as their general bankruptcy counsel. The motion was granted. Debtors sought authority to retain special counsel for landlord tenant issues, which was approved by the Court without objection.

### B.    Request to Pay Prepetition Claims

In connection with their bankruptcy filing, Debtors sought emergency authority to pay certain prepetition claims of utilities and employees, and those motions were granted by the Court in specific orders.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## C. Request to Use Cash Collateral

Debtors sought and obtained interim authority to use rents and other income of the Project, which is Mezz Lenders' cash collateral. That authority was granted with the secured creditor's consent and is currently being extended by agreement of the parties on a month-to-month basis.

## D. Bankruptcy Proceedings

Pursuant to an order of the Court, these bankruptcy cases are jointly administered under one caption. The cases are not substantively consolidated. Each Debtor filed schedules of assets and liabilities, a statement of financial affairs, and other schedules required by the Bankruptcy Code and Rules. Copies of those filings are available from the Clerk of the Court or from Debtors' bankruptcy counsel.

The Debtors filed their Joint Plan of Reorganization and Disclosure Statement on July 23, 2010. *See* Dkts. 119 ("Plan") and 120 ("Disclosure Statement"). That Plan and Disclosure Statement was amended by the filing of the Debtors' Amended Plan and Disclosure Statement dated September 1, 2010. *See* Dkts. 168 ("Amended Plan") and 169 ("Amended Disclosure Statement"). The Debtors further modified their Amended Plan on November 1, 2010. Dkt. 240 ("First Modification to Amended Plan"). Lenders oppose the Debtors' Amended Plan as modified.

## E. Automatic Stay

The automatic stay provisions of § 362 of the Bankruptcy Code prevents creditors from taking actions to collect debts or take debtor property without leave of the Bankruptcy Court. The Mezz Lender sought relief from the stay to foreclose its lien on Grigio's ownership of Mondrian. The Senior Lender also filed a motion for relief from stay, seeking to foreclose its lien on the Mondrian Project. Debtors have opposed both motions, which are now set for hearing contemporaneously with the Court's consideration of the Debtors' Amended Plan.

## F. Leases and Contracts

Debtors have the opportunity to elect under Bankruptcy Code § 365(a) whether to assume or reject their unexpired Leases and real estate contracts. The Bankruptcy Code allows a debtor 120 days after the filing date to assume or reject unexpired leases on non-residential real property where the debtor is the lessee or tenant. The Court granted Debtors' motion to extend that deadline an additional 90 days in order to

make the election and in particular assume Tempe lease in connection with Debtors' Plan of Reorganization. Tenant leases have already been assumed. As explained in more detail below, the Lenders' Plan provides that the Debtors will assume the GPLET lease with Tempe for the benefit of the Reorganized Debtor. All other contracts or agreements useful in connection with the Mondrian Project will be subject to review and assumption or rejection prior to confirmation of the Lenders' Plan.

## Article VIII.

### Debtors' Business Operations After Filing The Chapter 11 Case

The United States Trustee's office requires that debtors file a monthly operating report with the Court. Each Debtor is current in filing its operating reports, and a copy is available upon request or from the Clerk of the Court. The Mondrian Project continues to operate during these chapter 11 cases. Debtors are current on their postpetition reporting and tax obligations. Debtors are making monthly interest-only payments to Senior Lender under the Court's order authorizing use of cash collateral.

## Article IX.

### Summary of the Lenders' Plan

**A. Overview**

In the Lenders' Plan, Lenders generally propose to reorganize the Debtors through a consensual refinancing of their obligations to the Senior Lender, restructuring their obligations to Tempe; full payment of trade creditors, and a distribution of the equity in the Reorganized Debtor to the Lenders on account of their unsecured Claims. There are two Debtors. The Plan separately classifies and treats the Claims and Interests in Mondrian and Grigio.

**B. Unclassified Claims**

**1. Administrative Expenses.**

Administrative Expenses are not classified under the Lenders' Plan. Administrative Expenses are Claims against any Debtor for any costs or expenses of the Reorganization Case allowed under Code §§ 503(b) and 507(a)(1), including all actual and necessary expenses of preservation of the Estate.

All requests for payment of Administrative Expenses that accrued during the Administrative Period, including Professional fees, shall be filed and served by the Administrative Expenses Bar Date.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Lenders or Reorganized Debtor may settle an Administrative Expense other than a Professional Fee claim without further Bankruptcy Court approval. Unless the Reorganized Debtor objects to an Administrative Expense other than a Professional Fee claim within 60 days after the Administrative Expenses Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Expense shall be deemed Allowed in the amount requested. If the Reorganized Debtor objects to such an Administrative Expense, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense. Notwithstanding the foregoing, no request for payment of an Administrative Expense need be filed with respect to an Administrative Expense which is paid or payable in the ordinary course of business. Professionals retained pursuant to an order of the Bankruptcy Court must file applications for Bankruptcy Court approval of their Professional Fee claims instead of proofs of claim. Their Administrative Expenses are subject to Court approval after notice and hearing upon applications filed within the Administrative Expenses Bar Date, and shall be paid by the Reorganized Debtor only as ordered by the Court.

Except as specified above, all Allowed Administrative Expenses shall receive cash from the Reorganized Debtor in the amount of such Administrative Expenses on the later of (i) the Effective Date Date; or (ii) the date such Administrative Expense becomes an Allowed Administrative Expense, or at such other date and upon such other terms as may be agreed upon by the holder of the Allowed Administrative Expense and Debtor or ordered by the Court, and at such times as are mutually agreeable to the respective parties.

Notwithstanding the foregoing, (a) any Allowed Administrative Expense based on a liability incurred by a Debtor in the ordinary course of business during the Reorganization Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Allowed Administrative Expense may be paid on such other terms as may be agreed on between the holder of such Claim and Debtor.

Lenders' counsel intend to seek the award of an allowed Administrative Expense for fees incurred in seeking plan confirmation in the event the Court confirms the Lenders' Plan.

**2.  Priority Tax Claims.**

To the extent that Allowed Priority Tax Claims exist in both the Mondrian and Grigio estates, they

shall be subclassified between the Debtors. Tempe has filed a $245,340 proof of claim in the Mondrian case for a residential development tax. No other priority tax claims are scheduled or anticipated to be filed. Tempe's Allowed Priority Tax Claim shall be paid in full, in cash, on the Effective Date.

### 3. Insider Claims.

All scheduled and filed Claims held by Insiders shall be deemed to be waived or recharacterized and treated as existing Equity Interests under the Lenders' Plan. The existing Equity Interests of the Debtors are cancelled under the Lenders' Plan.

### C. The Classes Of Claims Designated Under This Plan And Treatment Of Such Claims Are As Follows:

### 1. Class 1. — Priority Claims (Mondrian).

This Class shall consist of Allowed Claims entitled to Priority under Code § 507(a), other than Priority Tax Claims. The Debtors have previously estimated such Claims to be *de minimus*. The only filed Claim subject to treatment under Class 1 is an Insider Claim in the amount of $20,094.00.

**Treatment:** To the extent Allowed by a Final Order of the Court, and not previously paid under the Court's orders or pursuant to applicable law, all non-Insider holders of Allowed Class 1 Claims shall be paid in full, in cash plus interest at the statutory rate, on the later of i) the entry of a Final Order allowing such Claim or ii) the Effective Date.

### 2. Class 2. — Senior Lender Secured Claim (Mondrian).

This Class shall consist of the Allowed Secured Claims against Mondrian held by Mezz Lender.

**Treatment:** On the Effective Date, the Senior Lender Secured Claim shall receive a cash payment of all proceeds remaining from the Senior Refinancing, after payment of all Effective Date payments contemplated by this Lenders' Plan. Upon receipt of such funds, Senior Lender shall release any and all liens and security interests it may hold with respect to the Project. In addition, the Senior Lender shall be deemed to hold an Allowed Unsecured Claim for any and all amounts due and owing on the Senior Note and for any costs and fees incurred with respect to the Senior Refinancing that have not otherwise been satisfied from the proceeds of the Senior Refinancing. Such Allowed Claim will be treated as provided in Class 6 below.

### 3. Class 3. — Tempe Secured Claims (Mondrian).

This Class consists of the Allowed Secured Claims held by City of Tempe against Mondrian. Claims in this Category include: (1) Tempe's junior Secured Claim pursuant to the Tempe Agreement (Claim No. 26); (2) Tempe Secured Claim with respect to a property assessment known as the Miller Road Improvement District Assessment in the amounts of $1,382,277.35 with annual payments of $104,509.40 due on or before October 1 (Claim No. 27); and (3) Tempe Secured Claim with respect to a property assessment known as the Rio Salado Improvement District Assessment in the amount of $4,195,031.87 with annual payments of $153,178.83 due on or before November 1 (Claim No. 31).

**Treatment:**

**a.** To the extent not paid by the Debtors prior to the Effective Date, the Reorganized Debtor will pay the annual Miller Road and Rio Salado Assessments in cash on the Effective Date and will continue to make all such annual payments as required by the assessments until such assessments are paid in full.

**b. Modification of GPLET Lease.** On the Effective Date, the GPLET Lease shall be deemed to be amended and assumed to provide for GPLET Lease payments totaling $10,943,020 over approximately 33 years in accordance with the Lease Payment Schedule attached hereto as **Exhibit 2**.

**c. Modification of Development Agreement.** On the Effective Date, the Development Agreement shall deemed to be amended and assumed such that future annual Tax Rebates payable by Tempe to the Reorganized Debtor shall be limited to a maximum of $35,000 for a period of ten (10) years from the date the certificate of occupancy was issued for the Project.

**c. Release of Junior Security Interest.** On the Effective Date, Tempe shall be deemed to have released any and all liens and claims it may have with respect to the Project, except that nothing contained herein shall constitute a release of its fee title to the property upon which the Project is located and account of which its GPLET Lease rights arise or any statutory liens it may have on account of the Miller Road or Rio Salado Assessments.

Tempe's Class 3 Claim is impaired and it is entitled to vote to accept or reject the Lenders' Plan.

**4. Class 4. — Mondrian Vendor Claims (Mondrian).**

This Class shall consist of the Allowed Unsecured Claims against Mondrian of trade vendors and

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1 | non-insider/non-Tempe unsecured creditors.

2 | **Treatment:** The Mondrian Vendor Unsecured Claims shall be paid in full with interest on the
3 | Effective Date. The Mondrian Vendor Claims are unimpaired and their holders are deemed to accept the
4 | Lenders' Plan.

5 | **5.** **Class 5. — Tempe Unsecured Claim (Mondrian).**

6 | This Class shall consist of Tempe's Allowed Unsecured Claim in the amount of $1,656,948.

7 | **Treatment:** The Allowed Tempe Unsecured Claim will be paid in full with interest on the
8 | Effective Date. The Tempe Unsecured Claim is unimpaired and Tempe is deemed to accept the
9 | Lenders' Plan with respect to Class 5.

10 | **6.** **Class 6. — Senior Lender Deficiency Claim (Mondrian).**

11 | This Class shall consist of the Allowed Unsecured Claims against Mondrian by the Senior
12 | Lender for any deficiency claim remaining on the Senior Note following payment and release of lien
13 | and interests contemplated by its treatment in Class 2 above.

14 | **Treatment:** The Senior Lender shall share pro rata in the equity interests of the Reorganized
15 | Debtor based on the amount of its Allowed Class 6 Claim with the holders of the Allowed Class 7 and
16 | 9 Claims. The Senior Lender's Allowed Class 6 Claim is impaired and Senior Lender is entitled to
17 | vote to accept or reject the Lenders' Plan.

18 | **7.** **Class 7. — Mezz Lender Claim (Mondrian).**

19 | This Class shall consist of the Allowed Unsecured Claims of the Mezz Lender against Mondrian.

20 | **Treatment:** The Mezz Lender shall receive a pro rata share of the equity in the Reorganized Debtor
21 | according to the value of its Allowed Unsecured Claim with the holders of Allowed Class 6 and 9 Claims.
22 | The Mezz Lender's Allowed Class 7 Claim is impaired and Senior Lender is entitled to vote to accept
23 | or reject the Lenders' Plan.

24 | **8.** **Class 8. — Equity Interests (Mondrian).**

25 | This Class shall consist of the holders of the Equity Interests of Mondrian.

26 | **Treatment:** Equity Interests in Grigio shall be cancelled. Grigio's Equity Interests are held by
27 | insiders and are not entitled to vote on the Plan.

{02698.001/00203312.DOC / 3}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

9.     **Class 9. — Mezz Lender Claims (Grigio).**

This Class consists of the Allowed Secured Claim and any deficiency Claim that the Mezz Lender may assert against Grigio with respect to the Mezz Loan. The Claim is secured by a Membership Pledge and Security Agreement dated November 21, 2006 on Grigio's equity ownership Interest in Mondrian.

**Treatment:** The Mezz Lender shall receive a pro rata share of the equity in the Reorganized Debtor according to the value of its Allowed Unsecured Claim with the holders of Allowed Class 6 and 7 Claims. The Mezz Lender's Allowed Class 9 Claim is impaired and Senior Lender is entitled to vote to accept or reject the Lenders' Plan.

10.     **Class 10. — Equity Interests (Grigio).**

This Class shall consist of the holders of the Equity Interests of Grigio.

**Treatment**: Equity Interests in Grigio shall be cancelled. Grigio's Equity Interests are held by insiders and are not entitled to vote on the Plan.

**D.     Treatment Of Executory Contracts And Unexpired Leases**

1.     **Assumption and Rejection of Contracts and Leases.**

a.     **Tempe GPLET Lease.**

The GPLET Lease will be amended and assumed as of Effective Date pursuant to the terms of the Lenders' Plan as described in Section C above.

b.     **Tempe Development Agreement.**

The Development Agreement will be amended and assumed as of Effective Date pursuant to the terms of the Lenders' Plan as described in Section C above.

c.     **Other Unexpired Leases and Executory Contracts.**

All tenant leases for the Project have already been assumed pursuant to Bankruptcy Court order, and will be retained for the benefit of the Reorganized Debtor. On the Effective Date, all executory contracts and unexpired leases that (i) have not been previously assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or (ii) are not otherwise the subject of a motion to assume pending on or before the Effective Date shall be deemed rejected pursuant to the terms of the Lenders' Plan. Entry of the Confirmation Order shall constitute approval of all rejections and assumptions contemplated hereby

pursuant to Code §§ 365 and 1123 as of the Effective Date, without prejudice to Mondrian's right to modify this portion of the Lenders' Plan prior to the Effective Date in accordance with Code § 1127(b).

### d. Rejection Damages

**Bar Date for Rejection Damage Claims.** Any Claim for damages arising from the rejection under the Lenders' Plan of an executory contract or unexpired lease must be filed and served upon Debtors by the Rejection Claims Bar Date. Any such Claims that are not timely filed and served will be forever barred and unenforceable against Debtors, the Estates, the Reorganized Debtor and their respective property, and entities holding these Claims will be barred from receiving any distributions under the Lenders' Plan on account of such untimely Claims. All timely filed Claims for rejection damages shall be classified as Class 4 Vendor Claims and treated in accordance with the Lenders' Plan.

### 2. Postpetition Contracts and Leases.

Any contracts, leases, and other agreements that Debtors entered into after the Petition Date, whether within or outside the ordinary course of business, other than contracts with Insiders (unless approved by Court Order), shall be retained by the Reorganized Debtor in its sole business discretion.

### Article X.

### Means of Execution and Implementation of the Lenders' Plan

The Reorganized Debtors' payment obligations under the Lenders' Plan will be financed by the Senior Refinancing, the Debtors' cash on hand as of the Effective Date, and the revenues generated from the ongoing operations at the Project. On and after the Effective Date, the Reorganized Debtor will be managed by its Manager, and the Project will be managed by a professional third-party property management company.

### A. Senior Refinancing.

On the Effective Date, a third party lender will loan the Reorganized Debtor not less than $53,000,000, the proceeds of which will first be used to satisfy any Effective Date obligations under the Lenders' Plan that are not otherwise paid from the Debtors' Effective Date cash with all remaining proceeds to be paid to Senior Lender on account of its Allowed Class 2 claim as provided in the Lenders' Plan. The Lenders are currently negotiating the terms of such a financing arrangement with a third party

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

lender. At this time, the Lenders expect the terms of the Senior Refinancing will generally include the following:[2]

Minimum Principal Loan Balance:    $53,000,000

Estimate Interest Rate:    6.25%

Minimum Term:    5 years

Collateral:    First position senior lien on all of Reorganized Debtors' assets, including, but not limited to, a first position lien on the Reorganized Debtors' leasehold interests in the Project, assignment of rents and leases, and security agreement for all personal property and cash and accounts of the Reorganized Debtor.

### B.    Management of Reorganized Debtor.

Mondrian's operating agreement shall be amended as of the Effective Date to provide that the Reorganized Debtor shall be managed by its Manager, who shall be appointed by a vote of a simple majority of the equity holders of the Reorganized Debtor. It is anticipated that the Manager will be an affiliate of the Senior Lender and TPG. Manager will, in its sole discretion, retain a professional property management company to operate the Project from and after the Effective Date. Lenders will identify such project management company, its qualifications to manage the Project, and the terms of its retention agreement by filing a disclosure with the Court not less than seven (7) days prior to the Confirmation Hearing.

### C.    Cancellation of Existing Securities and Agreement.

On the relevant Effective Date, and except as otherwise specifically provided for herein or as otherwise required in connection with any Cure:

1.    All existing securities and any note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of Debtors, except such notes or other instruments evidencing indebtedness or obligations of Debtors as are reinstated or unchanged under the Lenders' Plan, shall be cancelled, provided however that security interests shall be released upon receipt of

---

[2]    Final documents evidencing the exact terms and conditions of the refinancing will be filed with the Court seven (7) days prior to the Confirmation Hearing.

Distributions;

       **2.**     The obligations of and/or, Claims against, Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, articles of organization, operating agreement, warrant, and any other note, bond, indenture, or other instrument or document evidencing or creating any such cancelled indebtedness or obligation of Debtors, shall be released; and

       **3.**     The Debtors' existing Equity Interests will be cancelled and new equity interests in the Reorganized Debtor will be issued on a pro rata basis to the holders of Allowed Class 6, 7 and 9 Claims as provided in Section C above.

    **D.**     **Objections to Claims and Interests/Actions to Subordinate or Recharacterize Claims or Equity.**

Except as otherwise provided in the Lenders' Plan, objections to any Claims or Interests, and any action to subordinate or recharacterize a Claim or Interest, shall be filed and served upon the holder of such Claim or Interest no later than the Claims/Interests Objection Deadline. After the Effective Date, only the Reorganized Debtor shall have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests, or any action to object to, subordinate or recharacterize an asserted Claim or Interest.

    **E.**     **Other Litigation and Avoidance Actions.**

All of the Debtors' rights to avoid any prepetition or postpetition transfers of property of the Debtors are preserved under the Lenders' Plan and shall be retained by the Reorganized Debtor. On and after the Effective Date, the Reorganized Debtor shall have the exclusive power to bring, dismiss or compromise any causes of action or claims of the Debtors, including, but not limited to, avoidance actions pursuant to chapter 5 of the Bankruptcy Code, other proceedings discussed herein, and all matters pertaining to the implementation of the Lenders' Plan. Any and all recoveries that may be obtained on account of such causes of action or claims will inure to the benefit of the Reorganized Debtor.

    **F.**     **Retention and Payment of Professionals.**

Until the Effective Date, all applicable Bankruptcy Code Sections and Rules pertaining to the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1   employment and compensation of Professionals shall be applicable to the Cases. However, from and

2   after the Effective Date, the Reorganized Debtor is empowered to retain and compensate professional

3   persons in the ordinary course of business for all services provided after the Effective Date.

4         **G.    Compliance with Tax Requirements.**

5         Each Debtor shall comply with all withholding and reporting requirements imposed on such Debtor

6   by Governmental Units, and all distributions pursuant to the Lenders' Plan shall be subject to such

7   withholding and reporting requirements, if any. Notwithstanding any other provision of the Lenders' Plan,

8   Debtors, each holder of an Allowed Claim that has received a distribution pursuant to the Lenders' Plan,

9   and each holder of an Interest, shall have sole and exclusive responsibility for the satisfaction or payment of

10  any tax obligation imposed by any Governmental Unit, including income, withholding and other tax

11  obligations on account of its respective receipt of such distribution or on account of the transactions

12  undertaken with respect to its Claim or Interest pursuant to the Lenders' Plan. Debtors shall have no

13  responsibility for the satisfaction or payment of any tax obligation assessed or assessable upon

14  Debtors after the relevant Effective Date, or upon holders of Claims or Interests for any time period.

15        **H.    Corporate Action.**

16        Each of the matters provided for under the Lenders' Plan involving the corporate structure of any

17  Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized

18  Debtor shall, as of the relevant Effective Date, be deemed to have occurred and be effective as provided

19  herein, and shall be authorized, approved, and to the extent taken prior to the relevant Effective Date, ratified

20  in all respects without any requirement of further action by members, creditors, or managers of any Debtor

21  or Reorganized Debtor.

22        **I.    Effectuating Documents; Further Transactions.**

23        Brian Kearney, or any manager of any Debtor, or their respective designees, shall be required to

24  execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or

25  documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the

26  terms and conditions of the Lenders' Plan or to otherwise comply with applicable law. The manager of the

27  respective Debtors shall be deemed to have certified or attested to any of the foregoing actions. All

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1    records, contracts, lease agreements, deposits, etc. currently existing or existing at the time of Plan

2    confirmation shall be transferred and delivered to the Reorganized Debtor no later than 14 days

3    following entry of the Confirmation Order.

4        **J.**    **Discharged Claims and Terminated Interests.**

5        In accordance with Bankruptcy Code § 1141(d)(1), entry of the Confirmation Order shall

6    provide the Debtor with a discharge of any Claim against the Debtors, including, without limitation,

7    any Claim that arose at any time before the entry of the Confirmation Order and any Claim of a kind

8    described in Bankruptcy Code § 502(g). Following the entry of the Confirmation Order, every holder

9    of a Claim shall be precluded from asserting against the Debtors, the Reorganized Debtor, and any

10   assets of the Debtors, any further Claim based upon any document, instrument, act, omission,

11   transaction, or other activity of any kind or nature which occurred prior to the Confirmation Date,

12   except as provided in this Plan. In addition, except as otherwise provided herein, the Confirmation Order

13   shall provide, among other things, that no holder of a Claim against any Debtor may, on account of such

14   Claim, seek or receive any payment or other distribution from, or seek recourse against, any of

15   Debtors' respective successors or their respective property, except that from and after the Confirmation

16   Date, all Persons who have held, hold, or may hold Claims against or Interests in Debtors are permanently

17   enjoined from taking any of the following actions against the Debtors, Reorganized Debtor, Lenders, or any

18   of their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in

19   any place, any action or other proceeding, (B) enforcing, attaching, collecting, or recovering in any manner

20   any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; and

21   (D) commencing or continuing, in any manner or *in* any place, any action that does not comply with or is

22   inconsistent with the provisions of the Lenders' Plan. Notwithstanding anything to the contrary in the

23   Lenders' Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in the

24   Lenders' Plan shall not enjoin the valid exercise of such rights of setoff and recoupment. By accepting

25   Distributions pursuant to the Lenders' Plan, each holder of an Allowed Claim or Allowed Interest shall be

26   deemed to have specifically consented to the injunctions set forth herein.

27

{02698.001/00203312.DOC / 3}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## K.     Setoffs.

The Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Lenders' Plan in respect of such Claim, claims of any nature whatsoever that Debtors or the Reorganized Debtor may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtors or Reorganized Debtor of any such claim that Debtors or Reorganized Debtor may have against such holder of such Claim.

## L.     Exculpation and Limitation of Liability.

None of (a) Debtors, (b) Lenders, (c) or such parties' affiliates participating in the treatment of Claims under the Lenders' Plan, and (d) with respect to each of the foregoing Persons, each of their respective existing and former directors, officers, employees, agents, representatives, shareholders, partners, members, fiduciaries, principals, managers, predecessors, successors and assigns, subsidiaries, parents, affiliates, affiliated and managed funds, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, negotiation, implementation, confirmation or consummation of the Lenders' Plan, the Lenders' Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with the Lenders' Plan; provided, however, that nothing in this section shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order, or from compliance with the Lenders' Plan provisions.

## Article XI.

## General Considerations and Risk Factors To Be Considered

Every holder of a Claim against or Interest in a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Lenders' Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Lenders' Plan.

{02698.001/00203312.DOC / 3}

3636 North Central Avenue, Suite 700

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Lenders' Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. The reorganization contemplated by the Lenders' Plan provides for treatment of unsecured creditors that is the same or better than would otherwise be achieved by creditors under the Debtors' Amended Plan.

### B.    Certain Bankruptcy Considerations

If the Lenders' Plan is not confirmed and consummated, there can be no assurance that the Reorganization Cases will continue rather than be converted to liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Interests as the terms of the Lenders' Plan.

### Article XII.

### Feasibility Of The Plan And The Best Interest Test

### A.    Feasibility Of The Plan

To confirm the Lenders' Plan, the Bankruptcy Court must find that confirmation of the Lenders' Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtors. This requirement is imposed by Code § 1129(a)(11) and is referred to as the "feasibility" requirement. The Lenders believe that the Reorganized Debtor will be able to timely perform all obligations described in the Lenders' Plan, and, therefore, that the Lenders' Plan is feasible.

Specifically, refinancing of the Senior Note will reduce the Reorganized Debtors' long term debt obligations and allow it to fund principal and interest payments, capital improvements and all of the payments contemplated by the Lenders' Plan. The pro forma for the Project prepared by the Debtors in connection with the Sale contemplated by the Debtors' Amended Plan is attached hereto as **Exhibit 3**. The Debtors' have projected that the Project can support payments on first position loan of $70 million at 19% interest. The Lenders' Plan contemplates a significantly lower senior debt obligation at substantially less interest than Debtors' Amended Plan.

Accordingly, the Lenders believe that the Lenders' Plan satisfies the feasibility requirement of Code § 1129(a)(11). Lenders caution that no representations can be made as to the accuracy of any

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

projections by the Debtors or the Lenders or as to the ability of parties under the Lenders' Plan to achieve the projected results. Many of the assumptions and projections in this Lenders' Disclosure Statement are based are those included in the Debtors' Amended Disclosure Statement, which has previously been approved by the Court. Such information is subject to uncertainties outside the control of Lenders or the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which any projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect actual financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse. This Disclosure Statement contains a discussion of certain risk factors that may affect financial feasibility of the Lenders' Plan.

THE ATTACHED PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY DEBTORS' INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND DEBTORS' CONTROL.

CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE LENDERS, THE DEBTORS, THEIR AFFILATES, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## B.    Acceptance of the Lenders' Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims and Interests vote to accept the Lenders' Plan, except under certain circumstances.  Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Lenders' Plan.  Thus, a Class of Claims will have voted to accept the Lenders' Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.  Under Code § 1126(d), a Class of Interests has accepted the Lenders' Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Lenders' Plan.  holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Lenders' Plan.

## C.    Best Interests Test

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Code § 1129(a)(7), requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan, or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code.  In the Mondrian case, this "liquidation value" would consist primarily of the proceeds from orderly sale of Mondrian's assets.  The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the Court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

### D.    Estimated Valuation Of The Reorganized Debtors

By their Amended Plan, the Debtors are attempting to sell the Project for $75,340,000 and have asserted that such a sale represents evidence of the market value of the Project. On the Effective Date of the Lenders' Plan, the Debtors will emerge from bankruptcy as the Reorganized Debtor, and their assets and liabilities will be treated in accordance with the Lenders' Plan.

### E.    Application Of The Best Interests Test To The Liquidation Analysis And The Valuation Of The Reorganized Debtors

The Debtors have concluded that a liquidation of Mondrian's assets would result in no distribution to unsecured creditors. Lenders believe that, taking into account the liquidation analysis in the Debtors' Amended Plan (substantially repeated below) and the Debtors' valuation analysis of Reorganized Debtors, the Lenders' Plan meets the "best interests" test of Code § 1129(a)(7). Lenders believe that the

members of each impaired Class will receive at least as much under the Lenders' Plan as they would in a liquidation in a hypothetical chapter 7 case. Holders of Claims and Interests will receive as good or better recovery through the distributions contemplated by the Lenders' Plan because the Reorganized Debtors' continued operation as a going concern rather than a forced liquidation will allow the realization of more value for the creditors of the Debtors' Estates.

## Article XIII.

### Alternatives To Confirmation And Consummation Of The Lenders' Plan

The Lenders believe that the Lenders' Plan affords holders of Claims and Interests the potential for the greatest realization on Debtors' assets and, therefor; is in the best interests of such holders. If the Lenders' Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Reorganization Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.     Continuation Of The Bankruptcy Case

In the Lenders' view, the Debtors have failed to put forth any viable plan of reorganization during the pendency of these cases. The Debtors' Amended Plan has been voted on by creditors and has been rejected by more than 99.8% of creditors voting. Accordingly, the Lenders' lack all confidence in the Debtors' ability to reorganize in chapter 11 and continuation of the Cases without conversion and liquidation under chapter 7.

### B.     Alternative Plans Of Reorganization

The Lenders' Plan is an alternative to the Amended Plan that has been proposed by the Debtors. In the event that neither the Debtors' Plan nor the Lenders' Plan is confirmed, the Lenders' view it as unlikely that any other plan of reorganization will be put forth by any other party in interest and the Cases will be converted to chapter 7.

### C.     Liquidation Analysis

If no plan is confirmed, the Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate Debtors' assets. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective

{02698.001/00203312.DOC / 3}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

holders of Claims against or Interests in Debtors.

However, as described in the Debtors' Amended Disclosure Statement, the Debtors and the Lenders believe that creditors would lose substantially higher going concern value if Debtors were forced to liquidate. In addition, Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of Debtors' assets.

Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.

Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to holders of Claims and Interests under a chapter 11 liquidation plan probably would be delayed substantially.

In Debtors' opinion, as explained above, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Lenders' Plan.

## Article XIV.

### Tax Consequences Of The Plan

A summary description of certain United States federal income tax consequences of the Lenders' Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Lenders' Plan as discussed herein. Only the principal United States federal

{02698.001/00203312.DOC / 3}

income tax consequences of the Lenders' Plan to the Debtors and to holders of Claims and Interests who are entitled to vote to accept or reject the Lenders' Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Lenders' Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Lenders' Plan, and the discussion below is not binding upon the IRS or such other authorities. In addition, a substantial amount of time may elapse between the date of this Lenders' Disclosure Statement and the receipt of a final distribution under the Lenders' Plan. Events occurring after the date of this Lenders' Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Lenders' Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Lenders' Plan to Debtors or any holder of Claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code ("IRC"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Lenders' Plan, nor does it purport to address the United States federal income tax consequences of the Lenders' Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes. EACH HOLDER IS STRONGLY URGED

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

TO CONSULT ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, AND LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE LENDERS' PLAN.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims or Interests are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Lenders' Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.

### A. Debtors' Tax Consequences

In general, Payment of creditors' claims in full should not result in material tax consequences. Modification of the Tempe claim under the Payment Agreement and payment of less than the full amount of unsecured claims may result in cancellation of debt income reported to the Debtors.

### B. United States Federal Income Tax Consequences to Holders of Claims Against and Interests in Debtors

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Lenders' Plan to holders of Claims or Interests that are "United States holders" as defined below. The United States federal income tax consequences of the transactions contemplated by the Lenders' Plan to holders of Claims or Interests (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim or Interest and the consideration received in respect thereof are "securities" for United States federal income tax purposes; (2) the manner in which a holder acquired a Claim or Interest; (3) the length of time the Claim or Interest has been held; (4) whether the Claim or Interest was acquired at a discount; (5) whether the holder has taken a bad debt deduction or worthless stock deduction with respect to the Claim or Interest (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim or Interest; (7) the holder's method of tax

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

accounting; and (8) whether the Claim or Interest is an installment obligation for United States federal income tax purposes. Therefore, holders of Claims or Interests should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Lenders' Plan. This discussion assumes that the holder has not taken a bad debt deduction with respect to a Claim or Interest (or any portion thereof) in the current or any prior year and such Claim or Interest did not become completely or partially worthless in a prior taxable year. Moreover, Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Lenders' Plan.

For purposes of the following discussion, a "United States holder" is a holder of Claims or Interests that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

### 1. Claim Holders' Tax Consequences

Debtors pay cash to holders of Claims to discharge such Claims. The following discussion relates only to the holders of Claims that are not paid in cash. The United States federal income tax consequences arising from the Lenders' Plan to such holders of Claims will vary depending upon, among other things, whether such Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt instrument, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes.

Trade claims are not considered securities. Generally, corporate debt instruments with maturities

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1    when issued of less than five years are not considered securities, and corporate debt instruments with

2    maturities when issued of ten years or more are considered securities. Each holder is urged to consult its tax

3    advisor regarding the status of its Claim.

4         If such Claims constitute "securities" for United States federal income tax purposes, the exchange

5    of such Claims for cash should constitute a "recapitalization" for United States federal income tax purposes.

6    As a result, except as discussed below with respect to Claims for accrued interest and accrued market

7    discount, a holder of such Claims should recognize gain, but not loss, with respect to each Claim

8    surrendered in an amount equal to the lesser of (1) the amount of gain realized (i.e., the excess of the cash

9    and fair market value of any other property received by such holder in respect of its Claim over the adjusted

10   tax basis of such Claim), excluding any such cash or property received in respect of a Claim for accrued

11   interest that had not been included in income, and (2) the amount of cash received by such holder in respect

12   of its Claim (other than with respect to any Claim for accrued interest). Any such gain recognized will

13   generally be treated as capital gain if the Claim is a capital asset in the hands of the holder.

14        Under the Lenders' Plan, a portion of the cash distributed to holders of Claims may be treated as

15   distributed with respect to their Claims for accrued interest. holders of Claims for accrued pre-petition

16   interest which previously have not included such accrued interest in taxable income will be required to

17   recognize ordinary income equal to the amount of cash received with respect to such Claims for accrued

18   pre-petition interest. The extent to which consideration distributable under the Lenders' Plan is allocable to

19   accrued interest is not clear. holders of such Claims are advised to consult their own tax advisors to

20   determine the amount, if any, of consideration received under the Lenders' Plan that is allocable to accrued

21   interest.

22        If such Claims do not constitute "securities" for United States federal income tax purposes, the

23   exchange of such Claims for cash should constitute a taxable exchange for United States federal income

24   tax purposes. As a result, a holder of Claims would generally recognize income, gain or loss for

25   United States federal income tax purposes in an amount equal to the difference between (1) the cash

26   received in exchange for its Claim, and (2) the holder's adjusted tax basis in its Claim. The character of

27   such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. Any such gain recognized would generally be treated as ordinary income to the extent that the cash is received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the holder's method of accounting. A holder of Claims recognizing a loss as a result of the Lenders' Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.

### 2. Interest Holders' Tax Consequences

A holder of an Interest that is deemed cancelled under the Lenders' Plan will recognize a loss for United States federal income tax purposes in an amount equal to such holder's adjusted tax basis in the Interest. The character of such loss *as* capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the holder and whether the holder holds its Interest as a capital asset.

### C. Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Lenders' Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and, a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

{02698.001/00203312.DOC / 3}

### D. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE LENDERS' PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE LENDERS' PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## Article XV.

## Definitions

The Plan contains the definitions of terms used in the Lenders' Plan and this Disclosure that are not defined in the Bankruptcy Code and Rules.

## Article XVI.

## Conclusion/Recommendation

The Lenders' Plan provides for the maximum distributions available to creditors and preserves the value of the Project for the benefit of the Debtors' unsecured creditors that are not otherwise being paid in full under the Lenders' Plan. Lenders believe that any alternative to confirmation of the Lenders' Plan could result in significant delays, litigation, and costs. Moreover, Lenders believe that the Debtors' creditors will receive greater and earlier recoveries under the Lenders' Plan than those that would be achieved in liquidation or under an alternative plan, including the Debtors' Amended Plan. FOR THESE REASONS, LENDERS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE LENDERS' PLAN.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

DATED this 9th day of November, 2010.

**ENGELMAN BERGER, P.C.**

By: /s/ SBA #009613
    Steven N. Berger
    Scott B. Cohen
    Patrick A. Clisham
    3636 North Central Avenue, Suite 700
    Phoenix, Arizona 85012
    Attorneys for TPG (Grigio) Note Acquisition, LLC

**OSBORN MALEDON, P.A.**

By: /s/ SBA #009063
    James E. Cross
    Warren J. Stapleton
    2929 North Central Avenue, Suite 2100
    Phoenix, Arizona 85012-2794
    Attorneys for TPG (Grigio) Mezzanine, LLC

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012