# EXHIBIT 1

November 30, 2010

Mr. Bruce Gray
Chairman
Gray Development Group
4040 E. Camelback Road, Ste. 275
Phoenix, AZ 85018

Re:  Grigio Tempe Town Lakes

Dear Mr. Gray:

This letter and the Exhibits attached to it set forth the basic terms and conditions relating to the restructuring transaction between Mondrian TTL, LLC, a Delaware limited liability company (**"Mondrian"**), Grigio TTL, LLC, an Arizona limited liability company (**"Grigio"**), TPG (Grigio) Note Acquisition, LLC, a Delaware limited liability company (**"Senior Lender"**) and TPG (Grigio) Mezzanine, LLC, a Delaware limited liability company (**"Mezzanine Lender"**).  Mondrian and Grigio are sometimes collectively referred to herein as the **"Debtors"** and Senior Lender and Mezzanine Lender are sometimes collectively referred to herein as the **"Lenders"**.  Mondrian owns the 523-unit apartment project located at 1001 E. Playa del Norte, Tempe, Arizona (the **"Project"**).

Although the definitive legal documentation for the restructuring will include, in addition to the provisions outlined herein, other material terms and provisions to be negotiated by the parties, the parties intend to be legally bound by this letter (subject to obtaining required bankruptcy court approvals), and in reliance on this letter will proceed diligently to implement the agreements set forth herein.

If this letter and the attached Exhibits are satisfactory, then please indicate your acceptance by executing and returning the enclosed copy.

TPG (Grigio) Note Acquisition, LLC, a Delaware limited liability company

By:  _____
Kenneth A Picerne
President

TPG (Grigio) Mezzanine, LLC, a Delaware limited liability company

By: _____

Kenneth A Picerne
President

Agreed this 30th day of November, 2010

Mondrian TTL, L.L.C., a Delaware limited liability company

By:    Mondrian Manager, LLC, a Delaware limited
       liability company, its Manager

       By:    GDG Enterprises L.L.C., an Arizona
             limited liability company, its Manager

           By: _____
           Its: _____


Grigio TTL L.L.C., an Arizona limited liability company

By:    GDG Enterprises L.L.C., an Arizona
       limited liability company, its Manager

       By: _____
       Its: _____

Transaction Outline

1. <u>Major Elements of the Restructuring</u>

   1.1. The Debtors' pending bankruptcy cases are dismissed or otherwise resolved as outlined in 2 below.

   1.2. A single-purpose, bankruptcy-remote affiliate of the Lenders (the **"Optionor"**) takes title to the Project as outlined in 3 below.

   1.3. A single-purpose, bankruptcy-remote affiliate of the Debtors (the **"Optionee"**) gets a purchase option with respect to the Project as outlined in 4 below.

   1.4. An affiliate of the Debtors (the **"Property Manager"**) gets a property management agreement with respect to the Project as outlined in 5 below.

   1.5. Recapitalization of the obligations to the City of Tempe pertaining to the Project is implemented per the current understanding between the Lenders and the City of Tempe, as outlined in 6 below.

   1.6. Optionor puts new leasehold first trust deed financing in place, as outlined in 7 below.

   1.7. The parties exchange comprehensive mutual releases with respect to known and unknown claims pertaining to the Project, the guaranties and the bankruptcy cases arising through the date of the releases. The releases shall include known or unknown claims against (a) Debtors, (b) Lenders, (c) Canyon Johnson Urban Fund, (e) Babson Mezzanine Realty Investors LP, (f) Cornerstone, (g) Massachusetts Mutual, and (h) all affiliates, members, insiders, officers, directors and advisors of the foregoing persons.

   1.8. The guaranties of the Senior Lender's and the Mezzanine Lender's loans to Mondrian and Grigio are exonerated.

2. <u>Resolution of the Pending Bankruptcy Cases</u>

   2.1. The expected and preferred resolution is a dismissal of the case effective concurrently with implementation of the new structure (the **"Closing"**).

      2.1.1. The parties will immediately approach the court to postpone the December 1 hearing and otherwise implement a moratorium on the current adversarial activity (e.g. pending discovery, including depositions, preparation of joint pretrial statement, motions, plan prosecution, etc.) This would be a full standstill in place.

2.1.2. If the bankruptcy court does not approve dismissal, the resolution will be implemented pursuant to an amended plan of reorganization (either of the Debtors' plan or the Lenders' plan). If this becomes necessary, the parties will cooperate to achieve the most expeditious resolution feasible.

2.1.3. The objective of the parties is that the Closing will occur on or before December 31, 2010.

3. <u>Transfer of Title to Optionor</u>

3.1. At the Closing, the Optionor will take title to the GPLET leasehold and the Project via customary deed in lieu of foreclosure documentation.

3.2. Optionor must be a single-purpose, bankruptcy-remote entity. There will be personal recourse to Optionor's principals for all damages suffered by Optionee in the event Optionor files or becomes the subject of a bankruptcy and Optionee's option is rejected or otherwise is not honored in accordance with its terms in that bankruptcy.

3.3. The use of Debtor's cash on hand:

3.3.1. At the Closing, reserved amounts specifically earmarked for tenant security deposits will be transferred to Optionor. As of the date hereof, the amount of tenant security deposits is $120,000.

3.3.2. At the Closing, Optionor will provide (i) cash sufficient to pay administrative claims and any priority expenses (excluding attorney fees) in the bankruptcy cases, estimated to be under $100,000 in total, plus (ii) $150,000 to pay unsecured creditor claims, plus (iii) $257,688.23 to reimburse Debtors for the total of installments of the Miller Road and Rio Salado assessments that were paid by the Debtors in November and that will be paid by Debtors in December, plus (iv) $150,000.

3.3.3. At the Closing, the cash provided by Optionor pursuant to 3.3.2 plus the balance of the Debtors' cash on hand (to be prorated and calculated as of December 31, 2010 regardless of when the Closing actually takes place, using actual income generated from, and operating expenses incurred by, the Project and Debtor's non-default interest expense on the senior loan, with no amounts deducted on account of the City of Tempe obligations), expected to be about $1.2 million held in the debtor in possession account and in the property taxes and insurance reserve, will be used by the Debtors to pay their attorney fees and to pay the "Termination Consideration" to CJUF described in 3.4. Optionor will pay its own attorney fees, and Debtors will pay any additional amounts, over and above the funds available to them per this section 3.3.3, required to pay Debtors' attorney fees and the CJUF "Termination Consideration."

3.3.4. Prior to the Closing, the Project will continue to be operated in the ordinary course, including debt service payments on the Senior Lender's Loan at the non-default rate, such that neither the payment of operating expenses nor the collection of revenue is deferred.

3.4. At or prior to the Closing, the Debtors will implement the "Terminations" as described in the agreement between the Debtors and CJUF that is attached as Exhibit "B". The $1.295 million of "Termination Consideration" will be paid to CJUF by the Debtors or Optionee as provided in 3.3.3.

4. Purchase Option

4.1. At the Closing, Optionee will be granted an option to purchase Optionor's interest in the GPLET lease and the Project, which shall be freely assignable to Optionee without the need for any third-party approvals or consents. In addition to the specific provisions set forth below, the Option Agreement shall contain such terms and conditions as are customary in an option transaction, including without limitation: (i) Optionor's obligation to maintain the Property in substantially the manner in which the Property has been maintained in the past and otherwise consistent with the standards appropriate for a first class project serving the top tier of the market and the requirements of the new trust deed financing referred to in 7 below; (ii) Optionee's rights of inspection of the Property; and (iii) Optionee's remedy of specific performance in the event of an Optionor breach. Promptly following the execution hereof, Optionor and Optionee shall work together in good faith to agree on the forms of the Option Agreement and all related documents.

4.2. Optionee must be a single-purpose, bankruptcy-remote entity. There will be personal recourse to Optionee's principals for all damages suffered by Optionor in the event Optionee files or becomes the subject of a bankruptcy and the Optionee's option is extended or modified as a result of that bankruptcy.

4.3. The option will be exercisable at any time between the Closing and 11/30/2013.

4.4. If the option is exercised, the transfer of title to Optionee is to occur within 30 days after exercise, but no later than 12/31/2013.

4.5. The purchase price is $90 million, subject to 4.6.1, and 4.6.2.

4.6. A memorandum of the option will be recorded at the Closing.

4.6.1. The option will be subordinate to the restructured GPLET lease and amended development agreement. At the Closing the City of Tempe will agree to provide Optionee with concurrent notices of Optionor defaults and the right to cure, with the cost of any cure by Optionee being credited against the purchase price.

4841-0002-3304.1

4.6.2. The option will be subordinate to the new trust deed on the GPLET leasehold and the Project. At the funding of the new senior loan, which may occur at or subsequent to the Closing, the new senior lender will agree to provide Optionee with concurrent notices of Optionor defaults and the right to cure, with the cost of any cure by Optionee being credited against the purchase price.

4.6.3. Subject to 4.6.1 and 7.2, Optionor will deliver title free and clear of all subsequent liens, claims and encumbrances.

4.7. If the option is exercised, all Project income and expenses will be prorated as of the closing date.

5. **Property Management Agreement**

5.1. At the Closing, Optionor and Optionee's affiliate will enter into a property management agreement with respect to the Project in the form attached as Exhibit "C," with a 2.75% fee.

6. **Implementation with Tempe**

6.1. At the Closing, Optionor will pay $1,656,948 of water and sewer fees.

6.2. At the Closing, Optionor will pay $245,000 of residential development tax.

6.3. The Miller Road and Rio Salado annual assessments have been paid current by the Debtors from cash on hand/reserves, and at the Closing the obligation to pay such assessments in the future will remain as senior encumbrances.

6.4. At the Closing, the Payment Agreement with the City of Tempe and the second trust deed securing obligations thereunder will be fully and forever released in favor of a restructured GPLET lease as set forth in the Agreement Among Creditors that has been executed by the Lenders and the City of Tempe, a copy of which is attached as Exhibit "D".

6.5. At the Closing, the development agreement encumbering the Project will be amended to adjust the sales tax rebate, as set forth in the Agreement Among Creditors that has been executed by the Lenders and the City of Tempe.

7. **New First Trust Deed Financing**

7.1. Optionor will arrange a new leasehold trust deed loan. This financing is expected to fund at the Closing, but may fund subsequently.

7.2. The senior loan will be prepayable in connection with the exercise of the option, without premium or penalty, but will not be assumable by Optionee.

7.3. The leasehold trust deed securing the new loan will be subordinate to the restructured GPLET lease with Tempe, but will be senior to Optionee's option.

7.4. No further indebtedness may be secured by the Project.

8. <u>Additional Items</u>

8.1. The parties will issue a joint press release.

8.2. Optionor will have a license to use the Grigio name during the term of the option, but would be required to cease using the Grigio name not later than December 31, 2013 if the option is not exercised.

4841-0002-3304.1

# EXHIBIT "B"

Conditional Settlement, Termination and Release Agreement with CJUF

# CONDITIONAL SETTLEMENT, TERMINATION
# AND RELEASE AGREEMENT

This Conditional Settlement, Termination, and Release Agreement ("**Agreement**") is executed as of November 29, 2010 ("**Agreement Date**") by and among: (i) CJUF III Grigio Tempe Town Lake LLC, a Delaware limited liability company ("**Buyer**"); (ii) GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company ("**Gray Member**"); (iii) CJUF III GTTL Member LLC, a Delaware limited liability company ("**Preferred Member**"); and (iv) Bruce W. Gray, an individual ("**Guarantor**"). Buyer, Gray Member, Preferred Member and Guarantor are referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      Mondrian TTL L.L.C., a Delaware limited liability company ("**Seller**") is debtor and debtor-in-possession under Case No. 2:10-bk-14140-RJH pending in the U.S. Bankruptcy Court for the District of Arizona ("**Bankruptcy Case**").

B.      Buyer and Seller are the parties to the Amended and Restated Asset Purchase Agreement dated as of September 1, 2010 ("**APA**"). Close of escrow of the purchase and sale transaction contemplated by the APA is contingent on, among other things, confirmation by the Bankruptcy Court of Seller's Joint Plan of Reorganization dated July 23, 2010, as Amended September 1, 2010, as filed with the Bankruptcy Court on September 1, 2010 ("**Seller's Plan**").

C.      Gray Member and Preferred Member are the sole Members of Buyer. Buyer is governed by the terms of its Amended and Restated Operating Agreement, which is dated as of September 1, 2010 ("**Buyer's Operating Agreement**").

D.      Both the APA and the Buyer's Operating Agreement provide that the date by which close of escrow must occur shall be no later than December 31, 2010 ("**Original Outside Closing Date**").

E.      Pursuant to the terms of the Guaranty dated as of August 25, 2010, which Guaranty was amended by the First Amendment to Guaranty dated as of September 1, 2010 ("collectively, the "**Guaranty**"), Guarantor has guaranteed to Buyer and to Preferred Member the performance of certain obligations of Gray Member under the Buyer's Operating Agreement and the performance of certain obligations of Seller under the APA.

F.      Gray Member and Guarantor (collectively, the "**Gray Parties**") have requested that Preferred Member and Buyer (collectively, the "**CJ Parties**") agree to an extension of the Original Outside Closing Date to March 1, 2011 ("**Extended Outside Closing Date**") in exchange for payment of the Extension Fee as provided herein.

G.      The Gray Parties have also requested that, provided the Extension Fee has been paid, the CJ Parties agree to terminate the APA, the Buyer's Operating Agreement, and the Guaranty (collectively, the "**Terminations**") upon payment of the Termination Consideration. Preferred Member and Buyer are agreeable to the Terminations on the terms and conditions that are set forth in this Agreement.

## AGREEMENTS

For valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1.     Extension Fee.  In exchange for the CJ Parties' agreement to extend the Original Outside Closing Date to the Extended Outside Closing Date, the Gray Parties shall pay Preferred Member $295,000 ("Extension Fee") on the earlier of (a) December 31, 2010 or (b) the date on which the Termination Consideration is paid under Section 2 of this Agreement.  The Extension Fee is fully earned as of the date of this Agreement and shall not be subject to offset and once paid shall not be refundable.  If the Gray Parties pay the Extension Fee and close of escrow under the APA later occurs on or before the Extended Outside Closing Date, then the Extension Fee shall be a credit against the "Initial Gray Member Equity Investment" (as defined in the Buyer's Operating Agreement).

2.     Termination Consideration.

       (a)     To effectuate the Terminations, the Gray Parties shall (i) deliver to the CJ Parties written notice of election to effectuate the Terminations and (ii) pay to Preferred Member the sum of $1,000,000.00 ("Termination Consideration") as provided in Section 2(b) below.  The Terminations shall be effective only when such notice has been given, the Extension Fee has been paid to Preferred Member and the Termination Consideration has been paid to Preferred Member.  The Termination Consideration shall be payable on or before the earlier of (A) the Extended Outside Closing Date or (B) the date on which Seller or any of the Gray Parties consummate any voluntary or consensual transaction, regardless of form, with TPG (Grigio) Note Acquisition, LLC ("TPG I") and/or TPG (Grigio) Mezzanine, LLC and/or any of their affiliates (individually and/or collectively with TPG I, "Picerne") with respect to the "Property" (as defined in the APA) and which results in Picerne or its affiliates or assigns acquiring directly or indirectly all or substantially all of the Property or all or substantially all of the equity interests in Seller ("Picerne Transaction").  For the avoidance of doubt, the Termination Consideration is not payable if Seller declines to proceed with a voluntary transaction with Picerne, the Seller's Plan is not confirmed and Picerne is granted stay relief or otherwise acquires the Property pursuant to an order of the Bankruptcy Court despite Seller's objection.

       (b)     The Termination Consideration shall be paid by the Gray Parties to Preferred Member as follows:

              (i)     The "Deposit" (as defined in the APA) shall be paid to Preferred Member in payment of the Termination Consideration.  Upon the Gray Parties' delivery of written notice under Section 2(a) above, Preferred Member shall have the right to deliver to the "Escrow Agent" (as defined in the APA) written instructions in the form of Exhibit "1" to Exhibit "A" attached hereto ("Disbursement Instructions") and thereby cause the Deposit to be paid directly to Preferred Member.

              (ii)     The remainder, if any, of the Termination Consideration shall be paid to Preferred Member in cash.

3.     Deposit.

       (a)     If neither a Picerne Transaction nor the close of escrow under the APA has occurred by the Extended Outside Closing Date and the Gray Parties have not effectuated the Terminations pursuant to Section 2(a) above, then Preferred Member shall have the right to deliver the Disbursement Instructions to Escrow Holder.  Upon receipt of the Deposit, Preferred Member shall (i) first, apply the Deposit to payment of the Extension Fee if the Extension Fee has not previously been paid, and (ii) then disburse the balance to the Gray Member under Section 4.3(d)(iii) of the Buyer's Operating Agreement, all without prejudice to any rights or remedies of Preferred Member.

2

(b)    Without limiting the foregoing, Preferred Member shall have the sole right and power on behalf of Buyer to execute and deliver instructions to Escrow Agent respecting the termination of the APA and the disposition of or refund to Buyer of the Deposit. Neither the Gray Member nor anyone acting on its behalf shall have any right to execute or deliver any instructions to the Escrow Agent on behalf of Buyer or otherwise respecting the termination of the APA or disposition of the Deposit. Concurrently herewith, the Gray Member and Preferred Member shall execute and deliver to the Escrow Agent an irrevocable instruction in the form attached hereto as Exhibit "A". The Gray Member hereby waives any rights under the Operating Agreement or otherwise to control, hold, possess or manage the Deposit or the disposition or return thereof from "Escrow" (as defined in the APA).

(c)    If notwithstanding the provisions hereof the Deposit is transferred to any of the Gray Parties or to any account under the control of the Gray Parties, the Gray Parties shall be deemed to hold the Deposit in trust and upon receiving notice the Deposit was so transferred, the Gray Parties immediately shall cause the Deposit to be delivered to the Preferred Member.

4.    <u>Effect of Terminations</u>.    Upon timely payment of the Termination Consideration to Preferred Member, Buyer shall terminate the APA in accordance with its terms and Buyer's Operating Agreement and the Guaranty shall be immediately terminated and of no further force or effect and no Party shall have any right, liability, or obligation of any kind under the APA, Buyer's Operating Agreement, or the Guaranty. The termination of Buyer's Operating Agreement shall be deemed to have been a dissolution elected by Preferred Member pursuant to Section 3.2(d) of the Buyer's Operating Agreement for purposes of disposition of the Deposit, and the termination shall not affect the distribution of the Deposit in accordance with the provisions of Section 4.3(d) of the Buyer's Operating Agreement, subject to Section 3 of this Agreement.

5.    <u>Mutual Releases</u>.

(a)    Upon and concurrent with the effectiveness of the Terminations: (i) the CJ Parties release and forever discharge the Gray Parties and each of their respective affiliates, agents, employees, attorneys, heirs, successors, and assigns from any and all claims, demands, actions, damages, debts, costs, liabilities, obligations, contracts, agreements, causes of action, judgments, and suits at law or in equity arising out of or related to the Property, the Bankruptcy Case, the APA, Buyer's Operating Agreement, or the Guaranty; and (ii) the Gray Parties release and forever discharge the CJ Parties and each of their respective affiliates, agents, employees, attorneys, heirs, successors, and assigns, from any and all claims, demands, actions, damages, debts, costs, liabilities, obligations, contracts, agreements, causes of action, judgments, and suits at law or in equity arising out of or related to the Property, the Bankruptcy Case, the APA, Buyer's Operating Agreement, or the Guaranty.

(b)    If, and only if, Picerne joins in this Section 5(b) by signing in the space provided on the signature pages hereof no later than December 1, 2010, then upon and concurrent with the effectiveness of the Terminations: (i) the CJ Parties release and forever discharge Picerne and its affiliates, agents, employees, attorneys, heirs, successors, and assigns from any and all claims, demands, actions, damages, debts, costs, liabilities, obligations, contracts, agreements, causes of action, judgments, and suits at law or in equity arising out of or related to the Property, the Bankruptcy Case, the APA, Buyer's Operating Agreement, or the Guaranty; and (ii) Picerne releases and forever discharges the CJ Parties and each of their respective affiliates, agents, employees, attorneys, heirs, successors, and assigns, from any and all claims, demands, actions, damages, debts, costs, liabilities, obligations, contracts, agreements, causes of action, judgments,

3

and suits at law or in equity arising out of or related to the Property, the Bankruptcy Case, the APA, Buyer's Operating Agreement, or the Guaranty.

(c)     The only consequence of Picerne's failure to join in Section 5(b) by the Agreement Date shall be that the provisions of Section 5(b) shall have no force or effect. All other provisions of this Agreement shall be unaffected and shall remain in full force and effect.

6.     Extension of Original Outside Closing Date. Buyer agrees to extend the Original Outside Closing Date under the APA to the Extended Outside Closing Date. Preferred Member and the Gray Member hereby agree that the definition of "Outside Closing Date" under the Buyer's Operating Agreement is hereby amended to mean and refer to the Extended Outside Closing Date.

7.     Costs and Expenses.

(a)     · Each Party shall bear its own costs and legal expenses incurred in connection with the negotiation and documentation of this Agreement; provided, however, that Preferred Member may apply any funds received from Gray Member as an expense deposit or pre-funding of Preferred Member's expenses to the payment of any such costs and expenses incurred by Preferred Member.

(b)     In any action brought by a Party to enforce this Agreement the prevailing Party in such action shall be entitled is entitled to recover from the other Party all costs and expenses incurred by such prevailing Party in connection with such action, including attorneys' fees and litigation costs. For purposes of this Section 7(b), "Party" means either the CJ Parties, on the one hand, or the Gray Parties, on the other hand. The provisions of this Section 6 shall survive termination of the other provisions of this Agreement

8.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the Parties, their heirs, successors and assigns, and each of their present and former parent companies, affiliates, officers, agents, shareholders, owners, servants, directors, employees, former employees, investors, and all other representatives or anyone acting on their behalf.

9.     Entire Agreement. This Agreement amends the Preferred Equity Documents. To the extent, this Agreement conflicts with the Preferred Equity Documents, this Agreement controls. The Preferred Equity Documents remain in full force and effect as modified herein. This Agreement memorializes the entire agreement among the Parties on the matters enumerated hereby and expressly supersedes any prior or contemporaneous understandings, representations or drafts, oral or written, concerning the subject matter that may exist or may have existed except for the Preferred Equity Documents as amended hereby. The Parties represent that they have relied exclusively on the promises and representations set forth in this written Agreement and upon no other promises or representations.

10.     Modification of This Agreement. No provision of this Agreement other than Section 5(b) may be modified except by written instrument signed by all of the Parties; provided, however that if Picerne joins in Section 5(b) hereof as provided herein, such Section 5(b) may be modified only by written agreement signed by the CJ Parties and Picerne.

11.     Controlling Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona, including, without limitation, all matters of interpretation, construction, validity, performance and enforcement.

4

12.   Representation by Counsel.  The Parties agree that this Agreement has been negotiated at arms length, with the assistance and advice of independent legal counsel.  In entering into this agreement, the Parties acknowledge that they have received independent legal advice from their own counsel with respect to the advisability of making the settlement and releases provided in this Agreement.

13.   Execution in Counterparts.   This Agreement can be executed in any number of counterparts, whether by original, copy, telecopy, or electronic signature, each of which shall be an original but all of which shall constitute one instrument.

14.   Confidentiality.  The Parties agree that the existence of and the terms of this Agreement will remain confidential, subject to the right of the Gray Parties to disclose the terms of this Agreement to Picerne provided Picerne agrees to keep this Agreement and its terms confidential.

Executed as of the Agreement Date.

**BUYER:**

CJUF III Grigio Tempe Town Lake LLC, a Delaware limited liability company

By:   GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company, its Member

     By:   GDG Enterprises L.L.C., an Arizona limited liability company, its sole member and manager

          By: _____
          Its: _____


**GRAY MEMBER:**

GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company

By:   GDG Enterprises L.L.C., an Arizona limited liability company, its sole member and manager

     By: _____
     Its: _____

5

**PREFERRED MEMBER:**

        CJUF III Grigio Tempo Town Lake Member LLC, a Delaware
        limited liability company

    By:    Canyon-Johnson Urban Fund III, L.P., a Delaware
        limited partnership, its Manager

        By:    Canyon-Johnson Realty Advisors III, LLC, a
            Delaware limited liability company, its General
            Partner

            By: _____
                K. Robert Turner, its Managing Partner


**GUARANTOR:**

        _____
        Bruce W. Gray, an individual

Acknowledged and agreed as of the
Agreement Date for purposes of
Section 5(b) only:

**PICERNE:**

TPG (Grigio) Note Acquisition, LLC,
a DELAWARE LLC

By: _____

Its: PRESIDENT

TPG (Grigio) Mezzanine, LLC,
a DELAWARE LLC

By: _____

Its: PRESIDENT


Date: 11/30/2010


Attachments: Exhibit "A" – Escrow Instructions

LA1 1921064v.1

**PREFERRED MEMBER:**

CJUF III Griglo Tempe Town Lake Member LLC, a Delaware limited liability company

By:   Canyon-Johnson Urban Fund III, L.P., a Delaware limited partnership, its Manager

By:   Canyon-Johnson Realty Advisors III, LLC, a Delaware limited liability company, its General Partner

By: _____
K. Robert Turner, its Managing Partner

**GUARANTOR:**

_____
Bruce W. Gray, an individual

Acknowledged and agreed as of the Agreement Date for purposes of Section 5(b) only:

**PICERNE:**

TPG (Griglo) Note Acquisition, LLC,
a _____

By: _____
Its: _____

TPG (Griglo) Mezzanine, LLC,
a _____

By: _____
Its: _____

Date: _____

Attachments: Exhibit "A" – Escrow Instructions

LA1 1921064v.1

## AMENDMENT TO CONDITIONAL SETTLEMENT, TERMINATION
## AND RELEASE AGREEMENT

This Amendment to Conditional Settlement, Termination, and Release Agreement ("**Amendment**") is executed as of December 3, 2010 ("**Amendment Date**") by and among: (i) CJUF III Grigio Tempe Town Lake LLC, a Delaware limited liability company ("**Buyer**"); (ii) GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company ("**Gray Member**"); (iii) CJUF III GTTL Member LLC, a Delaware limited liability company ("**Preferred Member**"); and (iv) Bruce W. Gray, an individual ("**Guarantor**"). Buyer, Gray Member, Preferred Member and Guarantor are referred to in this Amendment individually as a "**Party**" and collectively as the "**Parties**".

RECITALS

A.      The Parties are party to that certain Conditional Settlement, Termination, and Release Agreement ("**Settlement Agreement**") dated as of November 29, 2010. The Parties desire to amend the Settlement Agreement as set forth herein.

B.      All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Settlement Agreement.

AGREEMENTS

For valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1.      <u>Amendment to Section 2(b) of Settlement Agreement</u>.  Section 2(b) of the Settlement Agreement is hereby amended to read as follows:

"(b)      The Termination Consideration shall be paid by the Gray Parties to Preferred Member as follows:

"(i)      The Gray Parties shall cause the Termination Consideration (and Extension Payment, if not previously paid) to be paid from funds from the bankruptcy estate of Seller. If Preferred Member does not receive such payment within one business day after receipt of Gray Parties' written notice of election to effectuate the Terminations, then the "Deposit" (as defined in the APA) shall be paid to Preferred Member in payment of the Termination Consideration.  In such event, Preferred Member shall have the right to deliver to the "Escrow Agent" (as defined in the APA) written instructions in the form of Exhibit "1" to Exhibit "A" attached hereto ("**Disbursement Instructions**") and thereby cause the Deposit to be paid directly to Preferred Member.

"(ii)      The remainder, if any, of the Termination Consideration shall be paid to Preferred Member in cash."

2.      <u>Amendment to Escrow Instructions</u>.  Exhibit "A" to the Agreement is hereby replaced with Exhibit "A" attached hereto. Concurrently herewith, the Buyer, the Preferred Member and the Gray Member shall execute and deliver to the Escrow Agent escrow instructions in the form of Exhibit "A" hereto, which shall supersede the instructions delivered pursuant to the Agreement prior to this Amendment.

1

3.     Entire Agreement; Modification.  The Settlement Agreement, as amended by this Amendment, continues in full force and effect, and contains the entire understanding and agreement of the Parties with respect to the subject matter thereof and hereof.  No provision of this Amendment (b) may be modified except by written instrument signed by all of the Parties.

4.     Controlling Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of Arizona, including, without limitation, all matters of interpretation, construction, validity, performance and enforcement.

5.     Representation by Counsel.  The Parties agree that this Amendment has been negotiated at arms length, with the assistance and advice of independent legal counsel.  In entering into this Amendment, the Parties acknowledge that they have received independent legal advice from their own counsel with respect to the advisability of entering into this Amendment.

6.     Execution in Counterparts.  This Amendment can be executed in any number of counterparts, whether by original, copy, telecopy, or electronic signature, each of which shall be an original but all of which shall constitute one instrument.

7.     Confidentiality.  The Parties agree that the existence of and the terms of this Amendment will remain confidential, subject to the right of the Gray Parties to disclose the terms of this Amendment to Picerne provided Picerne agrees to keep this Amendment and its terms confidential.

Executed as of the Amendment Date.

**BUYER:**

CJUF III Grigio Tempe Town Lake LLC, a Delaware limited liability company

By:     GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company, its Member

      By:     GDG Enterprises L.L.C., an Arizona limited liability company, its sole member and manager

          By: _____
          Its: _____


**GRAY MEMBER:**

GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company

By:     GDG Enterprises L.L.C., an Arizona limited liability company, its sole member and manager

      By: _____
      Its: _____

2

**PREFERRED MEMBER:**

CJUF III Grigio Tempe Town Lake Member LLC, a Delaware limited liability company

By:     Canyon-Johnson Urban Fund III, L.P., a Delaware limited partnership, its Manager

        By:     Canyon-Johnson Realty Advisors III, LLC, a Delaware limited liability company, its General Partner

             By: _____
                 K. Robert Turner, its Managing Partner

**GUARANTOR:**

_____
Bruce W. Gray, an individual

Attachments: Exhibit "A" – Escrow Instructions

3

December 3, 2010

First American Title Insurance Company
National Commercial Services
777 South Figueroa Street, Fourth Floor
Los Angeles, CA 90017
Attn: Barbara Laffer
Senior Commercial Escrow Officer

Re:   Escrow No. NCS 438442 ("Escrow")
      Asset Purchase Agreement dated September 1, 2010 ("APA")
      by and between Mondrian TTL L.L.C. as Seller and
      CJUF III Grigio Tempe Town Lake LLC as Buyer

Capitalized terms used but not defined herein have the meaning given them in the APA.

Escrow Agent is hereby irrevocably instructed not to accept any instructions or directions on behalf of Buyer in connection with the termination of the APA, the Deposit or the return, refund or disposition of the Deposit from anyone other than CJUF III Grigio Tempe Town Lake Member LLC ("Preferred Member"). Without limiting the foregoing, Escrow Agent is irrevocably instructed to disregard any instructions or directions from GDG Grigio Tempe Town Lake L.L.C., an Arizona limited liability company, GDG Enterprises L.L.C., an Arizona limited liability company, any counsel for such entities, or by anyone else purporting to act on behalf of such entities, on their own behalf or on behalf of Buyer, in connection with the termination of the APA, the Deposit or the return, refund or disposition of the Deposit.

Further, upon receipt of an instruction executed by Preferred Member on behalf of Buyer in the form of Exhibit "1" attached hereto, Escrow Agent is hereby irrevocably instructed to transfer the Deposit directly to the Preferred Member by wire transfer as follows:

|         |                                        |
|---------|----------------------------------------|
| Bank:   | City National Bank                     |
|         | 400 N. Roxbury Drive                   |
|         | Beverly Hills, CA 90212                |
| ABA:    | 1220-1606-6                            |
| Account: | Canyon-Johnson Urban Fund III, LP     |
| Account #: | 123206037                           |

Please execute below to indicate your acknowledgement of and agreement to comply with these instructions. This letter is for the benefit only of the parties hereto and not for the benefit of any third party.

BUYER:

**CJUF III GRIGIO TEMPE TOWN LAKE LLC,** a
Delaware limited liability company

By:    GDG Grigio Tempe Town Lakee L.L.C., an
Arizona limited liability company, its Member

By:    GDG Enterprises L.L.C., an Arizona limited
liability company, its sole member and manager

By:
Its: _____

Acknowledged this _____ day of
December, 2010

**FIRST AMERICAN TITLE INSURANCE
COMPANY,**
  as Escrow Agent

**By:** _____
**Its:** _____

Acknowledged and agreed this __ day of
December, 2010

**GDG GRIGIO TEMPE TOWN LAKE L.L.C.,**
an Arizona limited liability company

By: GDG Enterprises L.L.C., an Arizona limited
liability company, its Manager

**By:** _____
**Its:** _____

Acknowledged and agreed this __ day of December,
2010

**CJUF III GRIGIO TEMPE TOWN LAKE
MEMBER LLC,**
a Delaware limited liability company

By:  Canyon-Johnson Urban Fund III, L.P.,
     a Delaware limited partnership, manager

    By:  Canyon-Johnson Realty Advisors III LLC,
    a Delaware limited liability company,
      its general partner

    By: _____
      K. Robert Turner,
      Managing Partner

Attachments: Exhibit "1" – Form of Demand Instruction

2

**Form of Instruction by Preferred Member
Disbursement Instruction**

TO: First American Title Insurance Company

FROM: CJUF III Grigio Tempe Town Lake LLC

RE: Escrow No. NCS 438442 ("Escrow")
Asset Purchase Agreement dated September 1, 2010 ("APA")
by and between Mondrian TTL L.L.C. as Seller and
CJUF III Grigio Tempe Town Lake LLC as Buyer

DATE: _____

Terms used with initial capital letters in this Disbursement Instruction have the meanings
set forth in the APA.

Pursuant to the terms of the APA, Buyer has terminated the APA. All conditions to the rights of the
undersigned to deliver these instructions have been satisfied. The undersigned hereby instructs Escrow
Agent to disburse the Deposit to CJUF III Grigio Tempe Town Lake Member LLC by wire transfer as
follows:

| | |
|---|---|
| Bank: | City National Bank |
| | 400 N. Roxbury Drive |
| | Beverly Hills, CA 90212 |
| ABA: | 1220-1606-6 |
| Account: | Canyon-Johnson Urban Fund III, LP |
| Account #: | 123206037 |

Very truly yours,

**CJUF III GRIGIO TEMPE TOWN LAKE MEMBER LLC,**
a Delaware limited liability company

By: Canyon-Johnson Urban Fund III, L.P.,
a Delaware limited partnership, manager

By: Canyon-Johnson Realty Advisors III LLC,
a Delaware limited liability company,
its general partner

By:_____
K. Robert Turner,
Managing Partner

EXHIBIT "C"

Property Management Agreement

# GRIGIO TEMPE TOWN LAKE

## APARTMENTS

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made and entered into this ____ day of December, 2010 (the "Effective Date"), by and between TPG (Grigio) Note Acquisition, LLC, a Delaware limited liability company ("Owner"), and Gray Residential L.L.C., an Arizona limited liability company ("Manager").

## R E C I T A L S

Owner is the owner of a 523-unit apartment property (the "Property"), known as Grigio Tempe Town Lake Apartments located in Tempe, Arizona.

Owner desires to employ Manager for the operation, direction, management and supervision of the Property, as outlined below and Manager desires to assume such duties upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants herein contained, Owner and Manager agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the following meanings when used in this Agreement:

Section 1.1    Budget.  A composite of (i) an operations budget, which shall be an estimate of receipts and expenditures for the operation of the Property during a Fiscal Year, including a schedule of expected apartment rentals (excluding security deposits) for the period in question and a schedule of expected special repairs and maintenance projects and (ii) a capital budget, which shall be an estimate of capital replacements, substitutions of and additions relating to the Property for a Fiscal Year.

Section 1.2    Depository.  A FDIC-insured commercial bank located in Arizona approved by Owner in writing.  Owner may direct the Manager to change the Depository from time to time.

Section 1.3    Fiscal/Budget Year.  The year beginning January 1st and ending December 31st, which is the fiscal year established by Owner for the Property; provided that the first fiscal year shall begin on the Effective Date and end on December 31 of the year in which the Effective Date falls, and the last fiscal year shall begin on January 1 of the year during which the term of this Agreement ends and end with the last day of such term.

Section 1.4  <u>Gross Receipts</u>.  The entire amount of all receipts, determined on a cash basis, from (a) tenant rentals collected pursuant to tenant leases of apartment units, for each month during the term hereof; provided that there shall be excluded from tenant rentals any tenant security deposits (unless such deposits have been applied as rental income or forfeited as provided below); (b) cleaning, tenant security and damage deposits forfeited by tenants in such period (subject to item (viii) below); (c) laundry and vending machines income (less any portion of such income payable to owners/vendors  of such machines); (d) any and all other receipts from the operation of the Property received and relating to the period in question; (e) proceeds from rental interruption insurance, but not any other insurance proceeds or proceeds from third-party damage claims; (f) telephone, cable television and utility income; and (g) any other sums and charges collected in connection with termination of the tenant leases (subject to item (viii) below).  Gross Receipts do not include the proceeds of (i) any sale, exchange, financing, refinancing, condemnation, or other disposition of all or any part of the Property or other capital transactions, (ii) any loans to Owner whether or not secured by all or any part of the Property, (iii) any capital expenditures or funds deposited to cover costs of operations made by Owner, (iv) any insurance policy (other than rental interruption insurance or proceeds from third-party damage claims), (v) income derived from other investments, (vi) abatement of taxes, awards arising from eminent domain proceedings or threats thereof, (vii) discounts, dividends, security deposits, cleaning deposits and other deposits not forfeited by tenants, and (viii) sums recovered from tenants as damages

Section 1.5  <u>Management Fee</u>.  The Management Fee is defined in Section 3.1 below.

Section 1.6  <u>Property Personnel</u>.  Those persons employed by Manager to carry out Manager's obligations under this Agreement (including, but not limited to, the general manager, leasing manager, leasing personnel, maintenance manager, maintenance personnel, resident services personnel and shared services personnel and other personnel necessary to the operation and maintenance of the Property), all as designated and approved by Owner as part of the Budget.

Section 1.7  <u>Term</u>.  The Term of this Agreement shall commence on the Effective Date and shall terminate on the date immediately preceding the one (1) year anniversary of the Effective Date; provided, however, that unless this Agreement has been earlier terminated, the Term shall be automatically extended for additional one (1) year periods, on a year-to-year basis, commencing on the then-scheduled end of the Term.  Notwithstanding the foregoing, (A) either Owner or Manager may terminate this Agreement by giving thirty (30) days notice in writing to the other party without reason, (B) either party may also terminate this Agreement for cause as specified by Sections 7.2 and 7.4 below and (C) this Agreement shall terminate automatically upon the sale of the Property by Owner.  If this Agreement is terminated by Owner pursuant to clause (A) above, then, concurrent with and as a condition to the effectiveness of such termination notice, Owner will pay Manager a termination fee equal to twelve times the Management Fee payable for the full calendar month preceding the month in which the termination notice is given.

Section 1.8  <u>Working Capital Reserve</u>.  Forty Thousand Dollars ($40,000) to be funded by Owner and maintained by Manager during the Term hereof, used in connection with

the operation of the Property in accordance with the terms hereof and restored per the terms hereof.

## ARTICLE II

## DUTIES AND RIGHTS OF MANAGER

Section 2.1    Appointment of Manager.  For and in consideration of the compensation hereinafter provided, Manager shall, and Owner hereby grants to Manager the right to, supervise and direct the leasing, management and operation of the Property.  All services performed by Manager under this Agreement shall be performed as an independent contractor of Owner.  Owner shall not be obligated to reimburse Manager for expenses for: (i) any overhead expenses of Manager incurred with respect to any offices located at any place other than on the Property, (ii) costs relating to accounting services performed hereunder, (iii) for any salaries of employees of Manager who are not on-site Property Personnel, or (iv) any travel expenses of employees of Manager in supervising the on-site Property Personnel and the operation of the Property, unless approved in advance in writing by Owner; provided, however, that Manager shall be reimbursed by Owner for expenses related to (ii) and (iii) for designated shared services personnel, including marketing, sales, accounting and operations management ("Shared Services"), as agreed to in the annual operating budget.

Section 2.2    General Operation.  Manager shall operate the Property in the same manner as is customary and usual in operation of comparable facilities located in the City of Tempe and in compliance with all applicable laws, and shall provide such services as are customarily provided by operators of residential properties of comparable class and standing in the Arizona area consistent with the Property's facilities.  Manager shall use that degree of care and skill which a reasonable businessman, as an owner of the Property, would exercise in transactions of a similar nature for its own account.  Manager and Owner shall collaborate to establish mutually acceptable methods to optimize retention and acquisition of tenants.

In addition to the other obligations of Manager set forth herein, Manager shall render the following services and perform the following duties for Owner in a commercially diligent and efficient manner:  (a) maintain businesslike relations with tenants whose service requests shall be received, considered and recorded in systematic fashion in order to show the action taken with respect to each and at all times during normal business hours, and with respect to emergencies, during all other hours, Manager agrees to be available to, or cause a representative of Manager to be available to tenants in the Property; (b) collect all monthly rentals due from tenants and rent from users of recreational facilities in the Property, if any; (c) request, demand, collect, and receive any and all charges or rents which become due to Owner, and otherwise protect the interests of Owner, which shall include the preparation and delivery to tenants of all late payment, default and other appropriate notices, requests, bills, demands and statements and at Owner's expense and direction, coordinate and oversee such legal action as may be necessary or desirable to collect rent and/or evict tenants delinquent in payment of monthly rental or other charges (security deposits, late charges, etc.) as more particularly described in Section 2.9 below; (d) use all reasonable efforts at all times during the term of this Agreement to operate and maintain the Property according to reasonable standards consistent with the operation of comparable units including, without limitation, utilizing commercially reasonable efforts to

obtain and retain tenants and to cooperate with any broker (or any locator service) in any reasonable manner likely to aid in filling any vacancy; (e) supervise the preparation of all brochures, campaigns and model apartments and advertise when necessary, at Owner's expense, the Property units for rent and display "for rent" or other similar signs upon the Property; provided Manager shall not use Owner's name in any advertising or promotional material without Owner's prior written consent and approval of such material; (f) act as Owner's representative with a company (a "Security Company") providing alarm systems, patrol and similar services ("Security Services") and monitor the performance of the Security Services by the Security Company, and (g) sign, renew and cancel tenant leases for the Property in compliance with standards established by Owner, on the lease form provided by Manager and approved by Owner, and on terms based upon criteria approved from time to time by Owner and based upon Manager's recommendations. Manager shall have no responsibility or obligation related to Owner's mortgage or debt obligations related to the Property.

Section 2.3    Budget.

(a)    The Budget for the first Fiscal Year has been approved by Owner. Manager shall submit to Owner for Owner's approval no later than three (3) months prior to the beginning of each successive Fiscal Year the Budget and detailed business plan for the ensuing Fiscal Year. Each such Budget shall be approved or disapproved by Owner within ninety (90) days after receipt, and in the event Owner fails to approve or disapprove any Budget within such period, such Budget shall be deemed to be disapproved. In the event Owner disapproves a Budget, Owner and Manager shall jointly prepare such Budget as soon as may be reasonably possible. Until a new Budget is approved, Manager shall operate on the Budget approved for the prior Fiscal Year; provided that Manager may exceed the budgeted amount on those lines items which are not directly controlled by Manager, i.e., taxes, insurance and utilities to the extent it is reasonably necessary to exceed the budgeted amounts in order to maintain the same level of service provided during the prior Fiscal Year. The Budget shall reflect the schedule of monthly rents for the new Fiscal Year and the amount of other receipts anticipated (based on proposed rents) for the new Fiscal Year and shall also constitute a major control under which Manager shall operate the Property, and there shall be no variances therefrom except as permitted by Section 2.6(a). Consequently, no expenses may be incurred or commitments made by Manager in connection with the maintenance and operation of the Property that constitute a deviation that exceeds 10% of the amounts allocated to such expenses for the period in question in the approved Budget without the prior consent of Owner; provided that the foregoing limitation shall not apply to expenses relating to taxes, insurance or utilities or expenditures required due to emergencies that threaten life or property or could result in civil or criminal liability for Owner and/or Manager.

(b)    In the event there shall be a material discrepancy between the actual results of operations for any month and the estimated results of operations for such month as set forth in the Budget, Manager shall furnish to Owner within fifteen (15) days after the expiration of such month a written explanation as to why the discrepancy occurred. If substantial variations have occurred or are anticipated by Manager during the course of any Fiscal Year, Manager shall prepare and submit to Owner a revised Budget covering the remainder of the Fiscal Year.

-4-

Section 2.4   Manager and Other Personnel.  Manager shall employ, discharge, and supervise all Property Personnel required for the efficient operation and maintenance of the Property and all such Property Personnel shall be solely the employees of Manager for all purposes. Manger shall have the right to hire, change or terminate personnel without approval of Owner; provided, however, that Owner shall have the right to approve any replacement general manager or maintenance manager.  Manager shall pay all salaries of such Property Personnel. Owner shall reimburse Manager monthly as set forth in Section 4.3 for the total aggregate compensation of all Property Personnel spending substantially all of their time working on the Property, including salary, bonuses, 401(k) and other fringe benefits payable with respect to such Property Personnel, as operating expenses; provided, however, that (A) all such expenses shall have been approved in the Budget and (B) Owner shall not reimburse Manager for the cost of (or otherwise be responsible for) any of such expenses with respect to any other personnel or overhead of Manager other than the Shared Services, including, without limitation, any executive personnel of Manager (such as the regional manager).  Without limiting the generality of the foregoing, Manager shall be required to bear the costs of all salaries of Manager's executive personnel and off-site personnel.  The term "fringe benefits" as used herein, shall mean the employer's contribution of FICA, unemployment compensation and other employment taxes, workmen's compensation, group life and accident and health insurance premiums, disability and 401(k) contributions.  In the event any of Manager's Property Personnel resign or are terminated, Manager shall promptly notify Owner of the same, and Manager shall use commercially reasonable efforts to employ a replacement who is reasonably acceptable to Owner.

Manager shall pay all wages and other benefits properly payable to the employees hired by Manager pursuant to this Agreement; maintain adequate payroll records; remit to the proper authorities all required income and social security withholding -taxes, unemployment insurance payments, workers' compensation payments and such other amounts with respect to the wages and other benefits payable to such employees as may be required under applicable laws, together in each case with all required reports or other filings; and obtain, maintain and administer all medical, disability and other insurance benefits, and other fringe benefits as may, from time to time, be required under any union or other agreements or arrangements pertaining to Manager's employment of such personnel.  Notwithstanding anything to the contrary in this Agreement, upon request made by Owner, Manager shall replace any employee of Manager that is performing services in respect of the Property.  In no event shall Manager enter into an employment contract for "on-site" employees at the Property relating to services to be performed at or for the Property except in accordance with the approved Budget.  Employees of Manager who have signing authority in respect of the Operating Account (as hereinafter defined) shall be subject to Owner's approval. Manager shall indemnify, defend and hold harmless Owner and all Owner Exculpated Parties (as hereinafter defined) from and against any and all claims arising out of Manager's hiring or terminating any employee or the terms of any such employment, including, without limitation, any obligation to make payments pursuant to the terms of this paragraph.

Section 2.5   Contracts and Supplies.

(a)   Except as otherwise provided herein, Manager, as agent for Owner and at Owner's expense, and without compensation directly or indirectly to Manager, except as expressly set forth herein, shall enter into written agreements with (i) concessionaires, licensees,

or other intended users of the facilities of the Property, (ii) marketing services providers, contractors furnishing services to the Property, including, but not limited to, utilities, janitorial, trash collection, cleaning, vermin extermination, furnace and air conditioning maintenance, security protection, pest control, landscape and irrigation system maintenance, repair, maintenance, and replacement of elements of the buildings, recreational facilities or common areas (to the extent such work cannot reasonably and less expensively be done by Property Personnel), and any other services that are reasonably necessary to the maintenance and operation of first-class properties comparable to the Property (herein called "Customary Services"). Manager shall place purchase orders as and when necessary to assure timely and adequate availability of such equipment, tools, appliances, materials and supplies as are necessary to properly maintain and operate the Property. Except to the extent that a specific contract, its terms and contractor are contemplated in the Budget, Manager may not enter into any service contract for any item involving an expenditure in excess of Five Thousand Dollars ($5,000) in any Fiscal Year without the prior written consent of Owner.

(b)     All contracts entered into by Manager, unless Manager has obtained Owner's prior written consent, must: (i) be cancelable without penalty upon not more than thirty (30) days notice; (ii) have terms of one (1) year or less; (iii) contain the insurance requirements set forth herein or as otherwise required by Owner; (iv) require Owner's consent to any assignment; and (v) contain no early termination fee or penalty. In the event that Manager shall enter into any contract in violation of the foregoing, the same shall constitute an immediate default hereunder by Manager, and Owner shall be entitled to any and all rights and remedies provided in this Agreement, by law or in equity with respect to such default. In addition, should Owner desire to cancel any such contract for any reason whatsoever, then any sums due thereunder shall be the contractual obligation and liability of and for the account of Manager.

(c)     If Owner shall so require, Manager shall obtain competitive bids for any such contracts and, in connection therewith, shall investigate the competency and history of all potential bidders; develop and submit detailed specifications for work to be performed; solicit and obtain such bids; conduct an analysis of bid results; and shall submit all bids to Owner for review and approval, together with Manager's recommendation with respect thereto. Manager shall continually inspect the Property and use commercially reasonable efforts to ensure that all contract specifications are being properly administered, and conduct periodic complete walk-throughs of the Property with specific Customary Service providers as often as reasonably necessary.

(d)     Manager shall not enter into any contract or agreement (which affects, in any way whatsoever, all or any portion of the Property) with any affiliate of Manager without the prior written disclosure of such affiliate relationship to Owner and the prior written consent of Owner.

(e)     Fully executed original copies of all contracts entered into by Manager pursuant to this Agreement shall be promptly transmitted by Manager to Owner.

(f)     Owner acknowledges that certain economies may be achieved with respect to certain expenses incurred on behalf of the Property if materials, supplies or services are purchased in quantities for use in connection with the Property and the operation of other

-6-

apartment properties. Manager may purchase or obtain some items in bulk or quantities in its own name and charge the Property (subject to the limitations set forth in the Budget) its pro rata share; provided, Owner shall be charged only for the actual cost of such items used for the benefit of the Property (with any pro rata discount accruing to Owner), and the pro rata cost of such items shall not result in expenses greater than would otherwise be incurred at competitive prices or terms less favorable than would otherwise be available for such items in the locale where the Property is located. Manager shall make records available to Owner at all reasonable times and shall disclose to Owner any interest of Manager in any vendor, so that Owner may review such expenses incurred.

(g)

The cost of executing cooperative branded marketing and hospitality programs between Grigio Metro and the Property, as reflected in the approved budget and business plan for the Property, will be allocated based on properties' unit counts.

Section 2.6    Alterations, Repairs and Maintenance.

(a)    Manager shall make or install, or cause to be made and installed at Owner's expense and in the name of Owner, all necessary or desirable repairs, interior and exterior cleaning, painting and decorating, plumbing, alterations, replacements, improvements and other normal maintenance and repair work on and to the Property as are customarily made by other managers in the operation of similar type apartment properties; provided that no unbudgeted expenditure may be made for such purposes without the prior approval of Owner, except (i) unbudgeted expenditures within any capital expense contingency item in the Budget and which do not exceed five percent (5%) of the applicable Budget in the aggregate when combined with all other unbudgeted expenditures made pursuant to this clause (i) during the period as to which the applicable Budget applies; and (ii) emergency repairs involving manifest danger to life or property, or when necessary to avoid criminal or civil liability, or for the safety of the tenants, or to avoid the suspension of any necessary service to the Property, which repairs may be made by the Manager without prior approval and irrespective of the cost limitations imposed by Section 2.3(a), provided that in each such instance, Manager shall, before causing any such emergency repair to be made, use reasonable efforts under the circumstances to notify Owner of that repair. All such work shall be performed by Property Personnel unless it is not reasonable for them to do so due to the expertise, time constraints, or other considerations involved, and/or because having them do so is more expensive. Any contracts for capital improvements shall be subject to Owner's prior review and approval.

(b)    In accordance with the terms of the approved Budget or upon written demand and/or approval (except in the case of emergency) of Owner, from time to time during the term hereof Manager shall, at Owner's expense, make all required capital improvements, replacements or repairs to the Property. Subject to obtaining Owner's prior written approval in regard to sums necessary to cover costs of unbudgeted capital improvements, Manager shall first use any excess funds in the Depository Account, that are not committed to operating expenses, and then shall use funds furnished by Owner for that purpose.

TPG v.7-23-10

Section 2.7    Licenses and Permits.  Manager shall apply for, obtain, and maintain, in the name and at the expense of Owner, all licenses and permits (including deposits and bonds) required of Owner or Manager in connection with the management and operation of the Property.  Owner agrees to execute and deliver any and all applications and other documents and to otherwise cooperate to the fullest extent with Manager in applying for, obtaining and maintaining such licenses and permits.

Section 2.8    Compliance with Laws.  Manager shall use all commercially reasonable efforts to cause all such acts and things to be done in and about the Property as are required by this Agreement or by any laws, regulations and requirements of any federal, state or municipal government having jurisdiction respecting the use or manner of use of the Property or the maintenance or operation thereof.  Neither Manager nor anyone authorized to act for Manager shall, in the rental, lease or sale, the provision of services or any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, national origin, or any other basis prohibited by law.

Section 2.9    Legal Proceedings.  Manager shall institute, in its own name or (if Owner authorizes in writing) in the name of Owner, all legal actions or proceedings that Manager deems reasonable and which Owner approves in writing in order to collect rent, or other income from the Property pursuant to the Leases and to evict and dispossess tenants or other persons in possession, unlawful detainer, or to otherwise cancel, terminate, or enforce any lease, license, concession or Customary Service contract for the breach thereof by the tenant, licensee, concessionaire, or contractor.  All decisions with respect to settlement or case management shall be made only after consultation with and approval by Owner.  Manager shall promptly notify Owner of any order, rule, or determination or notice of violation of any law or order of any governmental authority relating to the Property.

Section 2.10    Suits and Claims.  With respect to all claims, causes of action, lawsuits and other legal proceedings affecting or related to the Property or this Agreement, Manager shall act in the following manner:

(a)    Notice.  Manager shall notify Owner (and Owner's insurance carrier upon the direction of Owner) as soon as possible after receipt of notice of any damage or injury occurring in, at or to the Property and of any claim against Owner or Manager or which involves the Property.  Manager shall also promptly notify Owner of any violation of an order, rule or determination of any governmental or quasi-governmental authority affecting the Property, and shall promptly notify Owner of the service upon Manager of any summons, subpoena or other like legal document, including any notices, letters or other communications setting out or claiming any actual or alleged potential liability of Owner or the Property.

(b)    No Actions Prejudicing Owner.  Manager shall not knowingly take any action that might operate to bar Owner from obtaining any protection afforded by any policies of insurance Owner may hold or to prejudice the defense in any legal proceedings involving Owner or the Property, or otherwise prevent Owner from protecting itself against any such claim, demand or legal proceeding.

-8-

(c)     Cooperation.  Manager shall cooperate fully with Owner, but at no expense to Manager (unless expressly indicated herein), in the defense of any claim, demand or legal proceeding; provided that except as set forth in Section 6.6, Owner shall have the sole and exclusive right to conduct the defense of any such claim, demand or legal proceeding against Owner.

Section 2.11   Mortgage and Restrictive Covenant Compliance.  Owner shall provide specific covenants and provisions contained in its mortgage or other agreements affecting the Property which Manager shall reasonably seek to comply with in its management of the Property; provided, however, that Manager shall not be responsible for failure of Owner to comply with such covenants and provisions. The costs of such compliance shall be an operating expense borne by Owner; provided, that in no event shall such costs be borne by Manager.  To the extent Owner provides such materials to Manager, Manager shall familiarize itself with the terms and provisions of any restrictive covenants now or hereafter encumbering or affecting the Property or any portion of the Property so that Manager may assist Owner in complying with all of Owner's obligations thereunder.  The costs of such compliance shall be an operating expense borne by Owner; provided, that in no event shall such costs be borne by Manager.

Section 2.12   Response to Emergencies.  Manager shall have an Emergency Response Plan in place to address what to do in the event of an emergency.  The Plan may be based upon the guidelines contained in the Owner's Risk Management Policy and Procedures Manual.  In the event of any emergency, Manager shall take such action as is reasonably necessary to prevent injury to persons and damage to property and generally to protect Owner's interests.  In connection therewith, in case of emergency, Manager may, without Owner's prior approval, incur the obligation to make appropriate expenditures for repairs and other items of expense that are not authorized in an approved Budget and have not been otherwise authorized by Owner, if in Manager's reasonable judgment, such expenditures are necessary to prevent injury to persons or damage to property; provided, however, that in no event shall such emergency expenditures exceed Twenty Five Thousand Dollars ($25,000) for any one emergency without Owner's prior approval.  Manager shall inform Owner of any such emergency expenditures within one (1) business day after the obligation for such expenditures is incurred.

Section 2.13   Taxes and Assessments.  All real estate and personal property tax bills, improvement assessments will be mailed directly to the Owner. Once Owner has reviewed they will be sent to Manager. Manager shall obtain and verify bills for real estate and personal property taxes, improvement assessments and other similar charges that are or may become liens against the Property and shall recommend payment (or, if reasonable, appeal as in its best judgment it may decide).  Manager shall include the obligation to make such payment in the Operating Budget and otherwise cause such bills to be paid in such time as to avoid penalty for late payment or to permit Owner to take advantage of discounts.  If Owner directs Manager to make payment, Manager shall pay, at the expense of Owner, all real estate and personal property taxes and assessments levied or assessed against the Property or personal property used in connection therewith, such payments to be made in each case so as to avoid the imposition of additional interest, penalties or other charges for the late payment thereof (or if Owner directs, so as to obtain any available discount), and shall furnish Owner with evidence of payment. Manager agrees to annually review and, at Owner's request and at Owner's expense, submit a report on all real estate and personal property taxes and assessments affecting the Property (and

-9-

if so requested, Manager may engage outside consultants, at Owner's expense, with Owner's prior approval) and to initiate and pursue appeals of same, if so directed by Owner.

## ARTICLE III

## MANAGEMENT FEES

Section 3.1    Management Fee. In addition to the other reimbursements to Manager provided for elsewhere in this Agreement, Owner shall, on a monthly basis in accordance with Section 4.3 below, pay to Manager for its property management services a Management Fee of 2.75% of Gross Receipts.

Section 3.2    Place of Payment. All sums payable by Owner to Manager hereunder shall be payable to Manager at Gray Residential 4040 E. Camelback Road, Suite 275 Phoenix, AZ 85018, unless the Manager shall from time to time specify a different address in writing.

## ARTICLE IV

## PROCEDURE FOR HANDLING RECEIPTS AND OPERATING CAPITAL

Section 4.1    Bank Deposits. Manager shall establish and maintain with the Depository, an account for the sole benefit of the Owner styled "TPG (Grigio) Note Acquisition, LLC Operating Account" (the "Operating Account"). The Operating Account shall be placed in a bank or other institution whose deposits are insured by the federal government, as selected by the Manager and acceptable to Owner in its sole discretion. Manager shall deposit on a daily basis all sums collected from the Property into the Operating Account. All funds in the Operating Account shall at all times be the exclusive property of Owner and shall not be commingled with (i) any funds in any other account, (ii) funds provided by Owner for the development and construction of the Property, or (iii) with any funds of Manager.

Section 4.2    Security Deposit Account. All tenant security and other deposits shall be disbursed in accordance with the applicable lease agreements pursuant to which such deposits have been made, and in accordance with all applicable laws, ordinances and regulations. All tenant security deposits shall be placed in a segregated interest-bearing account (to be established by Manager with the Depository or other commercial depository acceptable to Owner in its sole discretion) in Owner's name and for its sole benefit, styled "TPG (Grigio) Note Acquisition, LLC Security Deposit Account" (the "Security Deposit Account"). The Security Deposit Account shall be maintained in accordance with applicable state or local laws. Manager shall maintain detailed records of all security or other deposits, and such records shall be open for inspection by Owner.

Section 4.3    Disbursement of Deposits. Manager shall disburse from the Operating Account and pay all expenses in connection with the ownership, maintenance and operation of the Property on account of all taxes, assessments and charges of every kind imposed by any governmental authority having jurisdiction over the Property, and all costs and expenses of maintaining, operating, leasing and supervising the operation of the Property, including, but not limited to, salaries, fringe benefits and expenses of Property Personnel, insurance premiums, debt services, legal and accounting fees and the cost and expense of utilities, services and

concessions, in each case strictly in accordance with the Budget or as otherwise allowed by this Agreement. Manager is hereby expressly directed to disburse funds from the Operating Account during the term of this Agreement for the following items and at the times set forth below, to the following parties in order set forth below:

(a)    on or before the tenth (10th) day of each month, amounts otherwise due and payable as expenses of the Property which are authorized to be incurred under the Budget or under other terms of this Agreement;

(b)    on or before the tenth (10th) day of each month, to Manager for payment of an estimated amount (based on the previous month's actual collections) of the Management Fee for such month;

(c)    on or before the tenth (10th) day of each month, amounts necessary to fund, for the prior calendar month, any reserves set forth in the Budget or otherwise designated by Owner from time to time, in writing, in the amount so designated by Owner;

(d)    on or before the fifteenth (15th) day of the month, to a bank account designated by Owner by wire transfer of immediately available funds any and all funds remaining in the Operating Account in excess of Forty Thousand Dollars ($40,000) plus the amount Manager reasonably determines will be due and payable in the then current calendar month after the disbursements as specified in (a) through (c) above have been made. A copy of the excess cash flow calculation is to be e-mailed to Owner at time of distribution.

Owner and Manager acknowledge that the Management Fee paid hereunder is an estimate based on the previous month's actual collections and that upon the expiration or earlier termination of this Agreement they shall reconcile the actual fee and refund or pay the reconciled amount, as the case may be.

Section 4.4    Authorized Signatories.  Owner and Manager shall be signatories on the Operating Account; provided, that (i) Manager shall draw on the Operating Account solely to pay for expenses in amounts that are included within the approved Budget, (ii) Manager shall not draw on the Operating Account to reimburse itself for any payment advanced by Manager or to pay itself or any of its affiliates any fee or compensation without first obtaining the prior written consent of Owner (provided, however, that Manager may withdraw funds to pay itself the Management Fee that is due and payable hereunder so long as Manager accounts for such payments in the reports required to be prepared by Manager hereunder), (iii) checks or withdrawals in an amount equal to or greater than Ten Thousand and 00/100 Dollars ($10,000.00) or checks to pay utility or marketing invoices that are in excess of the amount authorized in the approved budget shall require execution by either (x) an Owner Signatory or (y) an Owner Signatory and a Manager Signatory and (iv) there shall not be any restriction on the right of Owner to draw on the Operating Account.  All Manager Signatories shall be covered by the fidelity bond required to be obtained by Manager pursuant to Exhibit A attached hereto and made a part hereof, provided, however, notwithstanding the foregoing, (x) Owner shall have the right to pay any third parties directly based on invoices received by Manager or Owner, and (y) Owner shall have the right to terminate Manager's authority to draw checks on the Operating Account at any time by delivering notice of such termination to Manager.  Upon request by

-11-

Owner, Manager shall promptly inform Owner of the amounts contained in the Operating Account. For purposes of this Agreement, a "Manager Signatory" means all signatories of Manager that have the right to draw upon the Operating Account, each of which Manager Signatory shall be approved by Owner in writing (and the parties acknowledge that as of the Effective Date, the Owner has approved _____ and _____ (and no other Persons) to be the Manager Signatories under this Agreement).

Section 4.5   <u>Repairs and Maintenance</u>.  Manager shall make or cause to be made and shall supervise all repairs, replacements, alterations, additions, improvements, decorations and maintenance on the Property (collectively, "Repairs"), including Repairs to any personal property located thereon in which Owner has an ownership or security interest, and shall purchase supplies and equipment for the maintenance and operation of the Property as Manager deems advisable or necessary. Any rebate or discount obtained by Manager for any of the foregoing expenditures shall become the property of Owner. Manager shall not make or incur any expenses for any Repairs that constitute a deviation from the Budget without the prior approval of Owner except in those cases where, in the reasonable opinion of Manager, an emergency necessitates so doing before such approval can reasonably be obtained. In such cases, Manager shall report the same to Owner with all reasonable promptness.

## ARTICLE V

## ACCOUNTING

Section 5.1   <u>Books and Records</u>.  On behalf of Owner, Manager shall keep, or shall supervise and direct the keeping, on the basis of generally accepted accounting principles consistently applied ("Modified Cash"), of a comprehensive system of accounting and office records, books, and accounts pertaining to the Property from which the accounts payable, accounts receivable, available cash, security and other deposits and other assets and liabilities can be readily identified and the amounts thereof determined.  Such records shall be subject to examination by Owner or its authorized agents, attorneys and accountants at all reasonable hours at the office where such records are maintained, and shall be delivered to Owner promptly, and in any event, within sixty (60) days after the termination or expiration of this Agreement. All books and records of the Property shall be kept at the Property or at the location where any central accounting and bookkeeping services are performed by Manager, but at all times shall be the property of Owner.

Section 5.2   <u>Periodic Statements; Audits</u>.

(a)   Manager will furnish the following data to Owner within the time periods set forth below:

(i)   On or before the tenth (10th) day of each month, Manager shall furnish a statement of operations on a Modified Cash basis for the Property, showing results of operations for the preceding month, together with any other management reports reasonably requested by Owner. The form of such report shall be that used by Manager in connection with its management of other apartment complexes.

-12-

(ii)     On or before the tenth (10th) day of each month, but not more than monthly, Manager shall furnish Owner with a rent roll and rent status report for all apartment units.  The form of such rent roll and rent status report shall be used by Manager in connection with its management of other apartment complexes.

(iii)     Upon request of Owner, and at Owner's expense, Manager shall cooperate and assist Owner in the preparation of an annual statement of operations for the Property prepared by an independent certified public accountant in accordance with GAAP.

(iv)     Within ten (10) days after the end of each month, Manager shall furnish Owner with a copy of the prior month's bank statement for the Operating Account described in Section 4.1 above.  Manager shall also provide to Owner, within ten (10) days after the end of each month, a comprehensive bank reconciliation for the prior month.

(v)     On a weekly basis, Manager shall furnish Owner with a leasing report in the form provided by Owner.  Owner and Manager will collaborate to develop a leasing report that is auto generated by Manager's system.

(b)     To support the statements and reports Manager is required to deliver hereunder, Manager shall maintain copies of the following items:

(i)     All bank statements, bank deposit slips and if requested, copies of checks;

(ii)     Comprehensive bank reconciliations;

(iii)     Trial Balance

(iv)     Detailed General Ledger;

(v)     Comprehensive breakdown of the calculation of the Management Fee;

(vi)     Detailed cash receipts records;

(vii)     behind documentation for payroll, payroll taxes and employee benefits; and

(viii)     Invoices for items purchased and expenses paid.

Manager shall, at Owner's written election, either (i) preserve all of the foregoing records for a period of five (5) years or (ii) at the expiration of each Fiscal Year, deliver such records to Owner.  Such statements and computations shall be prepared from the books of account of the Property.

Section 5.3     Accounting and Reporting Expenses.  Except as otherwise set forth herein, all costs and expenses incurred in the preparation of any statements, budgets, schedules,

computations and other reports expressly required under this Article V or under any other provisions of this Agreement shall be paid by Manager.

Section 5.4    Inadequate Funds.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Manager have any obligation to advance any of its own funds in connection with the performance of its obligations under this Agreement unless expressly so provided herein and, unless expressly so provided, all expenditures required to be made by Manager hereunder shall be subject to Owner providing sufficient funds therefor.

# ARTICLE VI

# GENERAL COVENANTS OF OWNER AND MANAGER

Section 6.1    Operating Expenses.  Except as otherwise indicated herein, Owner shall be solely responsible for the costs and expenses of maintaining and operating the Property incurred by Owner or by Manager in accordance with the provisions of this Agreement, and shall pay all such costs and expenses, to the extent contemplated by this Agreement or incurred in accordance with the Budget.

Section 6.2    Owner's Right of Inspection and Review.  Owner, Owner's lender and their respective accountants, attorneys, and agents shall have the right to enter upon any part of the Property at all reasonable times during the term of this Agreement for the purpose of examining or inspecting the Property or examining or making extracts of books and records of the Property, but any inspection shall be done with as little disruption to the business of the Property as possible during normal office hours and with reasonable notice and in compliance with all applicable laws and lease terms.

Section 6.3    Indemnification and Hold Harmless.  Manager agrees to indemnify and save Owner and each Owner Exculpated Party harmless for, from, and against to the extent not otherwise covered by insurance, its actual loss, cost, liability and expense, including, but not limited to, reasonable counsel fees and disbursements to the extent resulting directly from (i) any acts constituting theft, fraud, willful misconduct or gross negligence on the part of Manager, or Manager's failure to take reasonable action for the theft, fraud, willful misconduct or gross negligence of its employees, agents and/or representatives, (ii) any willful misconduct by Manager in breach of a material term of this Agreement, or (iii) any representation or warranty of Manager contained herein being false in any material respect when made provided that Manager receives prompt written notice and an opportunity to cure and defend any such claim. Except for the matters covered by Manager's indemnity set forth in this Section 6.3, Owner shall indemnify, defend and hold harmless Manager for, from, and against any loss, cost, liability and expense, including, but not limited to, reasonable counsel fees, relating to the Property or the management of the Property by Manager that results from Manager's performance of Manager's obligations hereunder in accordance with the terms hereof, provided Manager:

(a) notifies Owner and any insurance carrier (as required) promptly after Manager receives notice of any such loss, damage or injury;

(b) agrees that Owner shall have the right, at its option, to conduct the defense to any claim, demand or suit by counsel reasonably acceptable to Manager.

-14-

Nothing contained herein shall be construed as indemnifying Manager against its theft, fraud, willful misconduct or gross negligence. The indemnification and hold harmless obligations of the parties in this Section 6.3 shall survive the expiration or earlier termination of this Agreement.

Section 6.4 <u>Covenants Concerning Payment of Operating Expenses</u>. Manager shall use commercially reasonable efforts to obtain all contacts, discount programs and cost-savings measures known to Manager and which are available to obtain services, products and tax and insurance rates for the Property at the lowest cost, without sacrificing the quality of such services or products. All rebates, discounts or commissions collected by Manager or credited to Manager's use that relate to the purchasing of supplies or the rendering of services for the Property shall be fully disclosed to Owner and deposited in the Operating Account.

Section 6.5 <u>Covenants Concerning Supplies</u>. Manager shall (i) exercise reasonable diligence to maintain, safeguard and preserve material, equipment and supplies belonging to the Property, all of which shall be delivered to and stored upon the Property and used only in connection with the Property; (ii) maintain an adequate inventory of such material, equipment and supplies and, if requested by Owner, furnish Owner with copies of such inventories; and (iii) promptly advise Owner in writing of the theft or mysterious disappearance of any such material, equipment and supplies.

Section 6.6 <u>Covenants Regarding Legal Proceedings</u>. Following Owner's written approval, Manager shall confer with and cooperate with counsel designated by Owner in the institution and prosecution of any remedies and proceedings which Owner may, in its sole and absolute discretion, decide to institute except for proceedings against Manager, and Manager and the Property Personnel shall be reasonably available as witnesses on request with respect to such proceedings. Except as with respect to suits and proceedings for which Manager is providing an indemnity pursuant to Section 6.3, suits and proceedings shall be subject to the sole direction by Owner, and all costs of such suits and proceedings shall be borne by Owner (unless such suit stems from Manager's or any Property Personnel's wrongful action or inaction for which it is indemnifying Owner, in such event all costs of such suits and proceedings shall be borne by Manager).

## ARTICLE VII

## <u>DEFAULTS; TERMINATION RIGHTS</u>

Section 7.1 <u>Default by Manager</u>. Manager shall be deemed to be in breach hereunder: (a) in the event Manager shall fail to keep, observe or perform any covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager; provided, however, that in the event of a non-monetary breach, such breach may continue for a period of five (5) days after notice thereof by Owner to Manager, or if such breach cannot be cured within five (5) days, then such additional period, not to exceed thirty (30) days, as shall be deemed reasonable by Owner, provided that Manager is capable of curing same and is diligently proceeding to cure such breach; (b) the filing by Manager of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law or the consent by any such entity to an involuntary petition in bankruptcy naming it as a debtor; or (c) the entering

of an order, judgment or decree with respect to Manager by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets and such order, judgment or decree remains in effect or unbonded for more than ninety (90) days.

Section 7.2    Remedies of Owner.  Upon the occurrence of a material breach by Manager as specified in Section 7.1 hereof, which remains uncured after written notice and an opportunity to cure with the same cure periods provided in Section 7.1 above, Owner shall be entitled to immediately terminate this Agreement and Owner shall have the right to pursue any other remedy it may have under this agreement.  Following such a termination, Owner shall have no further obligation to pay any Management Fee due hereunder. Notwithstanding such termination, Manager shall not be relieved of any liability arising as a result of Manager's default.

Section 7.3    Defaults by Owner.  Owner shall be deemed to be in breach hereunder in the event Owner shall fail to keep, observe or perform any covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Owner, and (a) in the event of a non-monetary breach, such breach shall continue for a period of thirty (30) days after written notice thereof by Manager to Owner, or if such breach cannot be cured within thirty (30) days, then such additional period as shall be reasonable provided Owner is capable of curing same and is diligently proceeding to cure such breach and (b) in the event of a monetary breach, such breach shall continue for a period of five (5) days after written notice from Manager with no additional period thereafter.

Section 7.4    Remedies of Manager.  Upon the occurrence of a breach by Owner as specified in Section 7.3 hereof, Manager, shall be entitled to terminate this Agreement and obtain all amounts then due and owing by Owner to Manager, together with a termination fee in an amount equal to twelve times the Management Fee payable for the month immediately preceding Owner's event of default and to pursue any other remedies provided hereunder.

Section 7.5    Event of Default.  If there is an occurrence of an Event of Default or a default which would otherwise permit Owner's lender to accelerate the Loan, Owner's lender (or its nominee) shall have the right at any time thereafter to terminate the Agreement, without cause and without liability, by giving written notice to Manager of its election to do so. Owner's lender's notice shall specify the date of termination, which shall not be less than 30 days after the date.

Section 7.6    Intentionally deleted.

Section 7.7    Sale of the Property.  This Agreement shall automatically terminate effective upon the sale of the Property or effective upon termination of Owner's right to collect the rents therefrom.  In connection with any sale or negotiations for sale by Owner, Manager agrees hereby to assist Owner, upon Owner's request, with (a) the preparation of marketing materials approved by Owner, in its sole discretion; (b) the development (together with Owner) of the list of parties to which marketing materials shall be distributed and the mailing of the same; (c) showing the Property and answering questions of prospective purchasers relating to the

Property; (d) the receipt of purchase bids; and (e) the preparation of such information, reports and other due diligence items as Owner may reasonably request; provided, however, in no event shall Manager be required to negotiate a sales contract with a potential purchaser or otherwise act (or provide services) as a broker for the Property. This section is not intended to modify the rights of Manager's affiliate under that certain option agreement with respect to the Property dated December ___, 2010

Section 7.8     Expiration of Term. Upon the expiration of the Term hereof, or as sooner terminated pursuant to this Agreement, the relationship created hereby shall immediately cease and Manager shall have no further right to act for Owner or draw checks on the Operating Account or pursue any of the activities described in this Agreement. Upon termination of this Agreement, Manager will estimate funds required to pay all obligations incurred by the Property or to be incurred by the Property through the termination date and which are budgeted in the Budget, and will submit written notification to Owner of estimated funds required to meet all obligations through the termination date. Upon termination for any reason, Manager shall deliver to Owner the following with respect to the Property:

(a)     a final accounting reflecting the balance of income and expenses on the Property as of the date of termination;

(b)     any of Owner's funds held by Manager with respect to the Property;

(c)     all bank statements, keys, promotional materials, signs, stationery, records, contracts, authorizations and other agreements relating to the Property, leases, tenant files, receipts or deposits, unpaid bills and other papers or documents which pertain to the Property and which are in Manager's possession;

(d)     all materials and supplies, keys, copies of contracts, agreements and documents, and copies of such other accounting papers, books and records pertaining to the operation of the Property as Owner may request;

(e)     assign any right Manager may have in and to any existing contracts and guarantees relating to the operation and maintenance of the Property as Owner shall require;

(f)     terminate any employees and personnel of Manager that are engaged in operations at the Property and that Owner requests be terminated; and

(g)     perform any other actions, or deliver any other documents, reasonably required hereunder upon termination of this Agreement, including facilitating an orderly transition of management to a new manager of the Property.

In the event of termination, Manager agrees to fulfill all reporting, bookkeeping and related functions hereunder through the period for which Owner agrees to pay Manager a management fee. This Section 7.8 shall survive the expiration or earlier termination of this Agreement. Provided however such termination shall not relieve Owner from its obligations hereunder.

TPG v.7-23-10

# ARTICLE VIII

## INSURANCE

Section 8.1    Owner's Insurance and Rights.  Owner, as an operating expense of the Property payable from the Operating Account, will obtain and keep in force property and commercial liability insurance covering Owner as primary insured and, with respect to liability insurance, Manager as additional insured, in accordance with the insurance coverage requirements applicable to Owner as set forth on Exhibit A.  Such insurance may be blanketed with other insurance carried by Owner or any affiliate of Owner, in which case a pro rata share of the premiums will be chargeable to the Property as an operating expense.  Unless Manager is obligated to indemnify, hold harmless and defend Owner pursuant to the terms of this Agreement, Owner or Owner's insurer will have the exclusive right (chargeable, at Owner's option, as an operating expense of the Property) to conduct the defense of any claim, demand or suit arising out of the ownership, operation or management of the Property.  If Manager is obligated to indemnify, hold harmless and defend Owner pursuant to the terms of this Agreement, then Manager or Manager's insurer will have the exclusive right (at its/their sole cost and expense) to conduct the defense of any claim, demand or suit arising out of the ownership, operation or management of the Property.  Nothing herein is intended to affect the general requirement of this Agreement that the Property will be managed, operated and maintained in a safe condition and in a proper and careful manner.  Manager will furnish whatever information is reasonably requested by Owner for the purpose of placement of insurance coverages and will aid and cooperate in every reasonable way with respect to such insurance and any claim or loss thereunder.  Manager will notify Owner (and Owner's insurance carrier upon the direction of Owner) promptly upon becoming aware of any casualty, loss, injury, claim or other event which may result in a claim under any insurance policy maintained by Owner.  Manager will cooperate with Owner and Owner's insurance carrier on loss control inspections, responding to recommendations and other safety issues.

Section 8.2    Manager's Insurance.  Manager will maintain (as an operating expense of the Property with respect to on-site employees only) Workers' Compensation and similar insurance as required by law.  Manager may maintain, at Manager's expense, Commercial General Liability Insurance.  Manager will maintain the insurance coverage requirements applicable to Manager as set forth on Exhibit A.

Section 8.3    Waiver of Subrogation.  In so far as, and to the extent that, the following provision may be effective without invalidating or making it impossible to obtain insurance, without additional cost, Manager and Owner agree that with respect to any hazard, liability, casualty or other loss or claim which is covered by insurance then being carried by either Owner or Manager, (a) the party carrying such insurance and suffering such loss releases the other party of and from any and all claims with respect to such loss to the extent of the insurance proceeds paid with respect thereto and specifically excepting from such release any deductible required to be paid therewith; and (b) their respective insurance companies shall have no right of subrogation against the other or their respective agents, contractors, employees, licensees or invitees on account thereof.

-18-

Section 8.4    Handling Claims.  Manager shall report to Owner promptly in writing all accidents and claims of which it is aware for damage and bodily injury relating to the ownership, operation, and maintenance of the Property and any damage or destruction to the Property coming to the attention of Manager. Manager shall not settle on Owner's behalf any claims with Owner's insurers or any third-party claimant.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1    Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Arizona.

Section 9.2    Notices.  Any notice or communication hereunder must be in writing, and may be given: (1) by personal delivery or by private courier with an acknowledged receipt, (2) by registered or certified mail, or (3) by facsimile transmission. Notice shall be deemed delivered upon receipt if personally delivered, or three (3) business days after a registered or certified letter containing such notice, properly addressed, with postage prepaid, is deposited in the United States mail, or on the date of delivery, as confirmed by facsimile confirmation if notice is delivered by facsimile transmission. Such notices or communications shall be given to the parties hereto at the addresses set forth opposite the names of the respective parties on the signature page hereof.  Any party hereto may at any time by giving ten (10) days written notice to the other party hereto designate any other address in substitution of the foregoing address to which such notice or communication shall be given.

Section 9.3    Severability.  If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or such other documents, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant or condition of this Agreement or such other documents shall be valid and shall be enforced to the fullest extent permitted by law.

Section 9.4    No Joint Venture or Partnership.  Owner and Manager hereby agree that nothing contained herein or in any document executed in connection herewith shall be construed as making Manager and Owner joint venturers or partners.

Section 9.5    Modification.  Except as otherwise specifically provided herein, any amendment, modification or termination of this Agreement may be effected only by a written instrument executed by Manager and Owner.

Section 9.6    Attorneys' Fees.  Should either party employ an attorney or attorneys to enforce any of the provisions hereof or to protect its interest in any manner arising under this Agreement, or to recover damages for the breach of this Agreement, the prevailing party in such action shall be entitled to recover all reasonable costs, damages and expenses, including attorneys' and experts' fees, and costs expended or incurred in connection therewith. The terms of this Section 9.6 shall survive any termination of this Agreement.

Section 9.7    Total Agreement.  This Agreement is a total and complete integration of any and all agreements existing between Manager and Owner with respect to the management of the Property and supersedes any prior oral or written agreements, promises or representations between them with respect to the management of the Property.

Section 9.8    Casualty or Condemnation.  In the event that the Property is substantially or totally damaged or destroyed by fire, tornado, windstorm, flood or other casualty during the Term of this Agreement, or should the Property or any portion thereof be condemned or otherwise taken (whether by private deed in lieu of foreclosure or otherwise), Owner may terminate this Agreement upon giving Manager written notice of termination on or before the date which is thirty (30) days after the date of such casualty or condemnation.  In the event of termination pursuant to this Section 9.8, neither party hereto shall have any further liability hereunder (except for the indemnification and confidentiality provisions set forth in this Agreement or as otherwise noted herein).

Section 9.9    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their permitted successors and assigns.  Manager, without the prior written consent of Owner, shall not assign, transfer, mortgage, pledge, or otherwise encumber or dispose of this Agreement or all or any part of its rights or interests hereunder (including, without limitation, by virtue of any merger or any change of the ownership of Manager), and any attempted assignment, mortgage, pledge, encumbrance, or disposition shall constitute a default hereunder and shall be void ab initio.  Owner is entitled to assign, transfer or otherwise dispose of this Agreement or all or any part of its rights and interests hereunder (including, without limitation, by virtue of any merger or any change of the ownership of Owner), provided Owner shall give Manager written notice thereof.

Section 9.10    Captions.  The titles or captions contained in this Agreement are for convenience only and shall neither restrict nor amplify the provisions hereof.

Section 9.11    Waiver of Rights.  Acceptance by either party of any payment made by the other party shall constitute neither a waiver of the right of the accepting party to contest whether or not the full amount due shall have been paid, nor a waiver of any other rights hereunder. Failure by either party to complain of any action, non-action, or default of the other party shall not constitute a waiver of any rights hereunder, nor shall the waiver of any right occasioned by a default in any one or more instances constitute a waiver of any right occasioned by either a subsequent default of the same obligation or by any other default.

Section 9.12    Limited Liability.  No general or limited partner, member or manager in or of the Owner, whether direct or indirect, or any direct or indirect partners, members or managers in such partners, members or managers or any disclosed or undisclosed officers, shareholders, principals, directors, employees, partners, servants or agents of the Owner or any of the foregoing or any investment advisor of Owner (including any assignee or successor of Owner) or other holder of any equity interest in Owner (each, an "Owner Exculpated Party" and collectively, the "Owner Exculpated Parties"), shall be personally liable for the performance of Owner's obligations under this Agreement.  The liability of Owner (including any assignee or successor of Owner) for Owner's obligations hereunder shall be limited to Owner's interest in the Property.

Section 9.13  Independent Contractor.  Notwithstanding anything to the contrary contained herein, Manager shall be an independent contractor performing management functions for Owner but shall, at all times, be subject to the provisions of this Agreement with respect to managerial decisions.  All records maintained by Manager with respect to the operation, leasing or maintenance of the Property shall, at all times, be and constitute the property of Owner and shall be surrendered to Owner in accordance with the terms hereof, without charge or expense except as provided for herein.  Nothing herein shall create an agency coupled with an interest.

Section 9.14  Relationship of Manager to Owner.  The relationship of the parties to this Agreement shall be that of principal and agent, and all duties to be performed by Manager under this Agreement shall be for and on behalf of Owner, in Owner's name, and for Owner's account.  In taking any action under this Agreement, Manager shall be acting only as agent for Owner, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties of this Agreement except that of principal and agent, or as requiring Manager to bear any portion of losses arising out of or connected with the ownership or operation of the Property. Manager shall not at any time during the period of this Agreement be considered a direct employee of Owner. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement and except that Manager is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

Section 9.15  No Interest in Real Property.  This Agreement shall not create an interest in real property and it shall not be recorded in the public records of any jurisdiction.

Section 9.16  Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall constitute one in the same instrument.

Section 9.17  Confidentiality.  As an acknowledgement of the sensitivity of the subject matter that Manager will have access to with respect to Owner's business operations and that Manager will be handling on behalf of Owner as provided in this Agreement, Manager hereby agrees to bind itself and its representatives, employees, agents, successors and assigns, to protect, keep and maintain all dealings, all contract terms and discovered information whatsoever regarding this Agreement, the Property, the terms of all documents relating thereto or the leasing and management of the Property, confidential and for the exclusive use of Owner.  Manager further agrees not to divulge any information concerning the financial condition, accounts or general operations of Owner or concerning any of the tenants or prospective tenants of the Property, unless Owner otherwise directs Manager in writing.  Notwithstanding the foregoing, disclosure will be permitted (a) as required by law or court order or (b) as necessary to perform Manager's duties hereunder.  This Section 9.17 will survive the termination of this Agreement.

Section 9.18  Representations.  Manager represents and warrants that (i) it has full power and authority to enter this Agreement; (ii) it is fully qualified and licensed, to the extent required by law, to manage real estate and perform all obligations assumed by Manager hereunder; and (iii) it is experienced in performing all obligations assumed by Manager hereunder.  Manager agrees to comply with all such laws now or hereafter in effect.

Section 9.19 <u>Owner's Approval</u>. Whenever provision is made herein for the approval or consent of Owner, or that any matter be to Owner's satisfaction, unless specifically stated to the contrary, such approval or consent shall be made by the Owner in its sole and absolute determination.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ADDRESS
c/o TPG Multifamily
30950 Rancho Viejo Road, Suite 200
San Juan Capistrano, CA  92675

OWNER
TPG (Grigio) Note Acquisition, LLC,
a Delaware limited liability company

By: _____
Its:

ADDRESS
c/o Gray Residential
4040 E. Camelback Road, Suite 275
Phoenix, AZ  85016

MANAGER
Gray Residential

By: _____
Its:

# EXHIBIT A

## OWNER AND MANAGER INSURANCE LIMIT REQUIREMENTS

(1)     The Owner, with the Manager's cooperation, shall procure and maintain in full force and effect at all times, at the Owner's expense, the following insurance coverage to protect the Owner and the Premises, as well as any other insurance required by any lease of space in the Premises, and all such coverages shall be in compliance with the terms of any mortgage, deed of trust or other security agreement covering all or a part of the Premises:

(a)     Commercial General liability insurance in broad form and amount satisfactory to the Owner, including, but not limited to, coverage for liabilities arising out of the hazards of ownership of the Premises, the utilization of independent contractors, and the Owner's assumptions of liabilities under any contract. The limit of liability shall not be in an amount less than Five Million Dollars ($5,000,000), or such amount as may be reasonably designated by the Owner from time to time, and shall be procured on an "occurrence" basis. Inasmuch as the Owner may require the Manager to be insured for liabilities arising out of any and all aspects of its operation and management of the Premises under this Agreement, said policy shall extend to and include all such exposures (with the same coverage limits as set forth above).

(b)     Property insurance on an "All Risks" form covering all real and personal property in the Premises, in an amount not less than the full insurable replacement value. Rents and/or other income shall also be insured for the same perils in amounts not less than the full amount of the annual gross rentals and other income payable by tenants, assuming full occupancy. Such policy, which shall be maintained in the name of the Owner, shall include replacement cost and agreed amount endorsements and a written provision that in the event of cancellation or reduction of coverage that the Owner and/or any other party designated by the Owner and the Manager be provided thirty (30) days' prior written notice. The Manager shall also assist the Owner in determining the need to carry any additional coverage including, but not limited to, coverage for contingent liability from laws affecting the demolition, construction or operation of the Premises. Upon such determination, the Owner shall immediately procure any such insurance for such exposure.

(c)     Standard forms of boiler & machinery insurance, on a blanket basis, with repair and replacement cost insurance. Such insurance shall include coverage for loss of rents and/or other income in amounts not less than the full amount of the annual gross rentals and other income payable by tenants, assuming full occupancy.

(d)     Such other insurance, including, but not limited to, flood, earthquake, collapse and/or sinkhole coverage, as may be desirable or requested by the Owner, required by applicable law, or by any ground or underlying lease, mortgage, deed of trust or other security agreement covering all or any part of the Premises.

# EXHIBIT "D"

## Agreement Among Creditors

# AGREEMENT AMONG
# CREDITORS

THIS AGREEMENT AMONG CREDITORS (this "Agreement"), dated as of October 21, 2010, is by and among TPG (Grigio) Note Acquisition, LLC, a Delaware limited liability company ("Senior Lender"), the City of Tempe, an Arizona municipal corporation (the "City") and TPG Grigio Mezzanine LLC, a Delaware limited liability company ("Junior Lender"). (The Senior Lender, the City, and the Junior Lender shall be individually and respectively referred to herein as "Party" and collectively as "Parties".)

## RECITALS

A.      Senior Lender, as successor to Keybank National Association, a national banking association, is the holder of a promissory note in the original principal amount of $62,675,000.00, as amended, made by Mondrian TTL, L.L.C., a Delaware limited liability company ("Mondrian"), which is secured by, among other things, a Deed of Trust (the "Senior Deed of Trust") against certain real property in the City of Tempe (the "Project").

B.      GDG Partners, L.L.C., a Delaware limited liability company, is indebted to City pursuant to a Payment Agreement, secured by, among other things, a second priority Deed of Trust against the Project ("City Deed of Trust").

C.      Junior Lender, as successor to Babson Mezzanine Realty Investors LP, a Delaware limited partnership, is the holder of a promissory note in the original principal amount of $8,600,000, made by Mondrian, which is secured by a collateral assignment (the "Junior Pledge") granted by Grigio TTL, L.L.C., a Delaware limited liability company ("Grigio") of Grigio's 100% membership interest in Mondrian.

D.      Senior Lender and City are parties to various subordination and inter-creditor agreements, including, without limitation, a Subordination and Intercreditor Agreement dated as of November 21, 2006, as amended (the "Senior Subordination Documents").

E.      Senior Lender and Junior Lender (collectively "Lenders") are parties to various subordination and inter-creditor agreements, including without limitation an Intercreditor Agreement dated November 21, 2006, as amended (the "Junior Subordination Documents").

F.      The City and Junior Lender are the current parties to that Subordination Agreement dated November 21, 2006 (the "City Subordination Documents").

G.      Mondrian is a debtor and debtor-in-possession in proceedings under Chapter 11 of the United States Bankruptcy Code, filed on May 9, 2010 in the United States Bankruptcy Court for the District of Arizona ("Bankruptcy Court"), jointly administered under Case No. 2:10-bk-14140-RJH (the "Mondrian Bankruptcy Proceeding").

H.      Grigio is a debtor and debtor-in-possession in proceedings under Chapter 11 of the United States Bankruptcy Code, filed on May 9, 2010 in the Bankruptcy Court, jointly

administered under Case No. 2:10-bk-14140-RJH (the "Grigio Bankruptcy Proceeding"; collectively, with the Mondrian Bankruptcy Proceeding, the "Bankruptcy Cases").

      I.     The City is the owner of the Project and leases the Project to Mondrian pursuant to that Land and Improvements Lease dated August 14, 2008 ("Lease").

      J.     The City has filed certain proofs of claim in the Mondrian Bankruptcy Proceedings, which are summarized in the Schedule of Claims attached hereto as Exhibit A ("Schedule of Claims").

COVENANTS

      NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties desire to set forth below their agreements and understandings regarding potential developments that may transpire in the Bankruptcy Cases

      1.     The Lenders previously have informed the City and the Bankruptcy Court that they intend to oppose and to vote to reject the Debtors' Joint Plan of Reorganization dated July 23, 2010, as amended September 1, 2010 (the "Debtors' Plan"), filed by Mondrian and Grigio in the Bankruptcy Cases, and hereby confirm that they will oppose and will vote to reject the Debtors' Plan. City previously has informed the Lenders and the Bankruptcy Court that it intends to vote to reject the Debtor's Plan and hereby confirms that it will vote to reject the Debtors' Plan. These decisions have been made independently by the respective Parties and based on each Parties' independent consideration of the Debtor's Plan as currently propounded and based on the information contained in the Disclosure Statement submitted by Mondrian and Grigio in support of the Debtors' Plan.

      2.     At the initial confirmation hearing on the Debtor's Plan (currently scheduled for October 26, 2010), stay lift motions by the Senior Lender and the Junior Lender are also scheduled for consideration by the Bankruptcy Court. The City has requested certain accommodations from the Lenders in the event that stay relief is granted in either of the Lenders' favor, as set forth in Section 4 below. In return, the City agrees to support the relief requested by the Lenders in the stay relief motions to allow Senior Lender and Junior Lender to enforce their security interests in, respectively, the Project and the Mondrian membership interests.

      3.     In the event stay relief is not granted to either of the Lenders, and the Lenders elect to pursue resolution of the Bankruptcy Cases through pursuit of a plan of reorganization filed by either or both of the Lenders ("Creditors Plan"), the City agrees to reasonably support efforts by the Lenders to obtain confirmation of the Creditors Plan provided that such Plan includes the payments, agreements, and benefits to and for the City described below in Section 4. Such support by the City shall not extend to joining in any Creditors Plan.

      4.     To address the potential contingencies regarding potential stay relief, confirmation of a Creditors Plan, or other possible resolutions of the Bankruptcy Cases and the respective lien rights of the Parties, the Parties further covenant that upon the occurrence of any of the following events ("Triggering Events") (i) Junior Lender foreclosing the Junior Pledge and obtaining ownership of the membership interests in Mondrian, (ii) Senior lender foreclosing the

-2-

8.    This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

9.    Lenders have not presently filed or presented a Creditors Plan.    Neither this Agreement nor any prior negotiations between the Parties constitute or are to be deemed a solicitation to vote to accept or reject any Creditors Plan .  Such solicitation shall only occur following the entry of an order by the Bankruptcy Court approving a disclosure statement related to the Creditors Plan or of other orders of the Bankruptcy Court allowing such solicitation.  This Agreement is a presently binding agreement among the Parties, as creditors in the Bankruptcy Cases and concerns and relates to their respective inter-creditor rights.  As such, this Agreement is presently effective and binding on the Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date first above written.

CITY:

CITY OF TEMPE,
an Arizona municipal corporation

By: _____
Name:  Hugh Hallman
Title:  Mayor
Date:  10/21/10

SENIOR LENDER:

TPG (GRIGIO) NOTE ACQUISITION, LLC
a Delaware limited liability company

By: _____
Name:  KENNETH A. PICERNE
Title:  PRESIDENT
Date:  10-21-2010

JUNIOR LENDER:

TPG GRIGIO MEZZANINE LLC,
A Delaware limited liability company

By: _____
Name:  KENNETH A. PICERNE
Title:  PRESIDENT
Date:  10-21-2010

- 4 -

| Claim No. | Description | Amount |
|---|---|---|
| Claim No. 26 | - Payment Agreement dated November 21, 2006, as amended<br>- Secured Claim<br>- Second lien on Project | - $9,786,681 due as of Petition Date<br>- Plus post-petition interest at .000137% per day<br>- Plus attorneys' fees & costs |
| Claim No. 27 | - Miller Road Assessments<br>- Land and Improvements Lease dated August 14, 2008 ("Lease")<br>- Playa del Norte Subordinate Development Parcel Agreement Parcel No. 5, as amended ("Development Agreement") | - Remaining amount due $1,382,277.35 ($104,509.40 installment due 11/1/10) |
| Claim No. 28 | - Residential Development Tax<br>- Priority Tax Claim (Section 507(a)(8)<br>-Lease | -$245,340 |
| Claim No. 30 | -Sewer and Water Fees<br>-Development Agreement<br>-Lease | -$1,656,948.00<br>- Plus post-petition interest at .00548% per day |
| Claim No. 31 | - Rio Salado-CFD Assessments<br>- Senior Lien on Project<br>- Development Agreement<br>- Lease | - Capital Assessments: current balance is $4,195,031.87<br>-O&M Assessments: current annual amount due is $153,178.83 and is due on October 1st and delinquent if not paid by December 1st. |

## Proposed lease modifications

| | | GPLET | Additional Pmt | Total |
|---|---|---|---|---|
| 2 | 2010 | $0.00 | $100,000.00 | $100,000.00 |
| 3 | 2011 | $0.00 | $100,000.00 | $100,000.00 |
| 4 | 2012 | $0.00 | $100,000.00 | $100,000.00 |
| 5 | 2013 | $0.00 | $100,000.00 | $100,000.00 |
| 6 | 2014 | $0.00 | $100,000.00 | $100,000.00 |
| 7 | 2015 | $0.00 | $100,000.00 | $100,000.00 |
| 8 | 2016 | $87,905.00 | $100,000.00 | $187,905.00 |
| 9 | 2017 | $263,715.00 | $100,000.00 | $363,715.00 |
| 10 | 2018 | $263,715.00 | $100,000.00 | $363,715.00 |
| 11 | 2019 | $210,972.00 | $100,000.00 | $310,972.00 |
| 12 | 2020 | $210,972.00 | $100,000.00 | $310,972.00 |
| 13 | 2021 | $210,972.00 | $128,134.00 | $339,106.00 |
| 14 | 2022 | $210,972.00 | $128,134.00 | $339,106.00 |
| 15 | 2023 | $210,972.00 | $128,134.00 | $339,106.00 |
| 16 | 2024 | $210,972.00 | $128,134.00 | $339,106.00 |
| 17 | 2025 | $210,972.00 | $128,134.00 | $339,106.00 |
| 18 | 2026 | $210,972.00 | $128,134.00 | $339,106.00 |
| 19 | 2027 | $210,972.00 | $128,134.00 | $339,106.00 |
| 20 | 2028 | $210,972.00 | $128,134.00 | $339,106.00 |
| 21 | 2029 | $158,229.00 | $128,134.00 | $286,363.00 |
| 22 | 2030 | $158,229.00 | $128,134.00 | $286,363.00 |
| 23 | 2031 | $158,229.00 | $128,134.00 | $286,363.00 |
| 24 | 2032 | $158,229.00 | $178,267.00 | $336,496.00 |
| 25 | 2033 | $158,229.00 | $271,644.00 | $429,873.00 |
| 26 | 2034 | $158,229.00 | $314,886.00 | $473,115.00 |
| 27 | 2035 | $158,229.00 | $314,886.00 | $473,115.00 |
| 28 | 2036 | $158,229.00 | $314,886.00 | $473,115.00 |
| 29 | 2037 | $158,229.00 | $314,886.00 | $473,115.00 |
| 30 | 2038 | $158,229.00 | $314,886.00 | $473,115.00 |
| 31 | 2039 | $105,486.00 | $314,886.00 | $420,372.00 |
| 32 | 2040 | $105,486.00 | $314,886.00 | $420,372.00 |
| 33 | 2041 | $105,486.00 | $314,886.00 | $420,372.00 |
| 34 | 2042 | $105,486.00 | $314,886.00 | $420,372.00 |
| 35 | 2043 | $105,486.00 | $314,886.00 | $420,372.00 |
| | | $4,834,775.00 | $6,108,245.00 | $10,943,020.00 |